# Exhibit 2 to
# Speight Declaration

## DECISION OF THE SERP APPEALS COMMITTEE
## REGARDING THE CLAIM FOR BENEFITS OF POPPI METAXAS

On March 23, 2017, the Supplemental Executive Retirement Plan Appeals Committee for Gateway Bank (the "Appeals Committee") met to hear Poppi Metaxas's appeal from the denial of her claim for disability and/or retirement benefits under Gateway Bank's Supplemental Executive Retirement Plan (the "SERP" or "Plan"). The appeal hearing was held at Gateway Bank located at 360 8th Street, Oakland CA. The Appeals Committee consisted of Gateway Bank directors Collin Madden, Dale McKinney, and Vinod Thukral. Ms. Metaxas was represented at the hearing by her counsel, Dan Feinberg, Esq. (of Feinberg, Jackson, Worthman & Wasow LLP) and her son, Dr. Bill Metaxas. Also attending were counsel for Gateway Bank, Jeffrey B. Kirschenbaum, Esq. and Raymond E. Loughrey, Esq. (of Kirschenbaum Law Corp.).

After careful consideration of Ms. Metaxas's claim, the facts and circumstances surrounding her employment and departure from Gateway Bank, all documents and evidence provided by Ms. Metaxas and Gateway Bank on this appeal, and the presentation and argument of counsel at the time of the hearing, Ms. Metaxas's appeal is DENIED.

## I.
## EVIDENCE PRESENTED TO AND CONSIDERED
## BY THE APPEALS COMMITTEE

By letter dated February 25, 2016, Gateway Bank denied Ms. Metaxas's claim for disability and/or retirements benefits under the SERP, and notified her of the right to an appeal:

> Pursuant to Section 8.3 of the SERP, if you disagree with this action, you may appeal this decision to the Committee for a full and fair review…. With such request, you must submit pertinent documents and comments in writing.

> The request for your appeal should contain an outline of the matter that you are appealing, along with any specific issues, comments or explanations of your position in this matter. You may submit any additional evidence or argument to support your position. You may also be provided, upon request and free of charge, reasonable access to and copies of all documents, records and other information relevant to your claim for benefits.

> … If you in fact timely file an appeal, the decision of the Committee with respect to your appeal will be final and binding.

(Ex. A-1, CLMREC 00014-00017). By letter dated August 15, 2016, Ms. Metaxas appealed the denial of her claim through her counsel Dan Feinberg (Ex. A, CLMREC 00003-00012) and submitted numerous documents relating to her claim and in support of her appeal. (Ex. A-1 to A-18, CLMREC 00013-00249). On February 21, 2017, Ms. Metaxas provided additional documents in support of her appeal (Exs. D, D-1 to D-3, CLMREC 00256-00276). These documents, together

with evidence submitted by Gateway Bank, were subsequently arranged by exhibits for ease of reference and copies were provided to all parties.

## II.
## MS. METAXAS'S EMPLOYMENT HISTORY WITH GATEWAY BANK

Ms. Metaxas was hired by Gateway Bank in 1995 as Chief Loan Officer/Chief Compliance Officer. (Ex. A, CLMREC 00003). She became Gateway Bank's President and Chief Executive Officer in 1998, and participated in the SERP. (*Id.*). Ms. Metaxas served as President and Chief Executive Officer of Gateway until spring 2010. (*Id.*). The parties dispute the exact date and circumstances of Ms. Metaxas's departure.

In 2008, the Office of Thrift Supervision ("OTS") conducted an examination of Gateway Bank.[1] The OTS concluded that Gateway's capital level was inadequate, and that Gateway had on its books an unacceptably high number of non-performing loans (also known as non-performing assets or "NPA") and properties acquired through foreclosure sales it conducted following default (also known as real estate owned or "REO"). (Ex. L, CLMREC 00407). As CEO, Ms. Metaxas was responsible for Gateway's compliance with OTS directives, and was charged with improving the bank's capital position while reducing the number of non-performing loans and foreclosure properties on Gateway's books.

According to an investigation conducted by the OTS, rather than trying to sell the NPA and the REO for the best possible prices on the open market, in 2009 Ms. Metaxas instead organized sham transactions to make it appear that Gateway's NPA and REO were sold at inflated prices. These transactions are referred to as the "Troubled Asset Sale" and the "Working Capital Loan." In so doing, she made false and misleading statements to Gateway's Board of Directors (the "Board") regarding the business purposes of the transactions, to induce the Board to approve them. (Ex. O, CLMREC 00520-524; 00529-535).

Gateway Bank contends that after the OTS shared the results of its investigation with the Board of Directors, the Board suspended Ms. Metaxas from employment on March 23, 2010 (Ex. G, CLMREC 00353) and later terminated her employment for malfeasance on April 29, 2010. (Ex. I, CLMREC 00367). Ms. Metaxas contends that she became disabled as of March 23, 2010 – the same date as her suspension -- and that on May 26, 2010, she submitted a letter of resignation to Gateway Board chairman Laurence Wang, claiming that was disabled and unable to return to work due to her treatment for ovarian cancer. (Ex. A, CLMREC 0004-0005); Ex. A-7, CLMREC 00170).

---

[1] The OTS was a United States federal agency under the Department of the Treasury that chartered, supervised, and regulated all federally chartered and state-chartered savings banks and savings and loans associations. In 2011, the OTS merged with the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corp., the Federal Reserve Board, and the Consumer Financial Protection Bureau. It ceased to exist as of October 19, 2011.

