UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Poppi Metaxas,

Plaintiff,

Vs.

Gateway Bank, F.S.B., and The Gateway Bank Supplemental Executive Retirement Plan, Defendants.

Judge: Edward M Chen
Case #: 3:20-cv-01184

## Declaration of Mrs. Poppi Metaxas

I, Poppi Metaxas, of Hillsborough, California, declare:

1. I am submitting this declaration in support of Plaintiff's Motion for Summary Judgment. If called, I could and would testify to the information which follows.

2. Background

    a. I joined Gateway Bank, FSB in 1995 as Chief Lending Officer and Chief Compliance Officer and led the bank as President and CEO from 1998 until my resignation due to disability on May 26, 2010.

    b. Gateway Bank's Board of Directors awarded me a Resolution of Appreciation for "sustained and substantial growth, outstanding achievements in asset and profit growth, innovative products, expansion of services, high customer satisfaction, technological sophistication, development of highly competent staff, and the respect and encouragement of the Office of Thrift Supervision" on July 25, 2002.

    c. Under my leadership, in 2003 and 2004, Gateway's success included distinction by the American Bankers Association Banking Journal as the first and second bank in its class in terms of return on equity, at 47% and 45%, respectively.

    d. On January 1, 2005, a supplemental executive retirement plan (SERP) was created to reward my successful leadership and retain my employment. I am the sole eligible participant of the plan.

    e. I was the Bank Administrator of Fremont Bank from approximately 1992 to 1995.

    f. I began my career with Bank of America in 1972 and worked until my resignation in 1992 as a Senior Vice President, in charge of the Golden Gate District, made up of 25 bank branches and approximately 500 employees, managing approximately $10 Billion in assets.

    g. I completed a Bachelor of Science in Economics from the University of San Francisco in 1978.

    h. I have been a shareholder of Gateway Bank, FSB from 1995 to the present day.

3. Professional Knowledge and Specialization

    a. I have executive-level banking experience since approximately 1985.

    b. During my tenure, I successfully led Gateway out of a series of regulatory capital directives and cease and desist orders placed prior to my employment with the bank. I enjoyed a respectful and productive relationship with all bank regulators, including OTS, FDIC, the Federal Reserve and The Federal Home Loan Bank.

    c. I have expert-level knowledge of Gateway Bank's corporate and financial records as a result of my employment as its CEO and board member from 1995 to 2010.

    d. I have expert-level knowledge with CEO-level preparation of institutional financial statements as well as regulatory oversight and compliance. I have expert-level knowledge and experience with the calculation of financial calculations including asset and liability amounts as well as bank financial ratios as calculated by management and regulatory agencies.

4. Evidence. I reviewed the following evidence to prepare this declaration:

    a. Exhibit 1. GWB's OTS 2009.04.29 Cease and Desist Order
    b. Exhibit 2. GWB's OCC 2011.10.26 Consent Order
    c. Exhibit 3. GWB's FDIC Financial Reports of 2010.03.31
    d. Exhibit 4. GWB's Audited Financial Statements of 2010.06.30
    e. Exhibit 5. GWB's FDIC Financial Reports of 2016.03.31
    f. Exhibit 6. GWB's Audited Financial Statements of 2014.12.31
    g. Exhibit 7. 2004.12.23 Metaxas Salary Deferral for first NY Life Insurance Premium Payment

    These documents are attached hereto as the Exhibit numbers referenced above.  Each is a true and correct copy of that full document or an excerpt thereof as explained herein.

**Facts, Data, and Conclusions**

1. OTS 2009.04.29 Cease and Desist Order No.: WN-09-007
    a. Source of Receipt: https://www.occ.gov/static/ots/enforcement/97103.pdf

    b. Conclusions:
        i. Gateway Bank was mandated by regulators to maintain:
            1. tier one (core) capital of at least seven percent and
            2. a total risk-based capital ratio of at least 14% (Page 2)

        ii. Gateway Bank was also directed to address matters related to its business plan, asset quality, management, liquidity, and compliance management, and was placed on several operating restrictions.

2. OCC 2011.10.26 Consent Order #2011-163

    a. Source of receipt: https://www.occ.gov/static/enforcement-actions/ea2011-163.pdf

    b. Conclusions:
        i. The Office of the Comptroller of Currency became Gateway Bank's primary regulator in approximately 2011 and superseded OTS order WN-09-007 with this consent order #2011-163.

        ii. Gateway Bank was mandated by regulators to maintain:
            1. tier 1 capital at least equal to nine percent (9%) of adjusted total assets and
            2. total risk-based capital at least equal to thirteen percent (13%) of risk-weighted assets. (Page 6-7)

        iii. Gateway's Board was specifically directed to "ensure that within thirty (30) days of the date of this Order, the Bank's books, records and internal management information systems (MIS) are restored to a complete and accurate condition." (Page 18)

        iv. Gateway Bank was also directed to address matters related to compliance, strategic plan, capital plan, and higher minimums, Quick$ale® program limits, allowance for loan and lease losses, the concentration of assets, liabilities, and off-balance sheet positions, third party contracts, employment and compensation agreements, books and records, and violations of law.

