**#2011-163**

*Also Terminates* **#WN-09-0007**

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| **In the Matter of:** | ) | AA-EC-11-90 |
| Gateway Bank, F.S.B. | ) | |
| San Francisco, CA | ) | |

**CONSENT ORDER**

**WHEREAS**, the Comptroller of the Currency of the United States of America ("Comptroller"), has supervisory authority over Gateway FSB, San Francisco, CA ("Bank");

**WHEREAS**, the Bank, by and through its duly elected and acting Board of Directors ("Board"), has executed a Stipulation and Consent to the Issuance of a Consent Order ("Stipulation and Consent"), dated October 26, 2011, that is accepted by the Comptroller through his duly authorized representative; and

**WHEREAS**, by this Stipulation and Consent, which is incorporated by reference, the Bank, has consented to the issuance of this Consent Order ("Order") by the Comptroller.

**NOW, THEREFORE**, pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818, the Comptroller hereby orders that:

ARTICLE I

COMPLIANCE COMMITTEE

(1)     Within five (5) days, the Board shall appoint a Compliance Committee of at least three (3) directors, none of whom shall be employees, former employees or controlling shareholders of the Bank or any of its affiliates (as the term "affiliate" is defined in 12 U.S.C. §1468(a) and § 371c ), or a family member of any such person.  Upon appointment, the names of the members of the Compliance Committee and, in the event of a change of the membership, the name any new member shall be immediately submitted in writing to the Director for Special

Supervision ("Director").  The Compliance Committee shall be responsible for monitoring and

coordinating the Bank's adherence to the provisions of this Order.

(2)       The Compliance Committee shall meet at least monthly.

(3)       Within thirty (30) days of the date of this Order and every thirty (30) days

thereafter or within such other time period as the Director requires in writing, the Compliance

Committee shall submit a written progress report to the Board setting forth in detail:

(a)       a description of the actions needed to achieve full compliance with each

Article of this Order;

(b)       actions taken to comply with each Article of this Order; and

(c)       the results and status of those actions.

(4)       The Board shall forward a copy of the Compliance Committee's progress reports,

with any additional comments by the Board, to the Director within ten (10) days of receiving

such reports.

ARTICLE II

STRATEGIC PLAN

(1)       Within sixty (60) days of the date of this Order, the Board shall develop and

forward to the Director for his review, pursuant to paragraph (3) of this Article, a written

Strategic Plan for the Bank that is acceptable to the Director, covering at least a three-year

period.  The Strategic Plan shall establish objectives for the Bank's overall risk profile, earnings

performance, growth, balance sheet mix, off-balance sheet activities, liability structure, capital

adequacy, reduction in the volume of classified and non-performing assets, product line

diversification, and market segments that the Bank intends to promote or develop, together with

strategies to achieve those objectives, and shall, at a minimum, include:

(a)      a mission statement that forms the framework for the establishment of strategic goals and objectives;

(b)      a description of the Bank's targeted market(s) and an assessment of the current and projected risks and competitive factors in its identified target market(s);

(c)      the strategic goals and objectives to be accomplished, including specific time frames;

(d)      specific actions designed to improve Bank earnings and accomplish the identified strategic goals and objectives;

(e)      specific actions designed to reduce the Bank's levels of classified and nonperforming assets;

(f)      identification of Bank personnel to be responsible and accountable for achieving each goal and objective of the Strategic Plan;

(g)      a financial forecast, to include projections for major balance sheet and income statement accounts, targeted financial ratios, and growth projections over the period covered by the Strategic Plan;

(h)      a description of the assumptions used to determine financial projections and growth targets;

(i)      an identification and risk assessment of the Bank's present and planned future product lines (assets and liabilities) that will be utilized to accomplish the strategic goals and objectives established in the Strategic Plan, with the requirement that the risk assessment of new product lines must be completed prior to the offering of such product lines;

(j)      a description of control systems to mitigate risks associated with planned

new products, growth, or any proposed changes in the Bank's markets;

(k)      an evaluation of the Bank's internal operations, staffing requirements,

Board and management information systems, and policies and procedures for

their adequacy and contribution to the accomplishment of the goals and objectives

established in the Strategic Plan;

(l)      a management employment and succession program to promote the

retention and continuity of capable management;

(m)      assigned responsibilities and accountability for the strategic planning

process, new products, growth goals, and proposed changes in the Bank's

operating environment; and

(n)      a description of systems designed to monitor the Bank's progress in

meeting the Strategic Plan's goals and objectives.

