**McGuireWoods LLP**
SABRINA A. BELDNER (SBN 221918)
Email: sbeldner@mcguirewoods.com
1800 Century Park East, 8th Floor
Los Angeles, CA  90067-1501
Telephone:  310.315.8200
Facsimile:  310.315.8210

SUMMER L. SPEIGHT *admitted pro hac vice*
Email: sspeight@mcguirewoods.com
800 East Canal Street
Richmond, VA  23219-3916
Telephone: 804.775.1000
Facsimile: 804.775.1061

Attorney for Defendants
Gateway Bank, F.S.B. and
The Gateway Bank Supplemental Executive Retirement Plan

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Poppi Metaxas,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Gateway Bank, F.S.B., and The Gateway Bank Supplemental Executive Retirement Plan,<br><br>                    Defendants. | CASE NO. 3:20-cv-01184-EMC (JCS)<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: August 25, 2022<br>Time: 1:30 p.m.<br>Place: Via Zoom Videoconference<br><br>Complaint Filed: February 17, 2020<br><br>*Honorable Edward M. Chen* |

1

## TABLE OF CONTENTS

2

**Page**

3  MEMORANDUM OF POINTS AND AUTHORITIES...................................................1

4  I.      INTRODUCTION ....................................................................................1

5  II.     ARGUMENT ...........................................................................................3

6          A.   Plaintiff Received the Benefit of a Full and Fair Review under
                ERISA's Regulations .................................................................3

7          B.   Any Conflict of Interest Should be Given Little to No Weight............5

8          C.   Plaintiff's Award of Disability under the Social Security Act and
9               a Separate Long Term Disability Plan Do Not Support a Finding
                of Disability as Defined by the SERP.........................................7

10         D.   The Committee Properly Weighed the Medical Evidence and
11              Expert Reports in the Administrative Record.................................9

12         E.   The Committee Reasonably Found that Plaintiff Had No
13              Disability as Defined by the Plan at the Time of Her Separation........12

14         F.   Plaintiff Experienced a Change in Employment Status under the
                SERP Upon the Board's Suspension ...........................................17

15         G.   The Board Had Cause to Terminate Plaintiff's Employment
16              Which Disqualifies Her from Termination Benefits.........................18

17         H.   Plaintiff's Claim for Equitable Relief under Section 502(a)(3)
                Fails as a Matter of Law..........................................................22

18 III.    CONCLUSION ......................................................................................25

19

20

21

22

23

24

25

26

27

28

i                                              CASE NO. 3:20-cv-01184-EMC (JCS)

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abatie v. Alta Health & Life Insurance Co.*,
    458 F.3d 955 (9th Cir. 2006) ............................................................... 19

*Ammons v. Diversified Adjustment Serv., Inc.*,
    2019 U.S. Dist. LEXIS 175842 (C.D. Cal. Oct. 9, 2019) ................................. 23

*Black & Decker Disability Plan v. Nord*,
    538 U.S. 822 (2003) ....................................................................... 7, 8

*Black v. Greater Bay Bancorp Exec. Supplemental Comp. Benefits
    Plan*,
    2018 U.S. Dist. LEXIS 234354 (N.D. Cal. Jan 23, 2018) .............................. 5, 6

*Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*,
    410 F.3d 1173 (9th Cir. 2005) ............................................................... 2

*Brown v. Blue Cross & Blue Shield of Alabama, Inc.*,
    898 F.2d 1556 (9th Cir. 1990) ............................................................. 19

*Dedicato Treatment Ctr. v. Cigna Health & Life Ins. Co.*,
    2017 U.S. Dist. LEXIS 220004 (C.D. Cal. Aug. 24, 2017) ............................ 24

*DK Holdings v. Miva, Inc.*,
    2019 U.S. Dist. LEXIS 57663 (S.D. Cal. Apr. 3, 2019) ................................ 23

*Gabriel v. Alaska Elec. Pension Fund*,
    773 F.3d 945 (9th Cir. 2014) ............................................................... 24

*Gateway Bank, F.S.B. v. Metaxas*,
    65 Cal. App. 5th 71 (2021) .................................................................. 1

*Harlick v. Blue Shield of California*,
    686 F.3d 699 (9th Cir. 2012) ............................................................... 19

*Kopeley v. Boeing Co. Voluntary Inv. Plan*,
    2020 U.S. Dist. LEXIS 246366 (C.D. Cal. Oct. 14, 2020) ............................ 24

*Pickern v. Pier 1 Imps. (U.S.), Inc.*,
   457 F.3d 963 (9th Cir. 2006) .................................................................... 23

*Saffon v. Wells Fargo & Co. Long Term Disability Plan*,
   522 F.3d 863 (9th Cir. 2008) .................................................................... 19

*Sluimer v. Verity, Inc.*,
   628 F. Supp. 2d 1099 (N.D. Cal. 2008) ...................................................... 2

*Stephan v. Unum Life Ins. Co. of Am.*,
   697 F.3d 917 (9th Cir. 2012) ...................................................................... 5

*Viad Corp. Supplemental Pension Plan v. Nasi*,
   586 F. App'x 451 (9th Cir. 2014) ........................................................... 4, 5

*Walker v. AT&T Ben. Plan No. 3*,
   2022 U.S. Dist. LEXIS 65045 (C.D. Cal. Apr. 6, 2022) .................................. 7

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
   435 F.3d 989 (9th Cir. 2006) .................................................................... 23

**Statutes**

29 U.S.C. § 1001 ............................................................................................. 1

29 U.S.C. § 1132(a)(1)(B) .............................................................................. 24

29 U.S.C. § 1132(a)(3) ............................................................... 22, 23, 24, 25

**Other Authorities**

29 C.F.R. § 2560.503-1 ............................................................................... 4, 5

CASE NO. 3:20-cv-01184-EMC (JCS)

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff Poppi Metaxas ("Plaintiff" or "Metaxas") worked as the President and Chief Executive Officer ("CEO") for Gateway Bank, F.S.B. ("Gateway" or the "Bank") until the federal government accused her of engaging in fraudulent, unlawful conduct and eventually charged her with conspiracy to commit bank fraud. After presenting evidence to Gateway's Board of Directors (the "Board") that Metaxas had engaged in fraudulent transactions, the Office of Thrift Supervision ("OTS"), a federal agency within the Department of Treasury, "demanded that she be removed from the bank." *Gateway Bank, F.S.B. v. Metaxas*, 65 Cal. App. 5th 71, 84 (2021). As a result, the Board suspended Plaintiff's employment in March 2010 and decided to terminate her employment and replace her as CEO in April 2010 based on her fraudulent conduct. Thereafter, in May 2010, Plaintiff submitted a sham resignation letter, purporting to resign due to health reasons and an inability to work.