Ms. Metaxas was later indicted for her role in the fraudulent transactions, and in 2015 she pleaded guilty to bank fraud and acknowledged that she intentionally concealed the true facts about the Troubled Asset Sale and Working Capital Loan from Gateway's Board. The transcript of her guilty plea before United States District Judge Joseph F. Bianco states, in part:

> THE COURT: Ms. Metaxas, at this point I need you to tell me in your own words what you did that makes you guilty of Count One [conspiracy to commit bank fraud]....
>
> THE DEFENDANT: From 1996 until approximately March of 2010 I was the president and CEO of Gateway Bank, a federally chartered savings bank in California. In 2009 I acted and agreed with other [sic] to arrange certain transactions that would help make Gateway's books look more acceptable to the regulators. One set of transactions [the Working Capital Loan] included a loan to Gateway's biggest customer which in your Honor it was used to fund payments back to the bank in the form of down payments from three other entities that purchased certain assets that the regulators wanted off the bank's books [the Troubled Asset Sale].
>
> I knew that the customers used the money from the [Working Capital Loan] to fund the down payment to Gateway for the purchase of the assets [the Troubled Asset Sale].
>
> Taken together, these transactions did not actually improve the condition of the bank, and I did not provide the complete information about these transactions to Gateway's board which ultimately had to approve them.
>
>                                  \*\*\*
>
> THE COURT: When you agreed with other [sic] to commit, to be involved in this fraudulent scheme, did you do so knowingly and intentionally?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And you knew it was against the law to commit a fraudulent scheme like this, didn't you?
>
> THE DEFENDANT: Yes.
>
>                                  \*\*\*

THE COURT: All right. Ms. Metaxas, please stand. How do you now plead to Count One of the indictment 14-109, conspiracy to commit bank fraud, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: Did you do what you are charged with doing in Count One, Ms. Metaxas?

THE DEFENDANT: I did.

THE COURT: Are you pleading guilty because you are guilty?

THE DEFENDANT: Yes.

THE COURT: Are you pleading guilty voluntarily and of your own free will?

THE DEFENDANT: Yes.

(Ex. O, CLMREC 00520-524; 00529-535).

## III.
## MS. METAXAS'S MEDICAL HISTORY DURING
## HER EMPLOYMENT WITH GATEWAY BANK

Ms. Metaxas was diagnosed with Stage IIA ovarian cancer in May 2008. (Ex. A, CLMREC 00004; A-3, CLMREC 00034-00133; A-5 CLMREC 00155-00166). She underwent surgery that included an exploratory laparotomy, bilateral salpingo-oophorectomy, total abdominal hysterectomy, a bilateral periaortic and pelvic lymph node dissection, and removal of her omentum in June 2008. (*Id.*). Ms. Metaxas subsequently received standard adjuvant chemotherapy, consisting of six cycles of carboplatin and paclitaxel chemotherapy, from July to November 2008. (*Id.*). The record does not indicate exactly when Ms. Metaxas returned to work after her surgery, but as noted below she was again working full-time at least by September 18, 2008. (Ex. A-3, CLMREC 00035).

Ms. Metaxas produced medical records from her health care providers at Kaiser (Ex. A-3, CLMREC 00034-00133) that were reviewed and analyzed by the Appeals Committee, Ms. Metaxas's expert witness Steven Fugaro, M.D. and Gateway Bank's expert witness Ari David Baron, M.D. Both doctors prepared expert reports that were provided to the Appeals Committee. (Ex. A-5, CLMREC 00155-00166; Ex. G-2, CLMREC 00340-00351).

Ms. Metaxas's medical records for the period September 2008 through the date of her purported resignation on May 26, 2010, show, *inter alia*, the following:

**September 18, 2008**: Ms. Metaxas was examined by her oncologist, Dr. Supriya Rajpal. (Ex. A-3, CLMREC 00034-00037). Dr. Rajpal recorded that Ms. Metaxas had "diffuse myalgia and arthalgias" during the first ten days of her chemotherapy with "some relief" by taking Tylenol. (*Id.* at CLMREC 00035). Dr. Rajpal noted that Ms. Metaxas had no fevers, no oral ulcers, no nausea/vomiting, no diarrhea, no anorexia, and no fatigue. (*Id.*). Dr. Rajpal noted that Ms. Metaxas was "working full time" (*id*), that her general appearance was "well developed, well nourished and in no acute distress (*id.* at CLMREC 00036)," and that her past medical history included migraines and chronic back pain which were "stable." (*Id.*). Ms. Metaxas declined pain medications and antidepressants. (*Id.*).

**October 9, 2008**: Ms. Metaxas was examined by Dr. Rajpal. (Ex. A-3, CLMREC 00038-00041). Dr. Rajpal recorded "LE neuropathy b/l constant — not painful, not tripping." (*Id.* at CLMREC 00039). Dr. Rajpal found that Ms. Metaxas had no nausea/vomiting, no diarrhea, no oral ulcers, no myalgias/arthralgias, no depression, and no fevers." (*Id.*) Her general appearance was "well developed, well nourished, in no acute distress." (*Id.* at CLMREC 00040). Dr. Rajpal also wrote that Ms. Metaxas was "tolerating chemotherapy." (*Id.*) Her migraine and back pain were noted as "stable." (*Id.*)

**November 20, 2008**: Ms. Metaxas was examined by Dr. Rajpal. (Ex. A-3, CLMREC 00042-00045). Dr. Rajpal recorded "LE neuropathy b/l of toes," and that Ms. Metaxas had no falls, no diarrhea, no oral ulcers, and no fevers. (*Id.* at CLMREC 00043). Dr. Rajpal recorded reports of fatigue and hot flashes upon awakening. (*Id.*) Dr. Rajpal remarked that Ms. Metaxas's appearance was "well developed, well nourished, and in no distress" (*id.*), and that her chemotherapy "course [was] complicated by LE neuropathy." (*Id.* at CLMREC 00044). Her migraines were noted as "stable" (*id.*) and there is no mention of any current back pain.