3. GWB FDIC Financials 2010.03.31

    a. Source of Receipt: https://www7.fdic.gov/idasp/advSearchLanding.asp
        i. Gateway Bank, FSB FDIC Certificate Number 33103

    b. Conclusion:

    i. As of March 31, 2010, the value of the Bank's total equity capital (assets minus liabilities) was $23.703 million (FDIC Exh.3, Line 25) and its core capital is listed as 7.31%. (FDIC Exh.3, Line 109).

    ii. Without the SERP recapture of $1.2M referenced by Tim Green in his exit interview, GWB's core capital would have been approximately 6.94%, Therefore, Gateway Bank would NOT have been in compliance with the OTS order.
1. 23.703 - 1.2 = 22.503
2. (22.503 / 23.703) * 7.31% = 6.94%

4. GWB Audited Financials as of 2010.06.30 (Excerpt)

    a. Source of Receipt: The Audited Financials were mailed to me by GWB as a shareholder.

    b. Conclusion: Gateway's annual financial statements report:
        i. The bank was not in full compliance with the order and was negotiating with regulators.
        ii. Bank regulators were considering mandating even further increased capital requirements.
        iii. If the Bank was not successful in its negotiations, it may have been required to rapidly raise new capital, reduce its balance sheet, and sell or liquidate the institution.

5. GWB FDIC Financials 2016.03.31

    a. Source of Receipt: https://www7.fdic.gov/idasp/advSearchLanding.asp
        i. Gateway Bank, FSB FDIC Certificate Number 33103

    b. Conclusion
        i. Gateway's Total Equity Capital on March 31, 2016, had fallen to $8.018M, which included the $1.2M recapture of the SERP liability.

        ii. Gateway's Core Capital Ratio had fallen to 5.49% on March 31, 2016.

        iii. Absent the $1.2M recapture, Gateway's core capital ratio would have been 4.67%, just over half the 9% mandate of the OCC Order.
1. 8.018-1.2 = 6.818
2. (6.818 / 8.018)* 5.49% = 4.67%

6. GWB Audited Financials as of 2014.12.31

    a. Source of Receipt: The Audited Financials were mailed to me by GWB as a shareholder.

    b. Conclusion: Page 25 (Regulatory Matters) Gateway's annual financial statements report:
        i. Gateway Bank was still not in full compliance with the OCC Order.

      ii. There is no assurance the Bank will be successful in executing the terms of the Order.

      iii. If the Bank is not successful in its compliance with the requirements of the Order it may receive a prompt corrective action and may be required to sell, liquidate or merge the Bank or in the event of a material decline in the capital levels, could be subject to FDIC receivership.

7. GWB Business Meeting 2013.10.22

    a. Source of Receipt: Administrative Record Exhibit D1, CLMREC259 (Excerpt)

    b. Citations: Tim Green States:
        i. Page 56: "Based on our reading of the policy, signed off by Perry Smith, Poppi did not meet the vesting requirements. And we, therefore, recaptured the SERP in March 2010 and brought that into the income.
        ii. Page 57 The value of the SERP is "Million 2".

    c. Conclusions:

        i. The elimination of the SERP liability of $1.2M immediately increased GWB's capital by $1.2M. CFO Green said he recaptured that amount into income, income automatically increases GWB's capital, all else equal.

        ii. The elimination of the SERP liability had the effect of placing the bank's equity capital in direct offset to my benefits payments under the SERP.

8. PM's deferred salary paid for the Insurance policy

    a. Source of Receipt: Initial Statement, NY Life Policy, and Statement mailed to me personally at the Bank.

    b. I deferred a portion of my salary to pay for the bank-owned life insurance policy in the amount of approximately $25,000 per month or $300K per year from 2004 until my resignation in 2010.

    c. By entering into the split-dollar endorsement for the SERP, I maintained property rights on a portion of the associated New York Life Insurance policy on my life in the amount of $1,851.543, to be paid to my husband, son, or brother in the event of my untimely death while employed at the Bank.

9. My calculations regarding what the effects of granting the SERP benefits would been on the value of the Bank's total equity and the value of Mr. Keefe's and Mr. Madden's stockholdings at contained in Exhibit 8 attached hereto.

10. My calculations of the value of the past due SERP benefits potentially owed to me are attached as Exhibit 9 hereto.

11. Interest and Financing Costs Incurred due to SERP Denial

As a result of the denial of my SERP, I incurred interest and financing costs of $2,152,610.86, documented and itemized in Exhibits 10-14 attached hereto which contain true and correct copies of the documentation relating to those costs.

As a result of the denial of my SERP benefits and the associated lack of income, starting with 2016, I ended up having to enter into expensive hard money borrowing with the assistance of my ex-husband and his company Ionian venture Partners. They agreed to borrow on my behalf not only because I was physically unable to handle such issues at that time, but also did not have the income to qualify either. To secure their interests I then either pledged my Real Estate equity on two properties as collateral to secure their loans and signed promissory notes agreeing to fully reimburse them for their borrowing costs either out of my SERP benefis –if they ever materialized- or by tendering my equity in the subject properties (75 San Pablo Ave San Francisco CA 94127 and 25 Edessa Court in Hillsborough CA 94110). For the third loan, I tendered to them 100% of my equity without consideration, so they would be able to secure financing as per the terms of the lender. The Agreement, described in my promissory note to them specifies that once I pay the loan in full the equity I had will be returned back to my name.

These arrangements were and continue to be financially challenging, but they were my only alternative given the circumstances. It is therefore my hope that the Court will take the hardship that the unfair and in my opinion inappropriate denail of my SERP benefits has caused me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and that this declaration was executed at Hillsborough, California on July 8, 2022.

Signed,

*[signature: Poppi Metaxas]*

Poppi Metaxas