(2)      If the Board's Strategic Plan under paragraph (1) of this Article includes a sale,

merger, or liquidation of the Bank, the Strategic Plan shall, at a minimum, address the steps that

will be taken and the associated timeline.

(3)      Prior to adoption by the Board, a copy of the Strategic Plan shall be submitted to

the Director for review and prior written determination of no supervisory objection.  The Board

shall review and update the Bank's Strategic Plan at least annually and more frequently if

necessary or required by the Director in writing.  Revisions to the Bank's Strategic Plan shall be

submitted to the Director for a prior written determination of no supervisory objection.  At the

next Board meeting following receipt of the Director's written determination of no supervisory

objection, the Board shall adopt and the Bank (subject to Board review and ongoing monitoring)

shall implement and thereafter ensure adherence to the Strategic Plan and any amendments or revisions thereto.

(4)     At least monthly, the Board shall review financial reports and earnings analyses prepared by the Bank that evaluate the Bank's performance against the goals and objectives established in the Strategic Plan, as well as the Bank's written explanation of significant differences between actual and projected balance sheets, income statements, and expense accounts, including descriptions of extraordinary and/or nonrecurring items.

(5)     At least quarterly, the Board shall prepare a written evaluation of the Bank's performance against the Strategic Plan, based on the Bank's monthly reports, analyses, and written explanations of any differences between actual performance and the Bank's strategic goals and objectives, and shall include a description of the actions the Board will require the Bank to take to address any shortcomings, which shall be documented in the Board meeting minutes.  Within ten (10) days of completing its evaluation, the Board shall submit a copy to the Director.

(6)     Until the Strategic Plan required under this Article has been submitted by the Bank for Director review, has received a written determination of no supervisory objection from the Director, and is being implemented by the Bank, the Bank shall not significantly deviate from the products, services, asset composition and size, funding sources, structure, operations, policies, procedures, and markets of the Bank that existed before this Consent Order without first obtaining the Director's prior written determination of no supervisory objection to such significant deviation.  Any request to the Director for prior written determination of no supervisory objection to a significant deviation must be submitted in writing to the Director at least thirty (30) days in advance of the proposed significant deviation and shall include:

(a)     an assessment of the adequacy of the Bank's management, staffing levels, organizational structure, financial condition, capital adequacy, funding sources, management information systems, internal controls, and written policies and procedures with respect to the proposed significant deviation; and

(b)     the Bank's evaluations of its capability to identify, measure, monitor, and control the risks with the proposed significant deviation.

(7)     For the purposes of this Article, changes that may constitute a significant deviation from the Strategic Plan include, but are not limited to, a change in the Bank's products and services, marketing strategies, marketing partners, underwriting practices and standards, credit administration, account management, collection strategies or operations, fee structure or pricing, accounting processes and practices, or funding strategy, any of which, alone or in aggregate, may have a material impact on the Bank's operations or financial performance; or any other changes in personnel, operations, or external factors that may have a material impact on the Bank's operations or financial performance.

ARTICLE III

<u>CAPITAL PLAN AND HIGHER MINIMUMS</u>

(1)     The Bank shall within one hundred and eighty (180) days of the date of this Order achieve, and thereafter maintain, the following minimum capital ratios (as defined in 12 C.F.R. Part 167)[1]:

(a)     Total risk-based capital at least equal to thirteen percent (13%) of risk-weighted assets;

---

[1] The requirement in this Order to meet and maintain a specific capital level means that the Bank may not be deemed to be "well capitalized" for purposes of 12 U.S.C. § 1831o and 12 C.F.R. Part 165, pursuant to 12 C.F.R. § 165.4(b)(1)(iv).

(b)     Tier 1 capital at least equal to nine percent (9%) of adjusted total assets.