Despite her fraudulent and criminal conduct, Plaintiff seeks an award of supplemental retirement benefits under the Gateway Bank Supplemental Executive Retirement Plan (the "SERP" or "Plan"), a plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* During the administrative claim procedure, the Plan administrator, the Committee, afforded Plaintiff a full and fair review on her claim. She had the opportunity to submit documents and make arguments, and even had the opportunity to appear in person with legal counsel at a hearing before the Committee on appeal. After considering and weighing Plaintiff's evidence and arguments, the Committee found her ineligible for benefits under the terms of the Plan. The record provides ample support for this finding. Under the terms of the SERP, Plaintiff is not eligible for benefits because the Board had Cause to terminate her employment and because she was not disabled at the time of her separation. Specifically, the Committee found that Plaintiff's fraudulent conduct and the circumstances surrounding her separation disqualify her from receiving SERP

1  benefits.  Those findings are subject to the deferential abuse of discretion standard of

2  review, Dkt. # 58, and under that standard, are reasonable.

3       In her briefing, Plaintiff does nothing but select a few pieces of evidence from

4  the record and argue that that evidence should have been given more weight by the

5  Committee.  But the SERP grants the Committee with the discretionary authority to

6  interpret the Plan, weigh and resolve conflicting evidence, and make benefit

7  determinations.  Under the deferential abuse of discretion standard of review, "[t]he

8  question is not 'whose interpretation of the plan documents is most persuasive, but

9  whether the . . . interpretation is unreasonable.'"  *Sluimer v. Verity, Inc.*, 628 F. Supp.

10  2d 1099, 1108 (N.D. Cal. 2008) (quoting *Canseco v. Constr. Laborers Pension Tr. For*

11  *S. Cal.*, 93 F.3d 600, 606 (9th Cir. 1996)).  The pieces of record evidence highlighted

12  by Plaintiff were fully vetted and considered by the Committee in denying her claim

13  for benefits.  In other words, the record does not leave the Court "with the definite and

14  firm conviction that a mistake has been committed" in denying Plaintiff benefits.  *Boyd*

15  *v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005).

16  Considering the totality of the administrative record, and the facts and circumstances

17  surrounding her separation, the benefit denial must be upheld as reasonable.

18       Recognizing that her claims fail on the administrative record, Plaintiff seeks, for

19  the second time, to supplement the record with *new* evidence she views as more

20  favorable to her claims.  But this evidence was not presented to or considered by the

21  Committee, and for that reason, this Court already *denied* an earlier request to

22  supplement the record with many of these identical documents.  Plaintiff cannot and

23  should not be permitted to circumvent the Court's prior orders in this case.  Thus, the

24  Court should strike the extra-record evidence submitted by Plaintiff in support of her

25  Motion for Summary Judgment for the reasons set forth in Defendants'

26  contemporaneously-filed Motion to Strike, which is fully incorporated herein.

27       Accordingly, summary judgment should be granted to Defendants on Plaintiff's

28  claims and Plaintiff's cross-Motion for Summary Judgment should be denied.

## II.   ARGUMENT

### A.   Plaintiff Received the Benefit of a Full and Fair Review under ERISA's Regulations

Plaintiff attempts to discredit the Committee's denial decision by alleging various procedural errors in connection with the initial claim decision.  As discussed below, the Committee did not err in reviewing Plaintiff's initial claim.  Even if the Court were to disagree, Plaintiff received a full and fair review following the Appeal Committee's review of her appeal.

Plaintiff first faults the Committee considering her initial claim for benefits for failing to consider her medical records.  Dkt. # 77, at 16.  But Plaintiff did not submit her medical records for the initial Committee's review, and instead submitted only an email "requesting a calculation of her benefits under the SERP" and demanding that "Gateway start paying her benefits."  CLMREC 00014.[1]  Her medical records were not submitted until her administrative appeal.  CLMREC 00004 n.1.

Therefore, the only evidence of any alleged disability before the initial Committee was Plaintiff's purported May 2010 resignation letter, in which she asserted an inability to work based on her 2008 cancer treatments.  CLMREC 00015.  In assessing this claim, the Committee noted that Plaintiff reported to work post-treatment without any issue until March 23, 2010, when the Board suspended her employment based on OTS's investigation into her criminal conduct.  CLMREC 00014.  Therefore, the Committee found that the Board removed Plaintiff from work because of her fraudulent and criminal conduct and did not credit her later contention that she could not report to work because of a disability.  CLMREC 00015.  It found no evidence to support Plaintiff's claim that she was unable "to engage in any substantial gainful activity" at the time of her purported resignation.  *Id.*

---

[1] The claim record is filed at Dkt. # 41-2 and 41-3, with any sealed portions filed at Dkt. # 42-4.  The claim record is referred to herein by Bates numbers "CLMREC".

1    Second, Plaintiff asserts that the Committee's initial denial letter did not

2    comply with ERISA's regulations relating to denial of ERISA governed disability

3    benefit claims under 29 C.F.R. § 2560.503-1(g)(vii).  The SERP, however, is a top

4    hat plan providing for supplemental retirement benefits under certain circumstances

5    to key employees, not disability benefits.  Dkt. # 41-7, Art. I.  The formula for

6    calculating the supplemental retirement benefits depends on whether the participant

7    separates employment based on retirement, disability, or other separation for good

8    reason or without Cause.  Dkt. # 41-7, Art. V.  The SERP is not, as Plaintiff suggests,

9    an employee welfare plan which provides for ERISA governed short-term or long-

10   term disability benefits and triggers additional requirements for review of claims.[2]

11   Third, the Committee's initial denial decision fully complies with regulatory

12   requirements for a full and fair review under 29 C.F.R. § 2560.503-1(g)(i)-(iv).  The

13   decision provides specific reasons for the denial decision and cites specific Plan

14   provisions at issue.  *See, e.g.*, CLMREC 00014 to 00015 ("Metaxas's claim for

15   benefits is denied because she experienced a change in employment status under

16   Section 3.2 of the SERP . . . ." and because the "Committee concludes that Metaxas

17   did not 'become disabled while Employed by the Employer'" under Section 2.9 of the

18   Plan.).  The denial decision describes the information needed for Plaintiff to make out

19   a claim if she were to disagree with the Committee's decision by outlining the

20   evidence considered by the Committee in denying Plaintiff's claim and inviting

21   Plaintiff to submit any "additional evidence or argument to support [her] position."

22

23   _____

24       [2] Plaintiff made a similar argument when asking the Court to conduct a *de novo*
     review due to the Committee's failure to issue a decision within 45 days of Plaintiff's
25   claim.  Dkt. # 56, at 5.  The 45-day consideration period cited by Plaintiff applies only
     to ERISA plans providing short- or long-term disability benefits, whereas the standard
26   60-day period applies to other plans like the SERP.  29 C.F.R. § 2560.530-1(i).  The
     Court found no merit in Plaintiff's argument and held that any such procedural error
27   would not change the applicable standard of review in any event.  Dkt. # 58, at 6
     (citing *Viad Corp. Supplemental Pension Plan v. Nasi*, 586 F. App'x 451, 452 (9th
28   Cir. 2014)).