No medical records were provided to the Appeals Committee for the period November 21, 2008 to May 27, 2009.

**May 28, 2009**: Ms. Metaxas was examined by Dr. Rajpal. (Ex. A-3, CLMREC 00046-00049). Dr. Rajpal recorded that Ms. Metaxas's CAT scans of her chest, abdomen and pelvis taken on May 7, 2009 were "stable." She also noted that Ms. Metaxas had "persistent UE/LE peripheral neuropathy - painful, hard to work on computer, wash dishes." (*Id.* at CLMREC 00047). Ms. Metaxas reported no abdominal pain and decreased hot flashes. (*Id.*). Dr. Rajpal described Ms. Metaxas's appearance as "well developed, well nourished, in no acute distress" and that she was wearing wrist braces. (*Id.*) Dr. Rajpal noted that her neuropathy "is improving." (*Id.* at CLMREC 00048). Her migraines were noted as "stable" (*id.*), and there is no mention of any current back pain.

**September 18, 2009**: Ms. Metaxas was examined by Dr. Rajpal. (Ex. A-3, CLMREC 00050-00053). Dr. Rajpal recorded that Ms. Metaxas had "intense b/l wrist pain involving thumbs and forearms" that "improves with braces." (*Id.* at CLMREC 00051). Dr. Rajpal noted that the wrist pain is "worse at night" and "worse with rotational movements of wrist," and that Ms. Metaxas was "still working on computer same amount." (*Id.*) Dr. Rajpal recorded "no numbness or tingling in fingers or toes," and described Ms. Metaxas's appearance as "well developed, well nourished, in no acute distress, wearing wrist braces b/l." (*Id.* at CLMREC 00052. Dr. Rajpal also

noted that Ms. Metaxas's wrist pain may be carpal tunnel syndrome rather than peripheral neuropathy and sent her to an orthopedic for an evaluation. (*Id.*). Her migraines were noted as "stable" (*id.* at CLMREC 00053), and there is no mention of any current back pain.

No medical records were provided to the Appeals Committee for the period September 19, 2009 through March 31, 2010.

**April 1, 2010**: Ms. Metaxas wrote to Dr. Rajpal that she "is not feeling well at all and need[s] an appointment please." (Ex. A-3, CLMREC 00054).

**April 6, 2010:** Ms. Metaxas was examined by Dr. Rajpal. (Ex. A-3, CLMREC 00055-00058). Dr. Rajpal's notes from that examination indicate reports of diffuse weakness, syncope, right groin pain, no abdominal pain, nausea, and vomiting one time per day. (*Id.* at CLMREC 00056). Dr. Rajpal reported no palpitations but that noted Ms. Metaxas had an irregular pulse, diarrhea twice per day, and had been "unable to work x couple of weeks." (*Id.* at CLMREC 00057). Dr. Rajpal described Ms. Metaxas's appearance as "tearful, in no acute distress." (*Id.*) She noted that Ms. Metaxas had "decreased wrist pain b/l after steroid injections – not wearing braces." (*Id.*) Further, Dr. Rajpal noted that her neuropathy/carpal tunnel syndrome had "improved" and called for a follow up with an orthopedic. (*Id.* at CLMREC 00058). Ms. Metaxas's migraines are noted as "stable" (*id.*) and there is no mention of any current back pain.

**April 9, 2010**: Ms. Metaxas was examined by Dr. Shandra Kazuko Yoshimi, an internist. (Ex. A-3, CLMREC 00059-00063). Dr. Yoshimi noted that Ms. Metaxas reported migraine headache, abdominal pain, and dizziness. (*Id.* at 00059-00063). Dr. Yoshimi noted that "3 months ago [Ms. Metaxas] developed dizziness, has had two syncopal episodes, upset stomach, R sided migraines associated with nausea" and "feels profound [sic] weak at times; stressed from work; had mild diarrhea that started in January that is now worse… nausea and occ vomiting." (*Id.* at CLMREC 00060). Dr. Yoshimi also noted that Ms. Metaxas had "normal muscle tone, no tremors, strength 5/5, normal gait and station, sensation intact." (*Id.* at CLMREC 00062). There is no mention of any current back pain.

**May 12, 2010**: Ms. Metaxas was again examined by Dr. Yoshimi for migraine headaches and dizziness. (Ex. A-3, CLMREC 00064-00067). Dr. Yoshimi recorded that "migraines occur daily … throbbing pain; worse with cough or sneezing; occ photophobia and phonophobia; occ nausea with migraines; started a few months ago; had normal head CT last month." Dr. Yoshimi recorded that Ms. Metaxas has had "episodes of unsteadiness where she feels as if she will lose balance while trying to rise from a sitting position," and "has fallen on a few occasions" which "started after her chemotherapy ongoing for more than one year." (*Id.* at CLMREC 00065). Her vital signs were reviewed, and she was "alert, well appearing and in no distress." (*Id.* at CLMREC 00066). Ms. Metaxas received medication for her migraines. (*Id.*).