(2)     Within sixty (60) days of the date of this Order, the Board shall develop and forward to the Director for his review, pursuant to paragraph (5) of this Article, a written three (3) year Capital Plan for the Bank.  The Capital Plan shall be consistent with the Strategic Plan and shall include:

(a)     specific plans for the maintenance of adequate capital that may in no event be less than the requirements of paragraph (1) of this Article;

(b)     quarterly projections for growth and capital requirements based upon a detailed analysis of the Bank's assets, liabilities, earnings, fixed assets, and off-balance sheet activities;

(c)     the sources and timing of additional capital to meet the Bank's current and future needs;

(d)     identification of the primary sources from which the Bank will maintain an appropriate capital structure to meet the Bank's needs; and

(e)     contingency plans that identify alternative sources and methods to strengthen capital, should the primary source(s) under paragraph (2)(d) of this Article not be available.

(3)     If the Bank's Capital Plan is entirely or partially based on recapitalizing the Bank through a stock offering, the Capital Plan shall: (i) identify the names of investors who have submitted paid-in stock subscriptions that are irrevocable pursuant to the terms of the stock offering and pursuant to applicable law; (ii) specify the amount of capital to be raised through the stock offering that is (either alone or combined with other sources of capital) consistent with the capital levels in the Capital Plan; (iii) provide an explanation of actions taken to comply with all

applicable securities laws and to obtain any necessary shareholder approvals; and (iv) include a

time line with specific and targeted deadlines for completing all steps necessary to successfully

close the offering.

(4)      If the Bank's Capital Plan outlines a sale or merger of the Bank, the Capital Plan

shall, at a minimum, address the steps that will be taken and the associated timeline to ensure

that within ninety (90) days after the receipt of the Director's written determination of no

supervisory objection to the Capital Plan, a definitive agreement for the sale or merger is

executed.

(5)      Prior to the adoption by the Board, a copy of the Bank's Capital Plan shall be

submitted to the Director for a prior written determination of no supervisory objection.  The

Board shall review and update the Bank's Capital Plan at least annually and more frequently if

necessary or if required by the Director in writing.  Revisions to the Bank's Capital Plan shall be

submitted to the Director for prior written determination of no supervisory objection.  At the next

Board meeting following receipt of the Director's written determination of no supervisory

objection, the Board shall adopt, and the Bank (subject to Board review and ongoing monitoring)

shall implement and thereafter ensure adherence to the Capital Plan and any amendments or

revisions thereto.

(6)      If the Bank fails to maintain the level of capital required by paragraph (1) of this

Article, or violates paragraph (2), then the Bank shall be deemed undercapitalized for purposes

of this Agreement, and the Bank shall take such corrective measures as the OCC may direct from

among the provisions applicable to undercapitalized depository institutions under 12 U.S.C.

§ 1831o(e) and 12 C.F.R. Part 165.  For purposes of this requirement, an action "necessary to

carry out the purpose of this section" under 12 U.S.C. § 1831o(e)(5) shall include restoration of

the Bank's Tier 1 capital to the minimum levels required by this Agreement, and any other action deemed advisable by the OCC to address the Bank's capital deficiency or the safety and soundness of its operations.

(7)     The Bank may pay a dividend or make a capital distribution only:

(a)     when the Bank is in compliance with its approved Capital Plan and would remain in compliance with its approved Capital Plan immediately following the payment of any dividend;

(b)     when the Bank is in compliance with 12 C.F.R. Part 163, Subpart E;

(c)     when the Bank is in compliance with the minimum capital ratios set forth in paragraph (1) of this Article; and

(d)     following the prior written determination of no supervisory objection by the Director.

## ARTICLE IV

## QUICK$ALE PROGRAM LIMITS

(1)     Effective immediately, the Bank's total dollar exposure as calculated at the beginning and the end of each business day to any one mortgage originator under the Bank's Quick$ale Program shall not exceed twenty-five percent (25%) of the Bank's prior month end level of Tier 1 capital plus Allowance for Loan and Lease Losses (ALLL).  The Bank should calculate the 25% limit by subtracting cash deposits from the total exposure to any one mortgage originator when the cash deposits are held in demand deposit accounts (DDA) and/or Curtailment accounts that are contractually obligated to remain in place until released by the Bank.

(2)     Effectively, immediately, the Bank's aggregate pipeline, warehouse and credit-enhancing repurchase total dollar exposure as calculated at the beginning and end of each business day from any single non-Government Sponsored Enterprise (GSE) investor under the Bank's Quick$ale Program shall not exceed three hundred percent (300%) of the Bank's prior month-end Tier 1 capital plus ALLL.