1  CLMREC 00016; *see, e.g.*, CLMREC 00015 (detailing the evidence relied on to find

2  that Plaintiff's employment performance was not at a level that deserves reward

3  through the SERP, that she did not reach retirement age, and that she was able to

4  engage in substantial gainful activity when she resigned).  Plaintiff's subsequent

5  appeal and the voluminous information she submitted in support show that she

6  understood from the denial decision the additional information she should submit for

7  consideration on appeal.  CLMREC 00003 to 00249.  Finally, the initial denial

8  decision details Plaintiff's right to appeal and bring a civil action.  CLMREC 00016.

9      In any event, even if the Court were to find that the initial denial decision failed

10  to comply with ERISA's regulation governing claim procedures in any respect, this

11  issue is a red herring for two reasons.  First, any deficiencies in the Committee's

12  procedural disclosures were corrected during the appeal process, and Plaintiff makes

13  no similar challenge to the Committee's decision on appeal.  As discussed *supra* in

14  Part II.E, the Appeal Committee fully considered Plaintiff's medical records and other

15  relevant evidence and reasonably determined that Plaintiff did not meet the definition

16  of disabled under the terms of the SERP.  Second, the remedy for any such procedural

17  violations would be to permit Plaintiff to file a lawsuit without having to exhaust

18  administrative remedies.  *See* 29 C.F.R. § 2560.503-1(l).  Thus, the purported

19  procedural violations, even if proven, do not change the applicable standard of review

20  or impact the reasonableness of the Committee's decision.  *See Viad Corp.*

21  *Supplemental Pension Plan v. Nasi*, 586 F. App'x 451, 452 (9th Cir. 2014).

22      **B.    Any Conflict of Interest Should be Given Little to No Weight**

23      Plaintiff argues that the Committee's decision should be found unreasonable

24  based on alleged conflicts.  The existence of a conflict of interest does not alter the

25  deferential standard of review.  *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917,

26  929 (9th Cir. 2012).  Instead, it is merely one factor to consider in reviewing a decision

27  for abuse of discretion.  *Id.*  "The weight of this factor depends upon the likelihood

28  that the conflict impacted the administrator's decision-making." *Black v. Greater Bay*

*Bancorp Exec. Supplemental Comp. Benefits Plan*, 2018 U.S. Dist. LEXIS 234354, at *19 (N.D. Cal. Jan 23, 2018) (quoting *Stephan*, 697 F.3d at 929). Where "active steps" were taken "to reduce potential bias and to promote accuracy," any conflict should be given minimal weight. *Id.* at *31 (quoting *Stephan*, 697 F.3d at 929).

Here, Gateway took active steps to minimize the impact of any conflict. Gateway's Board designated a three-member Committee to consider Plaintiff's initial claim, and a separate three-member Committee to decide Plaintiff's appeal. CLMREC 00226, 00335. The Board purposefully chose members who had not worked with Plaintiff personally and had no firsthand knowledge of the events leading to Plaintiff's separation. Dkt. # 41-6, at 6. In other words, the Board made sure both Committees had no bias or preconceptions relating to Plaintiff's benefit claim.

Plaintiff argues that the initial Committee's decision is tainted by a conflict because one member owned 24.91% of the Bank's voting stock and 77.34% of the Bank's non-voting stock. Dkt. # 79, at ¶ 1. Any purported conflict attributable to that one member is mitigated by the fact that the other two members did not own stock, and the initial denial decision was unanimous and supported by all three Committee members. Plaintiff speculates that the one member's stock ownership somehow tainted the entire decision-making process on her initial claim, but this argument falls flat. The Appeal Committee conducted a *de novo* review of her claim for benefits and granted Plaintiff a hearing on her appeal. The Appeal Committee was comprised of three different members, one who owned 0.97% of voting stock and 0.79% of non-voting stock, the second who owned no voting stock and 0.66% of non-voting stock, and the third who owned no voting stock and 3.95% of non-voting stock. Dkt. # 79. They again unanimously voted to deny Plaintiff's claim for benefits. Given the small percentages of stock ownership and the steps taken by the Board to minimize any conflict, the Court should assign little to no weight to this factor.

In arguing otherwise, Plaintiff relies on purported continuing attention and pressure from the OTS on the Bank to maintain certain capital thresholds. Plaintiff

6

has the gall to argue that the Bank's continued concerns "about the state of its financial health" should cut against the reasonableness of the Committee's denial decision.  In other words, Plaintiff committed (and pled guilty) to the very Bank fraud that resulted in substantial financial harm to the Bank and placed Gateway under increased scrutiny from federal regulators, yet she now asks the Court to hold that increased governmental scrutiny against the Bank for her own pecuniary benefit.  But the record contains no evidence that the Committee members denied Plaintiff's claim for the purposes of maintaining specific capital ratios.  Instead, the record shows the Committee fully considered and weighed Plaintiff's evidence and arguments against the SERP terms and provided logical and reasonable explanations for the claim denial.

### C.   Plaintiff's Award of Disability under the Social Security Act and a Separate Long Term Disability Plan Do Not Support a Finding of Disability as Defined by the SERP

Plaintiff relies heavily on the award of social security benefits to support her claim of disability under the SERP.  In doing so, she wrongly contends that the SERP's definition of disability adopts the criteria for an award of social security benefits.  That is not true.

"In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria.  'The validity of a claim to benefits under an ERISA plan,' on the other hand, 'is likely to turn,' in large part, 'on the interpretation of terms in the plan at issue.'"  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003) ("quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)".  Even though the SERP uses the phrase "substantial gainful activity," in one prong of the definition of disability, Dkt. # 41-7, Plan § 2.9, the Committee has the sole discretion to interpret that phrase in a reasonable manner.  It is not bound by the Social Security Act ("SSA") or its regulations which adopt a narrow view of "any substantial activity."  *See, e.g.*, *Walker v. AT&T Ben. Plan No. 3*, 2022 U.S. Dist. LEXIS 65045, at *26 (C.D. Cal. Apr. 6,

2022) (acknowledging that the determination of substantial gainful work under the SSA "rests on whether any such work exists in the national economy in light of someone's age, education, and work experience, regardless of whether such work exists in the immediate area in which the person lives"). In addition, unlike in social security benefit decisions, ERISA administrators are not required to give deference to the opinion of a treating physician. *Black & Decker*, 538 U.S. at 833. Thus, Plaintiff's award of social security benefits does not render her disabled under the Plan.

In any event, various statements in the decision awarding SSA benefits supports the reasonableness of the Committee's finding of no disability under the SERP. The November 2011 decision found Plaintiff had "residual functional capacity to perform sedentary work" and "light exertional level work," but found her "limited to unskilled work" given her "current pain." CLMREC 00207, 00211, 00213, 00214. The social security award was based on the finding that no jobs "exist in significant numbers in the national economy that [the Plaintiff] can perform" considering her age, education, work experience, and residual functional capacity. CLMREC 000214. Simultaneously, the decision recommends "continuing review" because "[m]edical improvement is expected with appropriate treatment." *Id.* Even Plaintiff's own treating physician opined "that he anticipated that [Plaintiff] would be able to return to her past relevant work" as Bank president in *December 2011*, just one month after this decision issued. CLMREC 00213. The SSA decision supports the Committee's finding that Plaintiff was not disabled under the SERP because she *could* engage in a form of substantial gainful activity. Dkt. # 41-7, Plan § 2.9 (requiring that the participant be "unable to engage in any substantial gainful activity").