**May 25, 2010**: Ms. Metaxas sent notes to Dr. Rajpal and Dr. Yoshimi stating that she continues to have strong upper body and head pain, and that her dizziness and drowsiness have intensified so that she needs to lay down frequently. She also wrote that she has been "unable to work since early April and do[es] not know what to do." (Ex. A-3, CLMREC 00068-00069).

**June 6, 2010**: Ms. Metaxas wrote to Dr. Rajpal that "The progressively worsening health challenges that I have dealing with [sic] for the last several months unfortunately forced me to resign from the job I love so much and have dedicated all my education and working career to." She also requested an appointment with Dr. Rajpal "to complete the required disability forms...." (Ex. A-3, CLMREC 00071).

**IV.**
**REVIEW OF CLAIM FOR TERMINATION AND/OR DISABILITY BENEFITS**

The Appeals Committee has authority to review Ms. Metaxas's appeal of the denial of her claim for termination and/or disability benefits pursuant to Section 8.3 of the SERP. That section provides:

> Review of Claim. Any person whose claim or request [for a benefit] is denied ... may request a review by notice given in writing to the Committee. The claim or request shall be reviewed by the Committee who may, but shall not be required to, grant the claimant a hearing. On review, the claimant may have representation, examine pertinent documents, and submit issues and comments in writing.

(Ex. A-2, CLMREC 00028). Section 8.4 of the SERP provides that the Appeals Committee's decision on review "shall be final and bind all parties concerned." (*Id.*).

**A.      MS. METAXAS WAS TERMINATED FOR CAUSE AND IS INELIGIBLE TO RECEIVE SERP BENEFITS**

Ms. Metaxas seeks termination benefits under the SERP. She argues that "[s]ince ... the Board did not change Ms. Metaxas's employment status pursuant to Section 3.2 during her employment with the Bank, [she] is entitled to receive her Accrued Benefit [pursuant to Section 5.3(b) of the SERP] determined as of May 26, 2010," the date she tendered a letter of resignation. (Ex. A, CLMREC 00008-000012).

Section 3.2 of the SERP states:

> Change in Employment Status. If the Board determines that a Participant's employment performance is no longer at a level which deserves reward through participation in this Plan, but does not terminate the Participant's employment with Employer, participation herein and eligibility to receive benefits hereunder shall be limited to the Participant's Accrued Benefit calculated on the date of the Change in Employment Status and shall only be payable if the Participant attains Retirement with Employer or becomes disabled while Employed by Employer.

(Ex. A-2, CLMREC 00025).

7

Section 5.3(b) of the SERP states:

> Notwithstanding Section 3.2, if a Participant's employment terminates prior to the participant's Retirement Date under any other circumstances than those described in Section 5.3(a), the benefit payable, in lieu of any other benefit under this Article V, shall be the Participant's Accrued Benefit determined on the date of termination. Payments shall commence at the participant's Retirement Date or as soon thereafter as allowed by law.

(Ex. A-2, CLMREC 00026).

The Appeals Committee disagrees, and finds that Ms. Metaxas is not entitled to receive termination benefits because she was fired for cause pursuant to Section 3.4 of the SERP prior to her alleged resignation. Section 3.4 states, in relevant part:

> Discharge for Cause. Notwithstanding Articles IV and V, no benefit shall be paid hereunder if a Participant's employment with Employer has been terminated for "cause." A termination for cause is a termination based upon the occurrence of any one of the following events:
>
> (a)     The Participant's willful and intentional violation of any state or federal banking or securities laws, or of the Bylaws, rules, policies or resolutions of Employer, or the rules or regulations of the Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, or other regulatory agency or governmental authority having jurisdiction over Employer, which has a material adverse effect upon Employer; ...

(Ex. A-2, CLMREC 00025).

Ample evidence shows Ms. Metaxas's willful and intentional violation of banking laws, most notably her own guilty plea. (Ex. O, CLMREC 00520-524; 00529-535). Minutes from the March 2010 Board of Directors meeting show that on March 23, 2010, after the OTS presented to the Board its findings of Ms. Metaxas's fraud against Gateway, the Board immediately suspended Ms. Metaxas without pay pending an investigation of the matter. The minutes state, in pertinent part:

> The Board noted the absences [sic] of Poppi Metaxas who was suspended as CEO on March 23, 2010 without pay pending an investigation of matters presented to the Board of Directors on March 23, 2010 by the OTS.

A detailed discussion was held by the Board on matters of day to day operations, responding to the OTS concerns and the implementation of the Banks [sic] management succession plan for the CEO.

\*\*\*

The Board of Directors met with Nick Dyer and others from the OTS to provide an update on the Boards [sic] actions and plan for day to day operations of the Bank following the suspension of Poppi Metaxas. The Board described the planed [sic] operations of the office of the CEO staffed by Jim Baxter, Larry Fentriss and Larry Wang consistent with the succession plan in place.

(Ex. J, CLMREC 00376).

Ms. Metaxas's suspension for malfeasance was confirmed by letter dated March 25, 2010, from Gateway Board chairman Laurence Wang to Nicholas J. Dyer, the Assistant Director (Western Division) of the OTS:

... consistent with the Board's fiduciary duty to the Bank, the Board voted yesterday to suspend Ms. Metaxas without pay, effective immediately, pending the conclusion of an independent internal investigation of these transactions that the Board will conduct through its Audit Committee and with the use of special outside counsel and any other consultants, as appropriate.