(3)     The exposure limits set forth in paragraphs (1) and (2) of this Article apply to one-to-four family residential loans underwritten to GSE standards that are purchased by the Bank through the Quick$ale Program.  The Bank shall not purchase any loans other than one-to-four family residential loans underwritten to GSE standards in the Quick$ale Program unless the Bank submits a written plan for purchasing loans that fall outside of GSE standards and receives prior written determination of no supervisory objection for the plan from the Director.  The written plan should contain, at a minimum:

(a)     a clear description of the underwriting standards to be used and a description of any differences between GSE underwriting standards and those underwriting standards for the non-GSE loans to be purchased;

(b)     daily dollar volume limits on the non-GSE loans to be purchased;

(c)     a clear description of how the Board and management will manage concentration risk for the non-GSE loans; and

(d)     mitigating risks for deviating from standard GSE loans.

ARTICLE V

ALLOWANCE FOR LOAN AND LEASE LOSSES

(1)     Within ninety (90) days of the date of this Order, the Board shall adopt and the Bank (subject to Board review and ongoing monitoring) shall implement and adhere to a written

program for the maintenance of an adequate ALLL.  The program shall be consistent with 12 C.F.R. § 160.160 and applicable regulatory guidance, including, but not limited to,  the Federal Financial Institutions Examination Council's "Interagency Policy Statement on the Allowance for Loan and Lease Losses" dated December 13, 2006 (The Office of Thrift Supervision ("OTS") CEO Memorandum No. 250); OTS Examination Handbook, Section 261, "Adequacy of Valuation Allowances;" OTS CEO Memorandum No. 329 (Accounting for Credit Losses and Impairments), dated December 9, 2009; OTS CEO Memorandum No. 304 (ALLL-Observed Thrift Practices Including Sound Practices), dated May 22, 2009; and any successor regulation or guidance, and shall at a minimum include:

(a)     internal risk ratings of loans;

(b)     results of the Bank's independent loan review;

(c)     criteria for determining which loans will be reviewed under Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 310 (Pre-codification reference: Statement of Financial Accounting Standards ("FAS") Statement No. 114), how impairment will be determined, and procedures to ensure that the analysis of loans complies with ASC 310 requirements;

(d)     procedures for segmenting the loan portfolio and estimating loss on groups of loans, consistent with Accounting Standards Codification 310-10 and 450-20 (formerly known as FASB Statement of Financial Accounting Standards No. 5, Accounting for Contingencies);

(e)     recognition of non-accrual loans in conformance with generally accepted accounting principles ("GAAP") and regulatory guidance;

(f)     loan loss experience;

(g)     trends of delinquent and non-accrual loans;

(h)     concentrations of credit in the Bank; and

(i)     present and projected economic and market conditions.

(2)     The program shall provide for a review of the ALLL by the Board at least once each calendar quarter.  Any deficiency in the ALLL shall be remedied by additional provisions from earnings in the quarter it is discovered prior to filing the Thrift Financial Report, or any required successor report of financial condition.  Written documentation shall be maintained of the factors considered and conclusions reached by the Board in determining the adequacy of the ALLL and made available for review by Bank Examiners.

(3)     A copy of the Board's ALLL program, and any subsequent revisions to the ALLL program, shall be submitted to the Director upon adoption by the Board.

ARTICLE VI

CONCENTRATIONS OF ASSETS, LIABILITIES, AND OFF-BALANCE SHEET POSITIONS

(1)     Within one hundred and twenty (120) days of the date of this Order, the Board shall adopt and the Bank (subject to Board review and ongoing monitoring) shall implement and adhere to an enhanced written concentration management program consistent with the guidance in OTS CEO Memorandum 311 (Risk Management: Asset and Liability Concentrations) dated July 9, 2009,; OTS Examination Handbook, Section 201, "Overview: Lending Operations and Portfolio Management;" OTS Examination "Handbook, Section 530, "Liquidity Risk Management," and any applicable successor regulation or guidance issued by the OCC.  The program shall include, but not be limited to, the following:

(a)     policy guidelines addressing the level and nature of exposures acceptable to the institution and setting concentration limits, including limits on commitments to individual borrowers and appropriate sub-limits;

(b)     procedures to identify and quantify the nature and level of risk presented by concentrations, including review of changes in conditions in the Bank's markets;

(c)     procedures to periodically review and revise, as appropriate, risk exposure limits and sub-limits to conform to any changes in the institution's strategies and to respond to changes in market conditions;