Plaintiff's reliance on the finding of disability from 2010 to 2011 under UNUM's Long Term Disability Plan is similarly misplaced. The UNUM plan defines "disability" in the first 27 months as the inability "to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way." CLMREC 00297. Again, that involved a different

8

1  analysis than applied by the Committee—whether at the time of her separation
2  Plaintiff could perform "any substantial gainful activity." Dkt. # 41-7, Plan § 2.9.

3      Any findings of disability under the SSA or UNUM's Long Term Disability
4  Plan do not show that the Committee abused its discretion in finding Plaintiff not
5  entitled to a disability benefit under the SERP. As noted by the Committee in
6  distinguishing the social security benefits award, "whether a condition should be
7  treated by plan administrators as disabling in a particular case is a medical and
8  administrative judgment committed to the discretion of the plan administrator based
9  on a fair review of the evidence." Dkt. # 41-4, at 16. In other words, the Committee
10 utilized a different definition of disability than the SSA and UNUM's Long Term
11 Disability Plan, and the Committee based its finding of no disability on an entirely
12 different record than that presented to the SSA or UNUM. The record before the
13 Committee includes not only Plaintiff's medical records, but also expert opinions on
14 the impact her medical condition had on her ability to work between her suspension
15 in March 2010 and her purported resignation in May 2010, and the circumstances
16 surrounding Plaintiff's separation. As discussed below, the Committee's finding of
17 no disability is reasonable based on the administrative record before it.

18     **D.    The Committee Properly Weighed the Medical Evidence and Expert**
19         **Reports in the Administrative Record**

20     Plaintiff next attempts to fault the Committee for focusing too much on whether
21 her cancer treatment and neuropathy (as opposed to other medical conditions)
22 rendered her disabled as of her separation date. The record shows that the Committee
23 properly determined that Plaintiff was not disabled as defined by the Plan due to any
24 impairment. To the extent the Committee focused in particular on Plaintiff's asserted
25 neuropathy, it did so because that is the condition she identified as disabling.

26     Plaintiff's purported resignation letter identified her cancer treatment and "the
27 effects of that treatment" on her general condition as rendering her disabled and
28 unable to return to work. CLMREC 00170. Her appeal letter specifically identified

her disability as "chemotherapy-induced neuropathy (CIPN)" resulting from her cancer treatment.  CLMREC 00004.  Plaintiff's attorney during the administrative claims process identified her "disabling symptoms" as "resulting from CIPN."  *Id.* Her appeal included an article titled "Chemotherapy-Induced Peripheral Neurotoxicity:  A Critical Analysis."  CLMREC 00135 to 00153.  Plaintiff also submitted an expert report from Steven Fugaro, M.D., a physician board certified in Internal Medicine, who opined that Plaintiff "was suffering from severe peripheral neuropathy as of March 2010."  CLMREC 00155, 00158.  Dr. Fugaro explained:

> In my opinion, the severe peripheral neuropathy that Ms. Metaxas had in March of 2010 clearly met the definition of disability as defined earlier in this report.  The impairment of her hands as well as her gait, combined with the pain of the neuropathy, made it unlikely she would be able to engage in any substantial, gainful activity.

CLMREC 00159.  As an afterthought, Dr. Fugaro references "additional medical problems" of alleged migraines, cervical and lumbar spinal stenosis, and fibromyalgia as being documented in 2010 and creating a "further significant impairment" on her ability to work.  *Id.*  During the hearing on appeal, Plaintiff's attorney continued to argue to the Committee that Plaintiff's disability stemmed from her cancer treatments, explaining that "because of her cancer treatment, Metaxas claimed disability benefits," Dkt. # 41-6, at 6, and that Plaintiff's 2008 cancer and chemotherapy "resulted in serious pain" for Plaintiff, *id.* at 7.

Based on Plaintiff's own characterization of her alleged disability as CIPN, which was further promoted by her expert, Dr. Fugaro, and her attorney, the Committee did not act unreasonably in considering an expert opinion from Dr. Ari David Baron, an oncologist with expansive experience treating patients with cancer and ongoing chemotherapy.  Dr. Baron was asked to opine on Plaintiff's complaints of CIPN as it relates to her disability status.  CLMREC 00340.  He reviewed Plaintiff's outpatient medical records from Kaiser, Dr. Fugaro's report (which included a

1    summary of Plaintiff's medical records and SSA benefit award), and other records

2    related to Plaintiff's employment, and relied on his own extensive experience in

3    treating over a thousand patients with chemotherapy. *Id.* As borne out by Plaintiff's

4    own medical records, Dr. Baron concluded that Plaintiff did not suffer from CIPN.

5    CLMREC 00342 to 00343. But Dr. Baron's opinion did not end there. He also

6    considered whether Plaintiff's other medical records supported a finding of disability.

7        Dr. Baron agreed that Plaintiff's medical records, which *post-dated* her

8    separation, show that Plaintiff "suffered a chronic pain syndrome, with a paucity of

9    neurologic signs or symptoms, which was diagnosed as fibromyalgia, with

10   contributing symptoms from spinal arthropathy resulting in spinal cord compression

11   and neural foramina compression." *Id.* at 00342. Dr. Baron opined that these medical

12   conditions "wax and wane, and may get better with adequate treatment" as shown by

13   Plaintiff's "medical records where she has better days, and flares of pain. The flares

14   are treated with steroid injections, and pain medicines, with adequate relief." *Id.* at

15   00342 to 00343. Dr. Baron concluded that her general condition did not render her

16   "unable to engage in any substantial gainful activity." *Id.* at 00343.

17        The Committee considered both Dr. Fugaro's and Dr. Baron's conflicting

18   reports and reasonably assigned more weight to Dr. Baron's opinion. The Committee

19   gave little weight to Dr. Fugaro's opinion because it conflicted with Plaintiff's

20   medical records and the opinion of Plaintiff's treating physician regarding her ability

21   to work. Indeed, Dr. Fugaro acknowledged interpreting the Plan's definition of

22   disability in the same manner as that applied by the SSA in awarding benefits,

23   CLMREC 00155, whereas the Committee found that it was not bound by the SSA's

24   definition of disability. In addition, the Committee reasonably afforded greater

25   weight to Dr. Baron's opinion on Plaintiff's asserted CIPN because of his expertise

26   in oncology and experience in treating patients undergoing chemotherapy.

27

28

Recognizing that her own records do not support a finding of disability based on CIPN, Plaintiff now attempts to rely on her chronic pain syndrome as her disabling condition and label the Committee's reliance on an oncologist's expert opinion as unreasonable.  Her attempt to shift theories should be rejected.  The Committee conducted a full and fair review of the records presented and arguments made and reasonably determined Plaintiff was not entitled to disability benefits under the SERP.