(Ex. K, CLMREC 00378). Mr. Wang also advised the OTS that immediately following the Board's vote to suspend her, Ms. Metaxas was barred from all physical and electronic access to the bank:

The Board instructed Bank employees immediately to revoke all access privileges to the Bank, including the Bank's physical offices and electronic systems, as well as any remote electronic access that Ms. Metaxas may have to Bank files, databases, e-mail system or other accounts. This included changing locks, key codes and passwords providing Ms. Metaxas with access to the Bank. In addition, Bank employees have been instructed not to discuss any Bank matters with Ms. Metaxas.... Please note that the suspension to Ms. Metaxas applies to all functions Ms. Metaxas performs at the Bank, as President and CEO.

(*Id*. at CLMREC 00378-379).

Other evidence presented to the Appeal Committee shows that the Board of Directors fired Ms. Metaxas for her misconduct on April 29, 2010. According to the OTS Report of Examination for the period February 22, 2010 through May 28, 2010:

> Management stability and the adequacy of management resources continue to be an ongoing concern. The bank's management structure is undergoing a significant transition. A formal OTS investigation into anomalies related to several transactions that occurred in 2009, resulted in the suspension of CEO Poppi Metaxas by the Board of Directors. The investigation focused on the involvement of Ms. Metaxas in the anomalies noted as well as her conduct as CEO. At the conclusion of our examination, the formal investigation was still ongoing.... As CEO, [Ms. Metaxas] was involved in all facets of the bank's operations and played a central role in management decision making. *At the board meeting held on April 29, 2010, the directors unanimously voted to terminate Ms. Metaxas' employment.*

(Ex. I, CLMREC 00367) (italics added).

Ms. Metaxas argues that she was not suspended or fired, and presented evidence showing she continued to receive direct deposit of her paychecks from March 19 through May 14, 2010 (Ex. A, CLMREC 00007), and a personnel record showing that she resigned effective May 26, 2010. (*Id.*, CLMREC 00005; Ex. A-8, CLMREC 00172). She also argues that the Board "was required to provide written notice to [her]" of her termination, which it purportedly failed to do. (Ex. A, CLMREC 00005).

The Appeals Committee considered this evidence and found it unpersuasive. First, Ms. Metaxas did not dispute the validity or authenticity of the minutes from the March 25, 2010 Board of Directors meeting or of the OTS Report of Examination noting her suspension and subsequent termination of employment. Second, the fact that Ms. Metaxas may have been paid following her suspension on March 23, 2010 may be attributed to error stemming from management instability and inadequate management resources as described by the OTS (Ex. I, CLMREC 00367), or from willful disregard of Gateway employees who previously served under her. The same is true for the processing of Ms. Metaxas's employee paperwork.

We also find that Ms. Metaxas's termination is best determined from the entirety of the circumstances, and not does simply hinge on receipt of written notice. The weight of the evidence show that Ms. Metaxas had been suspended, her physical and electronic access to the Bank had been revoked, and she was subsequently fired by unanimous decision of the Board on April 29, 2010 as reported by the OTS. Moreover, Ms. Metaxas's admitted breach of her covenant to perform her duties in "conformance with the highest standards of diligence, competence, skill, judgment, and efficiency in the Thrift industry" (Ex. A-9, CLMREC 00176) obviated any duty on the part of Gateway to provide her with formal written notice.

Accordingly, we find that Ms. Metaxas was terminated for cause and thus, pursuant to Section 3.4 of the SERP, is not entitled to receive termination benefits under the Plan.

## B. MS. METAXAS DID NOT BECOME DISABLED WHILE EMPLOYED BY GATEWAY BANK AND IS NOT ENTITLED TO DISABILITY BENEFITS

Alternatively, Ms. Metaxas seeks disability benefits under both prongs of Section 2.9 of the SERP. Section 2.9 of the Plan defines "Disability" as:

> (i) A medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, as a result of which the Participant is unable to engage in any substantial gainful activity; or

> (ii) An above-described impairment from which the Participant is receiving income replacement benefits for a period of not less than three (3) months under an accident and health plan covering employees of Employer.

### 1. Ms. Metaxas Was Not "Disabled" Within the Meaning of Section 2.9(i).

Ms. Metaxas claims she "was rendered unable to work due to CIPN [chemotherapy-induced peripheral neuropathy] and her other symptoms as of March 23, 2010" (Ex. A, CLMREC 00005), and subsequently "resigned from the Bank due to disability on May 26, 2010." (*Id.*). She thus contends she has met Section 2.9(i)'s definition of disability.

After carefully reviewing all evidence submitted to the Appeals Committee, we believe that Ms. Metaxas has not satisfied the definition of "Disability" under Section 2.9(i) of the SERP and therefore is not entitled to receive disability benefits under that section.

The overwhelming weight of the evidence supports this finding. Ms. Metaxas does not dispute that she continuously came to work until March 23, 2010, the date that the Board of Directors suspended her and revoked her physical and electronic access to Gateway Bank. (Ex. J, CLMREC 00376; Ex. K, CLMREC 00378-00379). She nonetheless claims that her disability began that *very same date*, which would be an astounding coincidence. Notably, as of May 26, 2010 – the date of her purported resignation – there is no evidence that Ms. Metaxas had been certified by a health care provider or an insurance company that she had a disability that left her no longer able to work.