(d)     periodic portfolio-level stress tests or sensitivity analysis to quantify the impact of changing economic conditions on asset quality, earnings, and capital;

(e)     appropriate strategies for managing concentration levels, including a contingency plan to reduce or mitigate concentrations in the event of adverse market conditions; and

(f)     periodic reports to the Board, to include the following, as appropriate:

(i)     a summary of concentration levels, by type and subtype;

(ii)     a summary of the Bank's market analysis;

(iii)     a discussion of recommended strategies when concentrations approach or exceed Board-approved limits;

(iv)     a summary of changes in risk levels by concentration type and subtype, with discussion of recommended changes in credit administration procedures (for example, underwriting practices, risk rating, monitoring, and training).

(2)      Upon completion, the Board shall forward a copy of the program required in

paragraph (1) of this Article, and any concentration reports, studies, or analyses to the Director.

ARTICLE VII

THIRD PARTY CONTRACTS

(1)      Effective immediately, the Bank shall not enter into an arrangement or contract

with a third party that is significant to the overall operation or financial condition of the Bank[2] or

outside the Bank's normal course of business, unless with respect to each such contract, the

Board of Directors or designated committee thereof, approves of the arrangement or contract and

certifies in writing:

(a)      why the third party arrangement or contract is in the best interest of the

Bank;

(b)      that management has completed, and the Board of Directors has reviewed

and approved, a thorough risk assessment that identifies the Bank's needs and

requirements;

(c)      that management has completed and documented proper due diligence to

identify and select a third party provider (including the consideration of more than

one competitive and arms length bid or proposal);

(d)      that the arrangement or contract with the third party is governed by written

agreements that outline duties, obligations, and responsibilities of the parties

involved;

---

[2] A contract will be considered significant to the overall operation or financial condition of the Bank where the annual contract amount equals or exceeds two percent (2%) of the Bank's total capital, as defined at 12 C.F.R. §167.5(c), where there is a foreign service provider, or where it involves information technology that is critical to the Association's daily operations without regard to the contract amount.

(e)      that management and the Board have established processes to provide appropriate ongoing oversight of the third parties and third-party activities; and

(f)      that the arrangement or contract with the third party complies with applicable law, regulation, regulatory guidance, and safe and sound practices, including, but not limited to Thrift Bulletin 82a and OTS Examination Handbook, Section 310 (Corporate Governance and Oversight by the Board of Directors) or any applicable successor regulation or regulatory guidance issued by the OCC.

(2)      The signed certification and any supporting documentation thereof shall be made a part of the minutes of the Board or designated committee thereof.

(3)      Upon completion of the signed certification pursuant to paragraphs (1) and (2) of this Article, the Bank is not required to receive a prior written determination of supervisory non-objection.

(4)      Notwithstanding the provisions of paragraphs 1 through 3 of this Article, the Bank shall not enter into any contract with a third party to assist in the sale, merger, or recapitalization of the Bank that requires the payment of anything other than expenses prior to such sale, merger or recapitalization, or that requires the Bank to pay, directly or indirectly, the cost of performing due diligence, or other services related to the transaction, unless the Bank first receives the Director's written determination of no supervisory objection.

(5)      Any request for the Director's written determination of no supervisory objection shall include:

(a)      the Board's written analysis of why the proposed contract is in the best interests of the Bank

(b)     a description of the due diligence credit review, fairness opinion or any other services to be performed by the third party, including a copy of the proposed contract or engagement;

(c)     a description of the Bank's due diligence process for agreeing to the services to be performed by a potential purchaser or merger partner; and

(d)     a determination by the Board that:

(i)     the activities to be performed by the third party as part of the sale or merger requirements are fair and reasonable to the Bank ;

(ii)    the parties are able to perform under the contract or commitment;

(iii)   the fees the Bank is required to pay to the third party are reasonable for the services provided; and

(iv)    the contract is in the best interests of the Bank.

(6)     Following any written determination of no supervisory objection by the Director, the Board shall regularly monitor the contractor or service provider's performance to ensure that the contractor or service provider is complying with the written contract or engagement.  The Board shall immediately take appropriate action if the contractor or service provider is not complying the written contract or engagement and shall maintain documentation of any such actions.