**E.**       **The Committee Reasonably Found that Plaintiff Had No Disability as Defined by the Plan at the Time of Her Separation**

Under the terms of the SERP, Plaintiff is eligible for Disability Benefits only if she "receives a monthly benefit under this Plan due to Disability."  Dkt. # 41-7, Plan § 5.2.  The Plan defines "Disability" as (i) a physical or mental impairment expected to last for a continuous period of at least a year and which renders the Participant "unable to engage in *any* substantial gainful activity" or (ii) an impairment from which the Participant "*is* receiving income replacement benefits for a period of not less than three (3) months under an accident and health plan covering employees of" the Bank.  Dkt. # 41-7, Plan § 2.9 (emphasis added).  The Committee considered and weighed Plaintiff's medical records from her health care providers, expert medical opinions provided by Plaintiff and the Bank, and other evidence in the record, and after conducting a full and fair review, determined that Plaintiff did *not* meet the Plan's definition of Disability.  Dkt. # 41-4, at 5-8, 12-17.

As discussed above, during the administrative claim procedure, Plaintiff asserted CIPN as her disabling condition.  In litigation, Plaintiff now appears to argue disability based on *different conditions* of chronic pain, migraines, and cervical and lumbar degenerative disc disease.  While Plaintiff disagrees with the Committee's findings regarding her limitations and ability to work, her disagreement alone does not render the Committee's decision unreasonable.  In fact, Plaintiff makes numerous

concessions in her brief demonstrating the reasonableness of the Committee's decision and the ample support therefor found in the administrative record:

- Plaintiff acknowledges that her symptoms of neuropathy had improved by mid-2009 and that wrist pain reported in September 2009 was suspected to be carpal tunnel syndrome rather than a symptom of neuropathy.  Dkt. # 77, at 6.

- Plaintiff acknowledges producing no office visit notes from September 2009 through her suspension in March 2010 regarding any physical or mental impairment or complaints about inability to work.  Instead, she was seen in late 2009 for planned "surveillance" CTs and blood tests to screen for reoccurrence of cancer, both of which were "normal" or "stable."  Dkt. # 77, at 6; *see also* CLMREC 00052 (referring to "surveillance" blood tests and CTs), CLMREC 00056 to 00057.

- Plaintiff acknowledges that she did not seek treatment from her health care provider until April 2010, *after* the Board voted to suspend her employment in March 2010.  Dkt. # 77, at 6-7; *see also* CLMREC 00054 to 00063.  Plaintiff first sought treatment from her oncologist, who referred her to her primary care physician.  *See* CLMREC 00054 to 00063.

- Between April and May 2010, Plaintiff received treatment for migraines and anxiety after reporting weakness, syncope, nausea, vomiting, weight loss, migraines, and diarrhea.  *See* Dkt. # 77, at 7.

- Plaintiff acknowledges submitting a resignation letter claiming an inability to work due to her 2008 cancer treatments on May 26, 2010.  In doing so, Plaintiff concedes she resigned before being taken out of work by any treating physician due to an alleged disability.  Dkt. # 77, at 7-8.  In fact, her treating physician wrote a doctor's note excusing her from work only from April 6 through April 30, 2010.  CLMREC 00168.

- Plaintiff then admits seeking treatment related to chronic pain from June 2010 to August 2010, months after her suspension from work and her purported resignation based on her 2008 cancer-related treatments.  Dkt. # 77, at 8-9.

- Plaintiff's own treating physician later determined that Plaintiff could not perform her regular or customary work as of March 23, 2010, but anticipated that she could return to her prior work as of December 1, 2011.  Dkt # 77, at 9; CLMREC 00213.  Importantly, her physician did *not* find that Plaintiff could not perform "any substantial gainful activity."  Indeed, Plaintiff does not dispute that as of June 2010, both Plaintiff and her health care provider acknowledged that Plaintiff *could* perform other types of work, even if she could not perform her normal work for the Bank, CLMREC 00077 to 00078.

- Plaintiff does not dispute that she *never* informed her treating physicians, the SSA, or UNUM that the Board suspended her employment as of March 23, 2010, the same day she claims disability, based on her criminal and fraudulent conduct reported by the OTS.  Instead, the administrative record shows that Plaintiff claimed an inability to go to work because of her newly reported symptoms, rather than admitting she had in fact been *barred* from returning to work.  *See, e.g.*, CLMREC 00057 ("Unable to work x couple of weeks"),

CLMREC 00068 ("I have been unable to work since early April and do not know what to expect next."), CLMREC 00070 ("While I did my level best trying to continue working while fighting cancer and chemo, I simply cannot do it any more.  As a result, I sadly had to [] tender a letter of resignation to the job that I have loved as of last week, due to health reasons.").

- Finally, Plaintiff does not dispute that she was not currently receiving any disability benefits under an employer-sponsored plan as of her May 2010 purported resignation.

The above, among other evidence in the record, supports the Committee's finding that Plaintiff did not meet the Plan's definition of having a disability.

As for the first prong, the Committee reasonably found that Plaintiff did not suffer from an impairment expected to last for at least a year *and* which rendered her unable to engage in *any* occupation.  Plaintiff's medical records show that her CIPN had improved as of September 2009.  The various symptoms reported by Plaintiff— such as abdominal pain and upset stomach, dizziness, syncopal episodes, and diarrhea—are indicative of stress, not neuropathy, and coincided with the start of the government investigation into her criminal conduct.[3]  Moreover, the records do not support that these conditions were disabling, and instead show that they largely resolved before her purported May 2010 resignation.  *See, e.g.*, CLMREC 00065 (noting that abdominal symptoms had resolved).  The medical records similarly show that other symptoms reported by Plaintiff, such as carpal tunnel, back pain, and migraines, had improved or were stable as of her purported resignation and that the chronic pain syndrome and fibromyalgia diagnosis postdate her resignation.  More importantly, Plaintiff's own physician and her heath records show that she "could do other jobs" or "other type of work" as of June 2010, CLMREC 00077 to 00078, and

---

[3] Plaintiff attempts to downplay the timing of these symptoms by claiming they first arose in January 2010, months before she first reported them to her treating physicians.  The April 9, 2010 office notes do indicate that Plaintiff described the dizziness and mild diarrhea as first developing three months earlier.  CLMREC 00060.  Plaintiff also emphasizes that on July 28, 2010, she reported experiencing numerous symptoms at some point "within the last 6 months."  CLMREC 00096.  But these later self-reports do not explain why she waited months, and only *after* she was suspended based on her criminal conduct, to seek treatment.

could return to her prior occupation of December 2011, CLMREC 00213.   The Committee determined that Plaintiff's medical records did not support a finding that any impairment prevented her from performing any gainful work as of March 23, 2010 or through her purported resignation on May 26, 2010.

As for the second prong, the Committee reasonably determined that at the time of her separation, Plaintiff was not receiving income replacement benefits under any Gateway disability plan.  Plaintiff concedes she was not receiving UNUM disability benefits at the time of her purported resignation but argues that the Committee "invented a temporal requirement in section 2.9 of the Plan which does not exist." Dkt. # 77, at 22. Far from inventing a temporal requirement, the Committee interpreted the plain and unambiguous language of the Plan, which expressly requires a participant to *currently* be receiving (i.e., "is receiving") income replacement benefits for at least three months under a Gateway plan. Dkt. # 41-7, Plan § 2.9.