Moreover, Ms. Metaxas produced no medical records for the six-month period prior to her suspension. Thus, there is no record of any neuropathy, migraine, back pain, or any other debilitating symptom, yet she would have us believe she was too disabled to go to work after March 23, 2010. Indeed, the last medical report was from September 18, 2009. It was only two weeks *after* her suspension, on April 6, 2010, that Ms. Metaxas first reported weakness, syncope, right groin pain, nausea, vomiting and diarrhea – symptoms that could be attributed to the stress

caused by the OTS's investigation into her fraud and suspension from employment, not from CIPN. In fact, Dr. Rajpal noted that Ms. Metaxas had *decreased* wrist pain after receiving steroid injections and was not wearing braces. Dr. Rajpal also noted that her neuropathy/carpal tunnel syndrome had actually improved, her migraines were stable, and there was no complaint of back pain. (Ex. A-3, CLMREC 00055-00058). While Dr. Rajpal's notes from April 6, 2010 state that Ms. Metaxas had been "unable to work x couple of weeks" (*id.* at CLMREC 00057), it appears Ms. Metaxas had not told Dr. Rajpal that she had been suspended from her employment.[2]

Records from the other two doctor examinations in April and May 2010 also do not support Ms. Metaxas's claim. On April 9, 2010, Dr. Yoshimi noted that Ms. Metaxas reported migraines, abdominal pain and upset stomach, dizziness starting "three months ago," two syncopal episodes, weakness, mild diarrhea. (Ex. A-3, CLMREC 00059-00063). But these symptoms are indicative of stress and not CIPN, and their appearance in January 2010 coincides with the OTS's investigation into Ms. Metaxas's illegal activities. As for CIPN, Dr. Yoshimi reported that Ms. Metaxas had "normal muscle tone, no tremors, strength 5/5, normal gait and station, sensation intact." (*Id.* at CLMREC 00062). As for migraines, this record is inconsistent with Dr. Rajpal's notes from three days prior, where Ms. Metaxas's migraines were described as "stable." While Ms. Metaxas reported being "stressed from work," she apparently failed to inform Dr. Yoshimi that she had been suspended because she was the target of a federal investigation. There is no indication that Ms. Metaxas was suffering from any back pain.

Over a month later, Dr. Yoshimi examined Ms. Metaxas for migraine headaches and dizziness. (Ex. A-3, CLMREC 00064-00067). Dr. Yoshimi recorded on May 12, 2010 that Ms. Metaxas experienced daily migraines with throbbing pain, occasional nausea with the migraines, and episodes of unsteadiness when rising from a sitting position. Dr. Yoshimi also noted that Ms. Metaxas "has fallen on a few occasions" which "started after her chemotherapy ongoing for more than one year." (*Id.* at CLMREC 00065). While Ms. Metaxas may indeed have been experiencing migraines, Dr. Yoshimi does not characterize them as so debilitating they rendered Ms. Metaxas unable to work, much less "expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months" as required by Section 2.9(i). Ms. Metaxas claims for the first time that she has experienced unsteadiness and has fallen ever since her chemotherapy for over a year, but none of the medical records she provided corroborates this. In fact, they show the opposite. The record from October 9, 2008 – during her chemotherapy – specifically states "no tripping reported." (*Id.* at CLMREC 00039). Similarly, the medical record from November 20, 2008 states "no falls." (*Id.* at CLMREC 00043). There is no mention of syncope in any of her medical records until April 6, 2010 (*id.* at CLMREC 00056), and the April 9, 2010 record indicates that she has a "normal gate and station." (*Id.* at CLMREC 00062).

---

[2] Ms. Metaxas submitted for our review a "Visit Verification/Family Leave Health Care Provider Certification" from Kaiser dated April 6, 2010; it states that she "has been unable and unable to attend work" from "now [April 5, 2010] until *4/30/10*" and is "undergoing diagnostic workup for multiple symptoms." (Ex. A-6, CLMREC 00168) (italics added). But Ms. Metaxas's employment already had been suspended, and there is no evidence that Ms. Metaxas obtained a certification to cover the period *after* April 30, 2010.

In support of her claim that she was disabled by CIPN, Ms. Metaxas submitted the expert report of Dr. Steven Fugaro. (Ex. A-5, CLMREC 00155-00159). Dr. Fugaro opined that Ms. Metaxas had "severe peripheral neuropathy as of March 2010" due to chemotherapy for ovarian cancer that had been completed in November of 2008. He wrote:

> Ms. Metaxas received 2 drugs, both of which are known to be frequently associated with CIPN. Her first drug, carboplatin, is a chemotherapy drug in the platinum group. CIP usually develops during platinum drug treatment and symptoms and signs may progress for 2 to 6 months after cessation of chemotherapy. Furthermore, symptoms can persist for years. .... In addition, her other chemotherapy drug, paclitaxel, is a taxane and also a common offender. This drug can itself produce a severe peripheral neuropathy and sensory effects are common. ... Studies have shown that 40% of patients receiving platinum drugs and paclitaxel in combination develop CIPN.

(*Id.* at CLMREC 00158).