## ARTICLE VIII

### EMPLOYMENT AND COMPENSATION AGREEMENTS

(1)     Effective immediately, the Bank shall not enter into, renew, extend or revise any contractual arrangement relating to compensation or benefits for any Senior Executive Officer, as defined at 12 C.F.R. §163.555, or director of the Bank, unless with respect to each such

contractual arrangement the Board or designated committee thereof, approves of the

arrangements and certifies in writing:

>    (a)     why the employment contract or compensation agreement is in the best
>
>    interest of the Bank and does not encourage executive officers or directors to
>
>    expose the Bank to inappropriate risks, and
>
>    (b)     that the employment contract or compensation agreement complies with
>
>    applicable law, regulation, regulatory guidance, and any other safe and sound
>
>    compensation practices, including, but not limited to 12 C.F.R. Part 359, 12
>
>    C.F.R. §§ 163.39 and 163.161(b), and 12 C.F.R. Part 170-Appendix A; the
>
>    Interagency Guidance on Sound Incentive Compensation Policies contained in
>
>    OTS Chief Executive Officer Memorandum No. 354; and OTS Examination
>
>    Handbook, Section 310 (Corporate Governance and Oversight by the Board of
>
>    Directors) or any successor applicable regulation or regulatory guidance issued by
>
>    the OCC.

(2)     The signed certification and any supporting documentation thereof shall be made

a part of the minutes of the Board or designated committee thereof.

(3)     Upon completion of the signed certification pursuant to paragraphs (1) and (2) of

this Article, the Bank is not required to receive a prior written determination of supervisory non-

objection.

ARTICLE IX

BOOKS AND RECORDS

(1)     The Board shall immediately take all necessary action to ensure that within thirty

(30) days of the date of this Order, the Bank's books, records and internal management

information systems (MIS) are restored to a complete and accurate condition.

(2)     Within thirty (30) days of the date of this Order the Board shall develop and

forward to the Director for his review, pursuant to paragraph (3) of this Article, an Action Plan,

including a timetable for the implementation of the Action Plan, detailing how the Board will

ensure that the books, records and internal MIS will be maintained in a complete and accurate

condition.  The program shall address, at a minimum, the following:

        (a)     procedures to ensure Thrift Financial Reports (or any required successor

report of financial condition) and other regulatory financial reports are accurate;

        (b)     timing and frequency of performing balance sheet and income and

expense account reconcilements;

        (c)     personnel assigned to perform account reconcilements;

        (d)     supervisory personnel independent of the account reconciliation process

assigned to review account reconcilements for completeness and accuracy;

        (e)     investigation and resolution of account reconciliation differences to occur

within the quarter of discovery;

        (f)     a charge-off policy on account reconciliation differences which cannot be

resolved within the quarter of discovery;

(g)     sufficient and ongoing training of personnel involved in the account

reconcilement process and resolution of account reconcilement differences, and

preparation of financial reports;

(h)     procedures to ensure MIS is accurate; and

(i)     standards for which Bank personnel will be held accountable to ensure

compliance with the requirements of this Article.

(3)     Prior to adoption by the Board, a copy of the Action Plan developed pursuant to

this Article shall be submitted to the Director for review and prior written determination of no

supervisory objection.  At the next Board meeting following receipt of the Director's written

determination of no supervisory objection, the Board shall adopt and the Bank (subject to Board

review and ongoing monitoring) shall implement and thereafter ensure adherence to the Action

Plan.

ARTICLE X

VIOLATIONS OF LAW

(1)     The Board shall require and the Bank shall immediately take all necessary steps to

correct each violation of law, rule, or regulation cited in any Report of Examination, or brought

to the Board's or Bank's attention in writing by management, regulators, auditors, loan review, or

other compliance efforts.  Within ninety (90) days after the violation is cited or brought to the

Board's attention, the Bank shall provide to the Board a list of any violations that have not been

corrected.  This list shall include an explanation of the actions taken to correct the violation, the

reasons why the violation has not yet been corrected, and a plan to correct the violation by a

specified date.

(2)     Within sixty (60) days of the date of this Order, the Board shall adopt and the

Bank (subject to Board review and ongoing monitoring) shall implement and thereafter ensure

adherence to:

(a)     specific procedures to prevent future violations as cited in the most recent

Reports of Examination; and

(b)     general procedures addressing compliance management that incorporate

internal control systems and education of employees regarding laws, rules, and

regulations applicable to their areas of responsibility.