This requirement and interpretation make sense considering the purpose of the SERP, which was meant to provide supplemental retirement benefits in the event of Plaintiff's retirement or separation through no fault of her own.  The SERP was not intended to provide a windfall to Plaintiff in the event of a temporary disability.  Thus, it only provides for benefits in the event of a disability where such condition is expected to last continuously for over a year *and* either (i) prevents Plaintiff from engaging in any other work; or (ii) Plaintiff is already receiving income replacement from Gateway for at least three months, such that Gateway has an incentive to payout SERP benefits rather than wait for Plaintiff to max out her entitlement to disability benefits and leave the Bank without a key employee performing the role.  The Committee's interpretation of the Plan is reasonable.

Plaintiff next argues that receipt of benefits under California's State Disability Insurance program somehow satisfies the requirement that she had received at least three months of Gateway-sponsored disability benefits.  Dkt. # 77, at 22.  The Court should decline to consider this argument because Plaintiff never raised it during the

administrative review process, and therefore, denied the Committee the opportunity to consider it in the first instance.  Moreover, a state-wide disability program does not meet the Plan definition, which requires "income replacement benefits . . . under an accident and health plan covering employees of Employer."  Dkt. 41-7, Plan § 2.9. Plaintiff also admits she did not receive benefits under the state-sponsored program, or under the SSA or UNUM, for at least three months *before* her separation.

Plaintiff also takes issue with the Committee pointing out the "astounding coincidence" that Plaintiff identified the date of her suspension from employment as the date of her disability. According to Plaintiff, finding her date of disability suspect requires "one to believe that [she] somehow duped at least six separate physicians on multiple occasions as well as the State of California's EDD Office, Unum Insurance Company, and the Social Security Administration."  Dkt. # 77, at 21.  It is nothing short of ironic that Plaintiff argues that she, a convicted felon who admitted to defrauding the Board, the Bank, and the federal government, could not have done such a thing, or that such a conclusion by *anyone* cannot be *reasonable*.  Moreover, Plaintiff does not dispute that she failed to report to any of these players her criminal conduct or her suspension and bar from work as of March 23, 2010.  Rather, the records show Plaintiff misled her treating physicians into thinking that she could not work because of her symptoms, rather than reporting that she could not work because her employment privileges had been revoked due to being under federal investigation for criminal conduct for which she ultimately pled guilty.

Ultimately, the administrative record clearly shows that Plaintiff reported to work without complaint until her suspension on March 23, 2010 due to her fraudulent conduct and the resulting criminal investigation.  Thereafter, the record shows that the Board voted to terminate her employment in April 2010, before her purported resignation in May 2010.  The record shows that Plaintiff could not work after March 23, 2010 because of her suspension and subsequent termination, not because of any medical impairment.  Moreover, any impairments asserted by Plaintiff that happen to

coincide with her suspension on March 23, 2010 through her purported resignation in May 2010 did not rise to the level of disability under the terms of the Plan.  This is supported by the fact that as of her May 2010 "resignation," no doctor had taken her out of work due to a disabling condition.  The Committee's determination that Plaintiff did not separate from the Bank because of a disability is reasonable.  The Court should decline Plaintiff's invitation to award her benefits based on a disability date she fabricated following her suspension pending the criminal investigation.

### F.    Plaintiff Experienced a Change in Employment Status under the SERP Upon the Board's Suspension

The Plan disqualifies Plaintiff from receiving a Termination Benefit in the event of a Board determination that Plaintiff's "employment performance is no longer at a level which deserves reward through participation in this Plan but does not terminate the Plaintiff's employment." Dkt. # 41-7, Plan § 3.2.  Under this provision, called "Change in Employment Status," Plaintiff would only be entitled to benefits if she reached retirement age or became disabled during her employment. *Id.*  There is no dispute that Plaintiff did not reach retirement age at the time of her purported resignation, and as discussed above, the Committee reasonably found that Plaintiff was not disabled at the time of her purported resignation.  This provision also bars Plaintiff from Termination Benefits given her change in employment status.

In challenging the Committee's change in employment status finding, Plaintiff argues that the Committee improperly attempted to make this change in status when such decision must be made by the Board.  Contrary to Plaintiff's suggestion, the Committee did not overstep its authority under the Plan. The Plan delegates to the Committee the sole discretionary authority to interpret the SERP.  In the exercise of such discretion, the Committee reasonably found that the Board's vote to suspend Plaintiff's employment on March 23, 2010 and revoke all Bank privileges satisfied the Plan's requirement for a Board determination that Plaintiff's employment performance no longer deserved reward through the Plan. Dkt. # 41-4, at 9.  The

Board suspended Plaintiff's employment pending the government's investigation into her fraudulent conduct, appointed three directors to take over Plaintiff's responsibility for Bank operations, and then initiated efforts, under OTS supervision, to select a replacement for Plaintiff. *Id.* The Committee properly found that the Board decision constitutes a "Change in Employment Status" as of March 23, 2010 under the Plan. Plaintiff's Change in Employment Status disqualifies her from Termination Benefits.

### G.   The Board Had Cause to Terminate Plaintiff's Employment Which Disqualifies Her from Termination Benefits

Even if no Change in Employment Status occurred, the Board had Cause to terminate Plaintiff's employment, and the Committee reasonably found that this also renders Plaintiff ineligible for Termination Benefits under the Plan.

Importantly, Plaintiff does not dispute that the OTS's report of her fraudulent conduct satisfies the definition of "Cause", which includes any "willful and intentional violation of any state or federal banking or securities laws, or of the Bylaws, rules, policies or resolutions of Employer, or the rules or regulations of the Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, or other regulatory agency or governmental authority having jurisdiction over Employer, which has a material adverse effect upon Employer." Dkt. # 41-7, Plan § 3.4(a). Instead, Plaintiff attempts to paint the Committee's Cause finding as a post hoc rationale that should not be considered. This argument fails on the facts and the law.

From a factual perspective, the initial Committee did not reach the issue of whether Cause existed for Plaintiff's separation because it found that the Board's suspension was sufficient to disqualify Plaintiff from Termination Benefits. On appeal, Plaintiff challenged that decision, and in doing so, it became clear during the appeal process that the characterization of Plaintiff's separation would be a key issue. Evidence regarding the Board's April 2010 vote to terminate Plaintiff's employment was received by the Committee during the appeal process and shared with Plaintiff's counsel in advance of the appeal hearing. Plaintiff was given an

opportunity to present any additional materials she wanted considered by the Appeal Committee.   *See* CLMREC 00335 to 00336.   Plaintiff's counsel then took the opportunity to supplement the record with evidence regarding her alleged resignation prior to the appeal hearing.  CLMREC 00256 to 00257.  The question of whether she was terminated or resigned was then discussed during the hearing, and Plaintiff received a full opportunity to respond to questions and make argument as to the characterization of her separation.   Dkt. # 41-6, at 7-8.   Plaintiff had ample opportunity during the claim process to produce evidence disputing a Cause termination and cannot genuinely claim surprise by the Committee's Cause finding.