We give Dr. Fugaro's report little weight. While he is undoubtedly a very fine doctor, Dr. Fugaro is board certified in Internal Medicine, not oncology. (Ex. A-5, CLMREC 00155). He is in full-time practice in general internal medicine and as a primary care physician. (*Id.*, at CLMREC 00161). His report does not state whether he has ever treated any women with ovarian cancer, whether he has any experience diagnosing or treating patients with CIPN, or whether he has any experience in chemotherapy, specifically the drug protocol of carboplatin and taxol that Ms. Metaxas received. He never examined or interviewed Ms. Metaxas, and his opinion is based solely on (1) Kaiser records from May 1, 2008 through July 15, 2015; (2) e-mails by Ms. Metaxas to Kaiser in 2010; (3) the Family Leave Health Care Provider certification dated April 6, 2008; and (4) a compilation of Kaiser patient discharge instructions dated June 6, 2008. (*Id.*, at CLMREC 00155). Dr. Fugaro gives no explanation why March 23, 2010 was chosen as the date of Ms. Metaxas's disability. He apparently had not been informed of the OTS's investigation of Ms. Metaxas in the winter and spring of 2010, or of her suspension from Gateway on March 23, 2010.

On the other hand, we give greater weight to the expert report of Dr. Baron. Dr. Baron is a diplomate in Medical Oncology, the chief of the Division of Hematology-Oncology at California Pacific Medical Center, holder of two faculty appointments as Associate Clinical Professor of Medicine, and runs the clinical trials program and quality improvement for oncology at California Pacific Medical Center. Over the course of his career he has treated hundreds of women with ovarian cancer (Ex. G-2, CLMREC 00340), and over a thousand patients with the carboplatin and taxol chemotherapy protocol. (*Id.* at CLMREC 00342). Dr. Baron did not examine Ms. Metaxas. His report is based on his reviewed of Ms. Metaxas's outpatient medical records from Kaiser, Dr. Fugaro's report, the March 25, 2010 correspondence between Gateway Bank and the OTS concerning the suspension of Ms. Metaxas's employment, and correspondence between counsel representing Gateway Bank and Ms. Metaxas. (*Id.*). Dr. Baron opined:

In summary, Ms. Metaxas suffered a chronic pain syndrome, with a paucity of neurologic signs or symptoms, which was [ultimately] diagnosed as fibromyalgia, with contributing symptoms from spinal arthropathy resulting in spinal cord compression and neural foramina compression. *None of her many providers, including her oncologist, neurologist, rheumatologist, and pain specialist believed this to be principally or even marginally due to her chemotherapy.*

\* \* \*

The drug combination of carboplatin and taxol is commonly used. In the initial description of the protocol [citation omitted], no patients reported grade 3 neuropathy. In a more recent study looking at the same drugs given weekly or every 3 weeks, [citations omitted] the grade 3 peripheral neuropathy was reported at 7%. Grade 3 neuropathy is considered severe enough that it interferes with activities of daily living.

In my 20 year practice, I have treated over a thousand patients with this protocol, and I have never seen anyone present with the symptoms that Metaxas had from chemotherapy.

(Ex. G-2, CLMREC 00342) (italics added). With respect to the severity and history of fibromyalgia and neuropathy related to Ms. Metaxas's osteoarthritis, he opined that:

in general these phenomena wax and wane, and may get better with adequate treatment. This is born out in her medical records where she has better days, and flares of pain. The flares are treated with steroid injections and pain medicines, with adequate relief.

\* \* \*

My conclusion would thus be that this does not constitute a condition whereby Metaxas would be unable to engage in any substantial gainful activity for a continuous period of not less than a year.

(*Id.*, at CLMREC 00342-00343). We believe that Dr. Baron's expert is highly credible given his extensive experience in this field, and his treatment of hundreds of women with ovarian cancer and over a thousand patients treated with the chemotherapy protocol Ms. Metaxas received.

Finally, we give little weight to the decision of the Social Security Administration, dated November 1, 2011, finding that Ms. Metaxas's disability began on March 23, 2010. (Ex. A-10, CLMREC 00207-00214). There is no explanation as to why this date was chosen, or whether the Attorney Advisor who made the decision was aware of Ms. Metaxas's suspension from employment as of that date. Further, we note that the same Attorney Advisor disregarded the

findings of the State's own medical consultative examiner. The examiner opined that Ms. Metaxas:

> could stand and walk for 2-4 hours in an 8-hour workday and lift and carry 10 and 20 pounds. She had extensive sensory loss in the hands but could [unintelligible] finger on an occasional basis. She had occasional postural restrictions except for squatting, which would be difficult. .... [Ms. Metaxas] could perform light exertional level work, and that she had normal neurological exam in January 2011 by the treating physician. The adjustment disorder identified by the consultative examiner was not severe as that term was defined in the regulations.

(*Id.*, at CLMREC 00214). The Attorney Advisor's conclusion that the State consultant's physical assessment "did not adequately consider the combined effect of the claimant's impairments" does not make sense given his specific findings.

As the various reports cited above suggest, that a person has a medical diagnosis does not by itself establish disability. Medical treatises list hundreds of medical conditions that do not necessarily prevent people from working. After a certain age, most people have pain, in various parts of their body, and they often have other medical conditions. Sometimes their medical conditions are so severe that they cannot work, and sometimes people are able to work despite their conditions. But whether a condition should be treated by plan administrators as disabling in a particular case is a medical and administrative judgment committed to the discretion of the plan administrator based on a fair review of the evidence.

2.. Ms. Metaxas Was Not "Disabled" Within the Meaning of Section 2.9(ii).