(3)     Upon adoption, the Board shall forward a copy of these policies and procedures to

the Director.


ARTICLE XI

OTHER PROVISIONS

(1)     All reports or plans which the Bank or Board has agreed to submit to the Director

pursuant to this Order shall be forwarded, by overnight mail or via email, to the following:

Director for Special Supervision          *with a copy to:*
Comptroller of the Currency               Comptroller of the Currency
250 E. Street, S.W.                       San Francisco Field Office
Mail Stop 2-7                             One Front Street, Suite 1000
Washington D.C.  20219                    San Francisco, CA 94111


(2)     The Board shall ensure that the Bank has sufficient processes, personnel, and

control systems to effectively implement and adhere to all provisions of this Order, and that

Bank personnel have sufficient training and authority to execute their duties and responsibilities

under this Order.

(3)      Although the Bank is by this Order required to submit certain proposed actions

and programs for the review or prior written determination of no supervisory objection of the

Gateway Bank, F.S.B.
Consent Order
Page 20 of 22

Director, the Board has the ultimate responsibility for proper and sound management of the Bank and the completeness and accuracy of the Bank's books and records.

(4)     It is expressly and clearly understood that if, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States of America to undertake any action affecting the Bank, including, but not limited to, taking any actions deemed appropriate related to the Bank Secrecy Act and related regulations, nothing in this Order shall in any way inhibit, estop, bar or otherwise prevent the Comptroller from so doing.

(5)     Unless otherwise stated, any time limitations imposed by this Order shall begin to run from the effective date of this Order.  Such time limitations may be extended in writing by the Director for good cause upon written application by the Board.

(6)     The provisions of this Order are effective upon issuance of this Order by the Comptroller, through his authorized representative whose signature appears below, and shall remain effective and enforceable, except to the extent that, and until such time as, any provisions of this Order shall have been amended, suspended, waived, or terminated in writing by the Comptroller.

(7)     In each instance in this Order in which the Board is required to ensure adherence to, and undertake to perform certain obligations of the Bank, it is intended to mean that the Board shall:

        (a)     authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings under the terms of this Order;

(b)      require the timely reporting by Bank management of such actions directed

by the Board to be taken under the terms of this Order;

(c)      follow-up on any non-compliance with such actions in a timely and

appropriate manner; and

(d)      require corrective action be taken in a timely manner of any non-

compliance with such actions.

(8)      This Order is intended to be, and shall be construed to be, a final order issued

pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form,

a contract binding on the Comptroller or the United States.

(9)      OTS issued a Cease and Desist Order to the Bank on April 24, 2009, OTS Order

No. WN-09-007.  This Order replaces OTS Order No. WN-09-007 in its entirety and, therefore,

OTS Order No. WN-09-0007 is hereby terminated.

(10)      The terms of this Order, including this paragraph, are not subject to amendment or

modification by any extraneous expression, prior agreements or prior arrangements between the

parties, whether oral or written.


IT IS SO ORDERED, this 26th day of October, 2011.


/s_____
Michael R. Brickman
Director for Special Supervision


Gateway Bank, F.S.B.
Consent Order
Page 22 of 22

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:** | ) |
| | )      AA-EC-11-90 |
| Gateway Bank, F.S.B. | ) |
| San Francisco, California | ) |

**STIPULATION AND CONSENT TO THE ISSUANCE**
**OF A CONSENT ORDER**

**WHEREAS**, the Office of Thrift Supervision has initiated Cease and Desist proceedings

against Gateway Bank, F.S.B., San Francisco, California ("Bank") pursuant to 12 U.S.C. § 1818

through the issuance of a Notice to Cease and Desist, on December 30, 2010 ("Notice of

Charges");

**WHEREAS,** the Bank filed an Answer to the Notice of Charges on January 24, 2011;

and,

**WHEREAS**, in the interest of cooperation and to avoid additional costs associated with

administrative and judicial proceedings with respect to the above matter, the Bank has agreed to

execute this Stipulation and Consent to the Issuance of a Consent Order ("Stipulation"), that is

accepted by the Comptroller of the Currency of the United States of America ("Comptroller"),[1]

through his duly authorized representative;

**NOW, THEREFORE,** in consideration of the above premises, and without admitting or

denying any wrongdoing, it is stipulated by the Bank that:

---

[1] Pursuant to Title III of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010), all functions of the Office of Thrift Supervision ("OTS") related to Federal savings associations were transferred to the Office of the Comptroller of the Currency ("OCC") on July 21, 2011.  See Dodd-Frank Act, § 312(b), 12 U.S.C. § 5412.