From a legal perspective, the cases cited by Plaintiff in support of her theory are distinguishable.   *Abatie v. Alta Health & Life Insurance Co.* involved the administrator "tack[ing] on a new reason for denying benefits in a final decision" without providing the plan participant an opportunity to present evidence regarding that rationale. 458 F.3d 955, 974 (9th Cir. 2006); *see also Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871-72 (9th Cir. 2008) (same).  This did not occur here, as Plaintiff was notified during the appeal process that the characterization of her separation would be an issue considered by the Appeal Committee.  Not only was she encouraged to submit evidence regarding the same for the Committee's consideration, but she in fact did so.

*Harlick v. Blue Shield of California* is unavailing as well.   There, the administrator raised a new argument to deny benefits for the first time in litigation. 686 F.3d 699, 719-20 (9th Cir. 2012). That is not the case here.  Plaintiff had a full opportunity to submit evidence during the appeal process, rebut evidence developed during the appeal process, and present argument at the appeal hearing.

*Brown v. Blue Cross & Blue Shield of Alabama, Inc.* is also inapposite.  In that case, the administrator reached opposing conclusions based on the exact same evidence.  898 F.2d 1556, 1569 (9th Cir. 1990).  Here, on the other hand, the Appeal Committee found Plaintiff ineligible for Termination Benefits for an additional reason

1    and based on a different record, which included additional evidence from both

2    Plaintiff and the Bank.

3         The administrative record contains substantial support for the Committee's

4    decision finding Cause for Plaintiff's separation.  Specifically, it shows that on March

5    23, 2010, the OTS informed the Board that Plaintiff had violated federal banking laws

6    and provided evidentiary support for its findings.  CLMREC 00353.  Gateway

7    immediately suspended Plaintiff's employment, had three directors assume

8    responsibility for Bank operations consistent with its succession planning, and then

9    recruited, with OTS approval, a CEO to replace Plaintiff.  CLMREC 00014, 00266,

10   00353, 00366, 00367.  Thereafter, "[a]t the board meeting held on April 29, 2010, the

11   directors unanimously voted to terminate Ms. Metaxas's employment" based on her

12   role in the fraudulent scheme as reported by OTS.  CLMREC 00367.  Plaintiff

13   challenges this evidence as unreliable because it comes from an OTS report of

14   examination.  But the OTS, who demanded that Plaintiff be removed from her position

15   and had to approve Plaintiff's replacement, would have knowledge of the Board's

16   decisions regarding Plaintiff's employment.  Based on the totality of the record, the

17   Committee reasonably found that Plaintiff's subsequent "resignation" does not

18   dissolve the prior existence of Cause to terminate Plaintiff.  Nor does the other

19   evidence cited by Plaintiff as proof of her resignation.[4]

20   _____

21       [4] For the most part, Plaintiff relies almost exclusively on extra-record evidence
     subject to Defendants' Motion to Strike.  Even if the Court were to consider this new
22   and outside-the-record evidence (which it should *not*), it further supports the
     Committee's benefit denial decision.  The April 29, 2010 Board meeting minutes
23   summarize discussions with OTS representatives who attended the Board meeting,
     including an update on "employee matters related to the Ideal Mortgage transactions"
24   (the fraudulent transactions at issue) and discussions of "Recruitment of CEO."  Dkt.
     # 78-1, at GSB033186.  Moreover, the Board received an update "on the status of
25   discussions about Mr. Jeffrey Cheung in the position of President/CEO whom was
     recommended to the Bank by the OTS."  *Id.* at GSB033188.  After considering Mr.
26   Cheung's qualification, the Board "ratified the decision to offer Mr. Cheung the
     position of President/CEO pending OTS approval."  *Id.*  The May 27, 2010 Board
27   meeting minutes show that the Board acknowledged receipt of Plaintiff's resignation
     letter and simultaneously voted to appoint Mr. Cheung as the CEO/President and

28

1      As determined by the Committee, Gateway had no obligation to provide
2  Plaintiff with formal notice of its Cause designation under either the SERP or
3  Plaintiff's employment agreement.   Dkt. # 41-4, at 11.   The Plan defines a
4  "termination for cause" as a termination based on the occurrence of certain events,
5  including violation of banking laws or regulations.   Dkt. # 41-7, § 3.4.   Under
6  Plaintiff's employment agreement, any termination following suspension due to
7  regulatory proceedings "shall be deemed a termination for cause."  CLMREC 00178.
8  The Plan similarly contains no requirement that the Board provide notice of the Cause
9  reason.  Nor does it allow Plaintiff to circumvent a Cause termination by resigning,
10 thereby beating the Board to the punch.  Plaintiff's termination from employment
11 stems from the OTS investigation into her fraudulent conduct, and Plaintiff's attempt
12 to characterize it as a resignation should be seen for what it is—another fraudulent
13 sham she is attempting to perpetrate on Gateway.  Ultimately, her criminal conduct
14 and resulting separation for Cause disqualifies Plaintiff from Termination Benefits
15 under the Plan.

16     The sparse evidence relied on by Plaintiff in the administrative record to
17 support her resignation does not change the above analysis.  Plaintiff first argues that
18 the Bank's former CFO worried about the Board allowing Plaintiff to resign before
19 notifying her of her Cause termination.  But as the Committee found, Plaintiff's
20 employment agreement automatically converts any termination following a
21 suspension due to a regulatory investigation into a Cause termination and the SERP
22
23

_____

24 Board member now that the Bank had "received the OTS approval for hiring of Jeff
25 Cheung."  Dkt. # 78-2, at GSB014951 to GSB014952.  These documents show that
   as of April 29, 2010, the Board had decided to terminate Plaintiff's employment as
26 CEO based on her fraudulent and unlawful conduct, had updated the OTS on that as
   well as recruitment efforts for a replacement CEO, and had decided to offer the CEO
27 position to Mr. Cheung pending OTS approval, which it had received by May 27,
   2010.  Clearly, there was no intention of reinstating Plaintiff as of April 29, 2010 or
28 any time thereafter.

1   similarly defines Cause as a termination following the occurrence of a regulatory

2   violation.

3       Plaintiff next argues that the former Bank Chairman sent her flowers and would

4   not have done so had she been terminated for Cause.  The record shows that the former

5   Chairman sent flowers to Plaintiff at some point as a token of appreciation.  Dkt. #

6   41-3, at CMREC 00266.  The former Chairman could not remember when he sent

7   flowers but he "think[s] it's 2010. . .. I do not remember the exact date or – it's roughly

8   2010, the first half of 2010."  *Id.*  The record does not establish that these flowers

9   were delivered after her suspension.  Nor does such an act reflect on whether Plaintiff

10   was separated for Cause or not.