Disability benefits are payable under SERP Section 3.2 only if an employee "becomes disabled *while* Employed by Employer." (Ex. A-2, CLMREC 00025) (italics added). Section 2.9(ii) defines "Disability" as an impairment for which a participant "*is receiving* income replacement benefits for a period of not less than three (3) months under an accident and health plan covering employees of Employer." (*Id.*, CLMREC 00024) (italics added). Thus, a participant must show that he or she "is receiving income replacement benefits" *while* an employee of Gateway Bank to be deemed disabled under Section 2.9(ii). The Appeals Committee interprets this section to cover situations where, for example, an employee is on extended sick leave (but has not resigned or been terminated) and is receiving income replacement benefits. In such a situation, there is a high probability that such participant will not be able to return to work. Here, however, Ms. Metaxas adduced no evidence that she received income replacement benefits *while* she was employed at Gateway Bank.[3] The evidence instead shows that Ms. Metaxas first applied for

---

[3] Assuming *arguendo* that Ms. Metaxas's "disability" began on March 23, 2010, the UNUM policy requires that a 90-day elimination period "must be satisfied before you are eligible to receive benefits." (Exh. E). As of the date of her termination for cause on April 29, 2010, Ms. Metaxas had not yet satisfied the 90-day elimination period and thus was not yet even eligible to receive income replacement benefits under the UNUM policy.

disability benefits under the UNUM policy sometime in late July or early August 2010, and that she received disability payments retroactive to late June 2010 -- well after the date of both her suspension (March 23, 2010) and her purported resignation (May 26, 2010). (Exhs. A-12, A-13).

At the hearing, Ms. Metaxas's counsel argued that disability benefits would be "illusory" if the Appeals Committee "insisted upon a literal interpretation" of Section 2.9(ii). The Appeals Committee disagrees. Gateway's interpretation not only supports the above-described policy considerations behind Section 2.9(ii), but follows its common-sense meaning "in an ordinary and popular sense as would a person of average intelligence and experience." (Ex. A at p. 7). On the other hand, under Ms. Metaxas's interpretation a participant could be eligible for disability benefits any time *after* her employment with Gateway has terminated, without any apparent limitation. To qualify for disability benefits under these circumstances, Section 2.9(ii) would need to use the future tense, *i.e.*, "is receiving *or will* receive income replacement benefits for a period of not less than three (3) months....."

## V.
## CONCLUSION

For all the reasons stated above, Ms. Metaxas's claim for termination and/or disability benefits under the SERP is DENIED.

Federal regulations require that the Appeals Committee advise all claimants that after a claimant's appeal has been finally decided, the claimant may bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

Dated: 5-22-2017
                                  Collin Madden

Dated: _____
                                  Dale McKinney

Dated: _____
                                  Vinod Thurkal

disability benefits under the UNUM policy sometime in late July or early August 2010, and that she received disability payments retroactive to late June 2010 -- well after the date of both her suspension (March 23, 2010) and her purported resignation (May 26, 2010). (Exhs. A-12, A-13).

At the hearing, Ms. Metaxas's counsel argued that disability benefits would be "illusory" if the Appeals Committee "insisted upon a literal interpretation" of Section 2.9(ii). The Appeals Committee disagrees. Gateway's interpretation not only supports the above-described policy considerations behind Section 2.9(ii), but follows its common-sense meaning "in an ordinary and popular sense as would a person of average intelligence and experience." (Ex. A at p. 7). On the other hand, under Ms. Metaxas's interpretation a participant could be eligible for disability benefits any time *after* her employment with Gateway has terminated, without any apparent limitation. To qualify for disability benefits under these circumstances, Section 2.9(ii) would need to use the future tense, *i.e.*, "is receiving *or will* receive income replacement benefits for a period of not less than three (3) months....."

## V.
## CONCLUSION

For all the reasons stated above, Ms. Metaxas's claim for termination and/or disability benefits under the SERP is DENIED.

Federal regulations require that the Appeals Committee advise all claimants that after a claimant's appeal has been finally decided, the claimant may bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

Dated:_____

Dated: 5/19/17

_____
Collin Madden

*Roger P. McKinneY*
Dale McKinney

Dated:_____

_____
Vinod Thurkal

16

disability benefits under the UNUM policy sometime in late July or early August 2010, and that she received disability payments retroactive to late June 2010 -- well after the date of both her suspension (March 23, 2010) and her purported resignation (May 26, 2010). (Exhs. A-12, A-13).

At the hearing, Ms. Metaxas's counsel argued that disability benefits would be "illusory" if the Appeals Committee "insisted upon a literal interpretation" of Section 2.9(ii). The Appeals Committee disagrees. Gateway's interpretation not only supports the above-described policy considerations behind Section 2.9(ii), but follows its common-sense meaning "in an ordinary and popular sense as would a person of average intelligence and experience." (Ex. A at p. 7). On the other hand, under Ms. Metaxas's interpretation a participant could be eligible for disability benefits any time *after* her employment with Gateway has terminated, without any apparent limitation. To qualify for disability benefits under these circumstances, Section 2.9(ii) would need to use the future tense, *i.e.*, "is receiving *or will* receive income replacement benefits for a period of not less than three (3) months....."

## V.
## CONCLUSION

For all the reasons stated above, Ms. Metaxas's claim for termination and/or disability benefits under the SERP is DENIED.

Federal regulations require that the Appeals Committee advise all claimants that after a claimant's appeal has been finally decided, the claimant may bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").


Dated:_____          _____
                                 Collin Madden

Dated:_____          _____
                                 Dale McKinney

Dated:___5/19/2017___            _____
                                 Vinod Thukral
                                 vt