## ARTICLE I

## JURISDICTION

(1)   Gateway is a "savings association" within the meaning of 12 U.S.C. §§ 1462(2) and 1813(b).  Accordingly, the Gateway is an "insured depository institution" within the meaning of 12 U.S.C. § 1813(c).

(2)   Pursuant to 12 U.S.C. § 1813(q), the Comptroller is "the appropriate Federal banking agency" to initiate and maintain a proceeding against the Bank pursuant to 12 U.S.C. § 1818(b).

## ARTICLE II

## CONSENT

(1)   The Bank hereby consents and agrees to the issuance of the accompanying Consent Order ("Order") by the Comptroller.

(2)   The Bank further agrees that the Order shall be deemed an "order issued with the consent of the depository institution" as defined in 12 U.S.C. § 1818(h)(2), and consents and agrees that the Order shall become effective upon its Effective Date and shall be fully enforceable as a final order by the Comptroller under the provisions of 12 U.S.C. § 1818(b).

(3)   The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.  The Bank also expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the U.S. Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

## ARTICLE III

## WAIVERS

(1)   The Bank, by signing this Stipulation and Consent, hereby waives:

(a)      all rights to a hearing and a final agency decision pursuant to 12 U.S.C. § 1818

and 12 C.F.R. Part 109;

(b)      all rights to seek judicial review of the Order;

(c)      any and all rights to challenge or contest the validity of the Order; and

(d)      any and all claims for fees, costs or expenses against the Comptroller, or any of

his agents or employees, related in any way to this enforcement matter or this Order,

whether arising under common law or the terms of any statute, including but not limited

to the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412.

## ARTICLE IV

## OTHER ACTION

(1)   The Bank agrees that the provisions of this Stipulation and Consent shall not inhibit,

estop, bar, or otherwise prevent the Comptroller from taking any other action against the Bank,

including but not limited to any actions deemed appropriate related to the Bank Secrecy Act and

related regulations, if, at any time, the Comptroller deems it appropriate to do so to fulfill the

responsibilities placed upon him by law.

(2)   The Bank agrees that nothing herein shall preclude any proceedings brought by the

Comptroller to enforce the terms of this Order, and that nothing herein constitutes a waiver of

any right, power, or authority of any other representatives of the United States or agencies

thereof, including the Department of Justice, to bring other actions deemed appropriate.

Gateway Bank, F.S.B.
Stipulation and Consent to Issuance of Consent Order
Page 3 of 6

## ARTICLE V

## OTHER PROVISIONS

(1)   The provisions of this Stipulation and Order are effective upon the Effective Date and shall remain effective and enforceable against the Bank and its successors in interest, except to the extent that, and until such time as, any provisions of this Order shall have been amended, suspended, waived, or terminated in writing by the Comptroller.

(2)   If any provision of this Stipulation and/or the Order is ruled to be invalid, illegal, or unenforceable by the decision of any Court of competent jurisdiction, the validity, legality, and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby, unless the Comptroller in his sole discretion determines otherwise.

## CLOSING

(1)   This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b)(2), and expressly does not form, and may not be construed to form, a contract binding on the Comptroller or the United States.

(2)   The terms of this Stipulation and accompanying Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting Board of Directors of the Bank, have hereunto set their hands on behalf of the Bank.

GATEWAY BANK, F.S.B.                    Accepted By:

San Francisco, California               THE COMPTROLLER OF THE CURRENCY


/s_____  10/26/11    /s_____  10/26/11
Laurence L. Wang        Date     By: Michael Brickman            Date
Chairman                         Director for Special Supervision


/s_____  10/26/11
Jessica L. Wang         Date


/s_____  10/26/11
Jeffrey Cheung          Date


/s_____  10/26/11
Laurence C. Fentriss    Date


/s_____  10/26/11
Joanne Fabian           Date


_____  _____
James E. Baxter, II     Date


/s_____  10/26/11
James Keefe             Date


/s_____  10/26/11
Noel Kullavanijaya      Date


/s_____  10/26/11
Timothy Anonick         Date