11       Finally, the Committee considered Plaintiff's evidence that she received pay

12   until her resignation and that human resources documented her separation as a

13   "voluntary quit."  The Committee found that these payroll and human resources errors

14   did not call into question the reasons for the Board's decision to suspend Plaintiff's

15   employment in March 2010 and replace her as CEO in April 2010 based on her

16   fraudulent conduct.  The weight of the evidence and the circumstances surrounding

17   Plaintiff's separation from employment overwhelmingly supports the Committee's

18   Cause finding.

19   **H.    Plaintiff's Claim for Equitable Relief under Section 502(a)(3) Fails**
     **as a Matter of Law**

20

21       Plaintiff's claim for equitable relief under ERISA section 502(a)(3), 29 U.S.C.

22   § 1132(a)(3), fails as a matter of law.  Plaintiff concedes that the SERP is a top hat

23   plan exempt from fiduciary duties under ERISA.  Yet, Plaintiff now contends that she

24   bases her section 502(a)(3) claim on an alleged breach of the contractual duty of good

25   faith and fair dealing, rather than on an ERISA-mandated fiduciary duty.  In making

26   this argument, Plaintiff asks the Court to ignore the specific allegations of her

27   Complaint basing her equitable relief claim *solely* on purported fiduciary breaches on

28   the part of Defendants.  Specifically, Plaintiff alleges that Defendants, "[i]n their

capacity as ERISA fiduciaries," owed her "certain fiduciary duties."  Dkt. # 1, ¶ 21.
She alleges that various "acts and omissions as alleged" in the Complaint "constitute
a breach of their fiduciary duties owed to plaintiff." Id. ¶ 23.  Plaintiff then requests
an equitable surcharge to remedy "defendants' breach of their fiduciary duties." Id. ¶
24.  As Plaintiff now concedes, this claim fails as a matter of law to the extent based
on fiduciary duties because such duties do not attach to top hat plans, such as the
SERP.  And the Court should refuse to consider Plaintiff's new theory of liability as
falling outside of the scope of her Complaint.

      The Complaint, which focused solely on alleged breaches of fiduciary duty,
does not allege any facts that would afford Defendants with fair notice of her current
theory of liability.  *See Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th
Cir. 2006) (holding that the district court did not err in finding that plaintiff failed to
provide defendant with adequate notice of new theories raised during summary
judgment where plaintiff's complaint alleged different facts); *Ammons v. Diversified
Adjustment Serv., Inc.*, 2019 U.S. Dist. LEXIS 175842, at *9-10 (C.D. Cal. Oct. 9,
2019) (concluding that plaintiff's factual allegations in opposition to summary
judgment were outside the scope of plaintiff's claims as alleged in the complaint).
"[S]ummary judgment is not a procedural second chance to flesh out inadequate
pleadings." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir.
2006).  "If a plaintiff fails to assert any factual allegations as to a particular theory of
liability in a complaint," a later attempt to submit evidence "supporting [that theory]
at the summary judgment stage is ineffectual." *DK Holdings v. Miva, Inc.*, 2019 U.S.
Dist. LEXIS 57663, at *8 (S.D. Cal. Apr. 3, 2019) (holding that plaintiff's breach of
contract theory of liability raised in opposition to summary judgment was outside the
scope of his complaint where his complaint pleaded a distinct theory of breach in great
detail with no mention of the new theory).  The Court should reject this new theory
of relief and grant summary judgment to Defendants on Plaintiff's section 502(a)(3)
claim as alleged in the Complaint.

1    Even if the Court were to overlook Plaintiff's allegations and consider an

2    alleged breach of the duty of good faith and fair dealing, Plaintiff's claim still fails as

3    a matter of law.  To state a section 502(a)(3) claim against a non-fiduciary, Plaintiff

4    must prove Defendants committed "a remediable wrong, i.e., that the plaintiff seeks

5    relief to redress a violation of ERISA or the terms of a plan," and that the relief sought

6    is "appropriate equitable relief."  *See Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d

7    945, 954 (9th Cir. 2014).  Plaintiff now asserts that the "remediable wrong" is

8    Defendants' breach of the duty of good faith and fair dealing.  To show such a breach

9    of duty, Plaintiff must show (1) the existence of a contract; (2) Plaintiff's performance

10    under the contract; (3) Defendants' breach; (4) damage to Plaintiff; and (5)

11    Defendants' unfair interference with Plaintiff's right to receive the benefits of the

12    contract.  *Dedicato Treatment Ctr. v. Cigna Health & Life Ins. Co.*, 2017 U.S. Dist.

13    LEXIS 220004, at *8-9 (C.D. Cal. Aug. 24, 2017).  Plaintiff's claim for equitable

14    relief is truly duplicative of her claim for benefits under section 502(a)(1)(B) and fails

15    for the same reasons discussed above.  Far from consciously and deliberately failing

16    to discharge duties under the SERP, the Committee properly found under the terms

17    of the SERP that Plaintiff was not entitled to benefits.

18    In addition to proving no "remediable wrong" committed by Defendants,

19    Plaintiff also does not seek "appropriate equitable relief."   *Gabriel*, 773 F.3d at 954.

20    Plaintiff couches her claim for relief as one for "surcharge," that is "monetary

21    compensation for a loss resulting from a[n administrator's] breach of duty, or to

22    prevent the [administrator's] unjust enrichment."  *Gabriel*, 773 F.3d at 957.  Plaintiff

23    must show actual harm and causation to obtain the relief of surcharge.  *Id.*  Here,

24    Plaintiff seeks an award of over $2 million in alleged "financial losses."  Essentially,

25    "[a]lthough styled as seeking an equitable remedy, Plaintiff's Complaint seeks

26    compensatory damages because she seeks monetary relief for all losses she sustained

27    as the result of Defendant's alleged breach of its [] duties."  *Kopeley v. Boeing Co.*

28    *Voluntary Inv. Plan*, 2020 U.S. Dist. LEXIS 246366, at *11 (C.D. Cal. Oct. 14, 2020).

This is not a permissible use of the section 502(a)(3) equitable claim. *Id.* Moreover, Plaintiff fails to show causation. Specifically, she cannot show that the asserted losses stem from the Committee's denial decision rather than her commission and conviction of felony bank fraud, her subsequent imprisonment, or the court-ordered criminal restitution and civil liability stemming from the same.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's 502(a)(3) claim for equitable relief, and Plaintiff's motion for summary judgment thereon should be denied.

## III.   <u>CONCLUSION</u>

Based on the foregoing, as well as for the reasons stated in any hearing on this motion, Defendants respectfully request that this Court deny Plaintiff's Motion for Summary Judgment, grant their Motion for Summary Judgment, enter judgment in their favor on all of Plaintiff's claims, dismiss Plaintiff's claims with prejudice, and allow Defendants such other and further relief as the Court may deem just and proper.

DATED: July 29, 2022            **McGuireWoods LLP**

By:  / s / Summer L. Speight
_____
Sabrina A. Beldner / Summer L. Speight
Attorney for Defendants, Gateway Bank, F.S.B. and The Gateway Bank Supplemental Executive Retirement Plan

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2022, **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was filed electronically in the Court's Electronic Case Filing system ("ECF"); thereby upon completion the ECF system automatically generated a Notice of Electronic Filing ("NEF") as service through CM/ECF to registered e-mail addresses of parties of record in the case.

_____/s/ Summer L. Speight_____
Summer L. Speight, Esq.