1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    POPPI METAXAS,                          Case No. 20-cv-01184-EMC

8              Plaintiff,

9         v.                                  ORDER GRANTING IN PART AND
                                              DENYING IN PART THE PARTIES'
10   GATEWAY BANK F.S.B., et al.,             CROSS-MOTIONS FOR SUMMARY
                                              JUDGMENT
11             Defendants.
                                              Docket Nos. 74, 77, 83
12

13

14        This is an action for supplemental retirement benefits pursuant to the Employee Retirement

15   Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a).  Plaintiff Poppi Metaxas filed this

16   case against her former employer Defendant Gateway Bank, F.S.B. ("Gateway") and the Gateway

17   Bank Supplemental Executive Retirement Plan ("the Plan").  She alleges that she worked as the

18   President and CEO of Gateway Bank and that she became "totally disabled under the terms of the

19   plan" due to "prolonged sickness" and other "acute and chronic medical problems."  Docket No. 1

20   ("Compl.") ¶¶ 7-10.  She filed a claim for disability and termination benefits on March 23, 2013,

21   which Defendants denied on February 25, 2016.  *Id.*  Metaxas appealed the denial on August 15,

22   2016, and "sent defendants additional documentation of her disability" with her appeal.

23   Defendants upheld the decision to deny benefits on May 22, 2017.  *Id.* at ¶¶ 12, 13.  Metaxas filed

24   the complaint on February 17, 2020 seeking relief under ERISA §§ 502(a)(1)(B), (a)(3).  *See* 29

25   U.S.C. §§ 1132(a)(1)(B), 1132(a)(3).

26        Now pending are the parties' cross-motions for summary judgment, and Defendants'

27   related motion to strike extra-record evidence.  *See* Docket Nos. 74 ("Def. MSJ"), 77 ("Pl. MSJ");

28   83 ("MTS").  For the following reasons, the Court **GRANTS in PART** and **DENIES in PART**

the parties' respective cross-motions for summary judgment and **DENIES** Defendants' motion to strike. The Court **REMANDS** the case to Defendants for reconsideration of Plaintiff's eligibility for termination benefits consistent with this decision.

## I.    BACKGROUND

Unless otherwise noted, all facts are drawn from the undisputed administrative record. *See* Docket Nos. 41-2, 41-3, 41-7, 42-3.1

A.    Relevant Plan Provisions

1.    Administration and Claim Procedure

Plaintiff was the only participant in Gateway's Supplemental Executive Retirement Plan, a top hat plan designed to "retain[] and attract[] individuals of exceptional ability" by providing Retirement, Disability, or Termination Benefits subject to the terms and conditions of the Plan. Docket No. 41-7 ("Plan") §§ 1, 5. The administration of the Plan is governed by the provisions in Article VII. Accordingly, the "Plan shall be administered by an Administrative Committee which shall consist of not less than three persons appointed by the Board [of Gateway]" and the "Committee shall have the authority to make, amend, interpret, and enforce all appropriate rules and regulation for the administration of this Plan and decide or resolve any and all questions including interpretations of this Plan, as my arise in connection with the Plan." Plan § 7.1. "A majority vote of the Committee members constituting a quorum shall control any decision." *Id.* Furthermore, the "decision or action of the Committee in respect of any question arising out of or in connection with the administration, interpretation and application of the Plan and the rules and regulations promulgated hereunder shall be final and conclusive and binding upon all persons having an interest in the Plan." *Id.* § 7.3.

The Plan sets out a claim procedure for "any person claiming a benefit, requesting an interpretation or ruling under the Plan, or requesting information under the Plan shall present the request in writing to the Committee which shall respond in writing as soon as practicable." *Id.* § 8.1. The decision on a claim, including review of the denial of a claim, rests with the

---

[1] These documents are Bates stamped with the prefix CLMREC, for "claim record." For brevity, the Court refers to the Bates stamp numbers with the prefix "AR" for "administrative record."

United States District Court
Northern District of California

1    Administrative Committee.  *Id*. §§ 8.1-8.4.  The Committee's "decision" regarding a claim for

2    benefits "shall be in writing" and the Committee's "decisions on review shall be final and bind all

3    parties concerned."  Plan § 8.4.

4           2.    Benefit Categories

5           The Plan provides three categories of potential supplemental retirement benefits:

6    retirement, disability or termination benefits.  Plan §§ 5.1, 5.2, 5.3.  Participants can only receive

7    one form of benefit if eligible under the terms of the Plan.  *Id*. §§ 5.2, 5.3 (stating that Disability

8    Benefits or Termination Benefits were only available "in lieu of any other benefit under" the

9    Plan).

10          First, Retirement Benefits are available only if a Plan participant separates from

11   employment upon reaching retirement age.  Plan §§ 2.13, 5.1.  There is no dispute that Plaintiff

12   separated before reaching retirement age and is therefore not eligible for Retirement Benefits.  *Id*.

13          Second, the Plan provides for Disability Benefits, in lieu of any other benefit under the

14   Plan.  *Id*. § 5.2.  "If a Participant receives a monthly benefit under this Plan due to Disability, the

15   benefit payable, in lieu of any other benefit under this Article, shall be the Participant's Accrued

16   Benefit determined on the date of Disability.  The date of such Disability shall be determined by

17   the Committee."  *Id*.  The Plan defines "Disability" as

18              (i)    a medically determinable physical or mental impairment
                       which can be expected to result in death or can be expected
19                     to last for a continuous period of not less than twelve (12)
                       months, as a result of which the Participant is unable to
20                     engage in any substantial gainful activity, or

21              (ii)   an above-described impairment from which the Participant is
                       receiving income replacement benefits for at least three (3)
22                     months under an accident and health plan covering the
                       employees of Employer.
23

24   Plan § 2.9.

25          Third, if a Plan participant separates from employment prior to retirement age, the Plan

26   provides for a Termination Benefit, unless the termination was supported by cause.  *Id* § 5.3; *see*

27   *also id*. § 3.4 ("[N]o benefit shall be paid hereunder if a Participant's employment with Employer

28   has been terminated for 'cause.'").  The Plan defines "cause" to include a "termination based

1   upon" the participant's "willful and intentional violation of any state or federal banking or

2   securities laws, or of the Bylaws, rules, policies or resolutions of Employer, or the rules or

3   regulations of the Federal Deposit Insurance Corporation, Office of the Comptroller of the

4   Currency, or other regulatory agency or governmental authority having jurisdiction over

5   Employer, which has a material adverse effect upon Employer." *Id*. § 3.4(a).

6        Even if a Plan participant is not terminated with "cause," the Plan excludes a participant

7   from receiving benefits under the SERP pursuant to a "Change in Employment Status" clause:

8           If the Board determines that a Participant's employment
    performance is no longer at a level which deserves reward through

9           participation in this Plan, but does not terminate the Participant's
    employment with Employer, participation herein and eligibility to

10          receive benefits hereinunder shall be limited. . . and shall only be
    payable if the Participant attains Retirement with Employer or

11          becomes disabled while employed by Employer.

12  *Id*. § 3.2.

13  B.    <u>Plaintiff's Employment with and Suspension from Gateway</u>

14       Gateway employed Plaintiff as President and CEO since 1998, as an at-will employee

15  serving at the pleasure of the Board.  AR 174.  During her employment in this position, Plaintiff

16  became a participant in the Bank's SERP, with a retirement age of 60.  AR 31.

17       Around September 2008, the Office of Thrift Supervision ("OTS"), the federal agency

18  tasked with conducting oversight of Gateway, instructed Gateway's Board that it needed to reduce

19  the number of nonperforming assets and bank-owned real estate on Gateway's books and to raise

20  capital.  AR 356-63, 407, 227.  Thereafter, in 2009, Plaintiff Metaxas, in her role of CEO of

21  Gateway, caused Gateway to engage in fraudulent transactions to purportedly clear nonperforming

22  assets, but, which, in fact had the effect of reducing Gateway's capital.  AR 227, 407-408.  "Most

23  of the damage resulted from backscratching deals that Metaxas arranged with Ideal Mortgage, a

24  mortgage lender run by Metaxas's co-conspirators."  AR 227.  "The scheme involved several

25  kinds of fraudulent transactions" which were "intended to conceal the true financial conditions of

26  Gateway and Ideal, and allow for the perpetuation of fraudulent schemes by the co-conspirators."

27  *Id*.

28       On March 23, 2010, one day after the OTS informed the Board that its examination of

United States District Court
Northern District of California

4

United States District Court
Northern District of California

Gateway's transactions in 2009 indicated that Metaxas engaged in unlawful and fraudulent conduct, Gateway's Board suspended Metaxas without pay, effective immediately, pending further investigation of the matter.  AR 227 (2016 memo from Initial Claim Committee member to Board describing Plaintiff's employment history), 353 (March 25, 2010 letter from Board to OTS), 376 (Minutes from March 25, 2010 Board Meeting).  In voting to immediately suspend Metaxas without pay, the Board also instructed Bank employees to immediately revoke all of her access privileges to the Bank, including the Bank's physical and electronic property, any remote electronic access to Bank files, databases, email, or other accounts, and changing locks, key codes and passwords through which Metaxas could access the Bank.  AR 353.  In addition, the Board instructed employees not to discuss any Bank matters with Metaxas, and the Board informed OTS that it would advise the agency in advance of any further contact between the Board and Metaxas.  AR 353-54.  The Board, however, made no express finding that Ms. Metaxas' performance warranted a bar on her receiving SERP benefits pursuant to §3.2

Two days later, on March 25, 2010, the Board met to discuss the day-to-day operations of the Bank given Plaintiff's suspension, the response to OTS concerns, and a succession plan to replace Plaintiff as CEO. AR 374, 376. "With the suspension of CEO Metaxas, three directors assumed the day-to-day responsibilities of the office of the CEO." AR 366.

Over the next month, and with OTS approval, "the board recruited Mr. Jeffrey Cheung to replace Ms. Metaxas as CEO."  AR 366.  Thereafter, according to a report prepared by OTS in its May 2010 examination of the Bank's activities, "[a]t the board meeting held on April 29, 2010, the directors unanimously voted to terminate Ms. Metaxas's employment" based on her role in the fraudulent scheme.  AR 367.  However, apart from the OTS report, there is no documentation that Gateway terminated Mr. Metaxas, and as indicated below, there is documentation to the contrary – that she resigned rather than suffered termination.

C.   Plaintiff's Medical History and Resignation Letter

According to Plaintiff's medical records, in May 2008, Plaintiff was diagnosed with ovarian cancer, which resulted in surgery and chemotherapy from June to October 2008.  AR 35, 43-44.  In November 2008, Plaintiff experienced neuropathy, a numbness in the limbs that is

induced by chemotherapy.  AR 44.  Medical notes from November 2008 indicate that Plaintiff had a history of migraine headaches and chronic back pain, and indicated that her migraines were "stable" at that time.  *Id.*  By May 28, 2009, Plaintiff's neuropathy was reported to be "improving," and her migraines remained "stable."  AR 47-48.  In September 2009, Plaintiff experienced "intense. . . wrist pain involving thumbs and forearms," which was "worse at night" and "worse with rotational movements of [the] wrist."  AR 51.  Plaintiff reported "no numbness or tingling in fingers or toes" at that time, and was "still working on computer same amount."  *Id.*  Plaintiff's physician treating her for cancer noted that "numbness/tingling" is "typical of peripheral neuropathy," and, because Plaintiff did not report such symptoms, referred Plaintiff for a consultation with an orthopedic physician "to evaluate [her] for carpal tunnel syndrome."  AR 52.

There are no medical records regarding Plaintiff's condition between September 18, 2009 and April 1, 2010.

On April 1, 2010, Plaintiff sent a message to the physician treating her cancer, Dr. Rajpal, indicating she was not feeling well and needed an appointment.  AR 54.  Plaintiff visited Dr. Rajpal on April 6, 2010, and was reported to be experiencing "diffuse weakness," "right groin pain," "syncope," "nausea," "vomiting 1x/day," and "diarrhea x2/day."  AR 56-57.  Plaintiff experienced "decreased wrist pain. . . after steroid injection – not wearing braces," neuropathy was reported to have "improved," and migraines were noted to be "stable."  AR 57-58.  The medical visit notes state that Plaintiff reported she was "unable to work x couple weeks," however there is no indication of the basis of Plaintiff's inability to work.  AR 57.

On April 9, 2010, Plaintiff reported having migraines, abdominal pain and dizziness.  AR 60.  According the physician notes from the April 9, 2010 visit, "3 months ago, [Plaintiff] developed dizziness, has had two syncopal episodes, upset stomach, [right] sided migraines associated with nausea (used to get migraines once a month but now get them every other day). . . feels profoundly weak at times; stressed from work; had mild diarrhea that started in January that is now worse. . . weight has decreased about 3lbs; has had night sweats. . . has cut back on water intake b/c liquids makes her nauseated."  *Id.*

6

United States District Court
Northern District of California

1    On May 12, 2010, Plaintiff reported dizziness, migraine headaches and occasional nausea,

2    and was prescribed a new medication for migraines and to restart a vitamin B6 regimen.  AR 65-

3    67.

4        On May 25, 2010, Plaintiff wrote a note to her primary care physician stating that she

5    continued to suffer dizziness and drowsiness, as well as pain in her upper body and head.  AR 68.

6    She stated, "I simply need to lay down in complete silence and darkness rather frequently.  I also

7    find myself unable to sleep at night so I start up each day drained, tired, irritable and unable to

8    focus and concentrate."  *Id*.  She further stated, "I have been unable to work since early April and

9    do not know what to expect next."  *Id*.; AR 69.  Plaintiff did not state the basis for her inability to

10   work, and there is no indication in this message or in the prior medical history notes that Plaintiff

11   reported that she had been suspended without pay from Gateway on March 23, 2010.  On May 26,

12   2010, Plaintiff's primary care physician responded and suggested "a different medication called

13   topiramate which may cause less sedation," and asked Plaintiff to let her know what she thought.

14   AR 70.

15       Also on May 26, 2010, Plaintiff filed a letter of resignation with the Bank based on

16   disability.  AR 170.  The letter, addressed to the Chairman of the Board, states:

17           [E]ffective immediately, I am hereby resigning from the Board of
             Directors and all employment with Gateway Bank.  As you know, I
18           have been battling ovarian cancer since 2008.  Although I have been
             under treatment since that time, the effects of that treatment and my
19           condition generally have rendered be disabled and unable to return
             to work.
20

21   *Id*.  On June 1, 2010, the company, through its Human Resources Director, issued a "Notice to

22   Employee as to Change in Relationship" indicating that Plaintiff's "employment status has

23   changed" due to her "[v]oluntary quit effective: 5/26/10."  AR 172.

24       On June 1, Plaintiff informed her primary care physician that she "had to tender [a] letter

25   of resignation to the job that I have loved as of last week, due to health reasons."  *Id*.  Similarly, on

26   June 6, Plaintiff wrote a message to the physician treating her cancer, informing the physician of

27   her resignation and requesting assistance to "complete the required disability forms."  AR 71.

28       On June 8, 2010, Dr. Rajpal noted that Plaintiff reported "neck pain radiating down to

arms and fingers," "sharp shooting pain," "diffuse myalgias," "migraines 3x/wk."  AR 73-74.  The notes state Plaintiff's pain conditions are "not consistent with taxol-induced neuropathy," and scheduled Plaintiff for a neurology consultation and rheumatology consultation.  AR 75.

At the neurology consultation on June 14, Dr. Mujahid Mahmood noted that Plaintiff reported she "feels she cannot do her normal work at bank – bc involved long distance travel and cannot sit for prolonged periods of time," and that Plaintiff was "planning to apply for disability – but [she] feels [she] could do other jobs."  AR 77; *id.* at 78 ("Planning to send disability paperwork. . . Feels could do other type of work – but not what she was doing previously").  Dr. Mahmood found that Plaintiff experienced "chronic pain" with "multifactorial" causes, including "likely w[ith] a component of peripheral neuropathy due to chemo[therapy]."  AR 78.  That same day, Plaintiff visited a rheumatologist who stated, "I believe you. . . have fibromyalgia. . . This is a type of chronic pain that has many associated symptoms.  Most of it is related to the pain and aching and fatigue in the muscles.  There is no particular medication.  We don't know why people get it."  AR 83-84.

On June 24, MRIs of Plaintiff's spine revealed disc protrusions and impingement of the spinal cord. AR 86-90.  On July 8, Dr. Rajpal, Plaintiff's oncologist, noted that Plaintiff continued to experience chronic pain and referred her to a chronic pain clinic.  AR 94.  In a pain assessment questionnaire in connection with Plaintiff's July 28, 2010 visit to the chronic pain clinic, Plaintiff answered a question regarding her symptoms in the "last 6 months" by indicating her symptoms included, among others, "back pain," "diarrhea," "dizziness," "fainting spells," "low energy," "headaches," "joint problems," "nausea," and "sleep problems."  AR 96.  Thereafter, on August 6, Plaintiff visited a pain specialist, Dr. Joseph Kwok, who assessed that Plaintiff experienced "chronic pain syndrome" and "facet arthropathy," and scheduled Plaintiff for a "back injection."  AR 102-03.

On October 18, 2010, Dr. Kwok noted that the injection for Plaintiff's lower back provided one week of "good relief," and that her back pain decreased on most days, but that her pain continued.  AR 105.  A second injection was prescribed.  *Id.*  On October 22, 2010, Dr. Rajpal noted that Plaintiff's back and neck pain persisted, and she experienced nausea and vomiting in the

United States District Court
Northern District of California

8

1   mornings.  AR 110.  Additional records from November 24, December 7, and January 11, 2011

2   indicate that Plaintiff continued to report severe pain with nausea and dizziness, and spent periods

3   of time in her bed as a consequence.  AR. 114-23.  Among the various treatments she was

4   prescribed to address her pain included morphine.  AR 124.

5   D.     Applications for Insurer Disability Benefits and Social Security Disability Benefits

6           After resigning from Gateway, Plaintiff filed a claim for long-term disability benefits from

7   UNUM, a group insurance policy for Gateway employees, and with the Social Security

8   Administration ("SSA") for disability benefits.  The record does not include Plaintiff's application

9   for benefits to UNUM or UNUM's determination of Plaintiff's eligibility for benefits, but there is

10  evidence that UNUM provided benefits to Plaintiff beginning on June 22, 2010.  AR 218.

11  UNUM's policy includes a 90-day elimination period from the date a disability begins before

12  benefits are paid, AR 283, so the June 22 benefit payment date corresponds to a March 23, 2010

13  disability onset date.  Plaintiff also received disability benefits from the State of California as of

14  March 31, 2010, corresponding to a disability onset date of March 24, 2010.  AR 218.

15          On November 1, 2011, after a hearing, the SSA determined that Plaintiff had been disabled

16  from working under §§ 216 and 223 of the Social Security Act since March 23, 2010.  AR 207-

17  214.  The SSA found that Plaintiff suffered from the following severe impairments:

18              Status post ovarian cancer with surgery and chemotherapy, in
                remission; lower extremity peripheral neuropathy; migraine;
19              cervical and lumbar degenerative disc disease with cervical spinal
                canal stenosis and spinal cord compression per MRI; right upper
20              extremity burning pain and shooting pain, numbness of all fingers
                and toes and weakness of right upper extremity; chronic pain
21

22  AR 211.  The SSA determined Plaintiff "has the residual capacity to perform sedentary work as

23  defined in 29 CFR 404.1567(a) except is unable to sustain work activities for an 8-hour work day,

24  or equivalent due to upper extremity pain, cervical and lumbar pain, and spinal stenosis."  *Id*.  The

25  decision further states,

26              The extensive treatment notes from Kaiser Permanent/South San
                Francisco show that the claimant was forced to stop working in early
27              2010 due to the effects of her chronic back pain, migraine
                headaches. . . and episodes of unsteadiness where she felt as if she
28              would lose her balance, caused by neuropathy.

United States District Court
Northern District of California

1   AR 212.  In support of its finding that Plaintiff's disability began on March 23, 2010, the SSA

2   explained that, "On August 13, 2011, Dr. Kwok submitted a report to the claimant's long-term

3   disability carrier.  He opined that the claimant had been incapable of performing her regular or

4   customary work since March 23, 2010 and that he anticipated her return to her regular/customary

5   work on December 1, 2011."  AR 212-13.  Dr. Kwok's underlying report does not appear in the

6   record.

7   E.    Plaintiff's Criminal Conviction for Fraudulent Conduct as CEO of Gateway

8         The fraudulent transactions reported by OTS led to a criminal indictment against Plaintiff,

9   charging her with conspiracy to commit bank fraud in a case filed in the United States District

10  Court for the Eastern District of New York.  AR 512 (*United States v. Metaxas*, 14-CR-190-JFB

11  (E.D.N.Y.)), 520.  According to the indictment, "[Plaintiff] along with others knowingly and

12  willfully conspired or agreed to execute a fraudulent scheme against Gateway Bank FSB and to

13  obtain more monies under the control of Gateway Bank by means of materially false and

14  fraudulent representations, in violation of the bank fraud statute section."  *Id.*

15        In April 2015, Plaintiff pled guilty to federal conspiracy to commit bank fraud.  AR 227.

16  In doing so, she admitted to the following conduct:

> In 2009 I acted and agreed with others to arrange certain
> transactions that would help make Gateway's books look more
> acceptable to the regulators.  One set of transactions included a loan
> to Gateway's biggest customer which . . . was used to fund
> payments back to the bank in the form of down payments from three
> other entities that purchased certain assets that the regulators wanted
> off the bank's books.  I know that the customers used the money
> from the loan to fund the down payments to Gateway for the
> purchase of the assets.  Taken together, these transactions did not
> actually improve the condition of the bank, and I did not provide the
> complete information about these transactions to Gateway's board
> which ultimately had to approve them.

24  AR 529-30.  Plaintiff admitted to her knowing and intentional involvement in the fraudulent

25  scheme.  AR 474-75, 532.  At Plaintiff's sentencing, a representative of Gateway Bank testified

26  that her unlawful conduct caused significant monetary damages to the Bank, the value of the

27  Bank's stock plummeted, and a number of employees lost their jobs due the Bank's losses.  AR

28  563.  Plaintiff was sentenced to 18 months of incarceration.  AR 590.

United States District Court
Northern District of California

10

F.      Plaintiff's Claim for SERP Benefits and Denial by the Initial Claim Committee

Plaintiff submitted a claim for SERP benefits on March 25, 2013. AR 7, 14. Due to Plaintiff's then-pending criminal case, the parties agreed to toll the processing of Plaintiff's claim. *Id.* After the tolling agreements expired, the Board appointed a Committee ("Initial Claim Committee) to consider Plaintiff's initial claim for benefits. AR 226. The Board named Chairman James Keefe, Member Frances Baker, and Member Ken Lee to the initial Committee. *Id.*

On February 25, 2016, the Initial Claim Committee issued a decision denying Plaintiff's claim. AR 14-16. Specifically, the Committee found that:

- "Gateway did not terminate [Plaintiff], she resigned on May 26, 2010." AR 15;

- Plaintiff made several misrepresentations to the Board to induce the Board into approving fraudulent transactions, AR 15;

- Plaintiff pled guilty to conspiracy to commit bank fraud against Gateway and caused damage to the financial condition and reputation of Gateway, *id.*;

- Because of her criminal conduct, Gateway was required to respond to criminal subpoenas, an investigation by a federal agency and defend itself from any criminal liability, *id.*;

- Such actions do not deserve award through the SERP, *id.*; and

- As a result, the Board suspended Plaintiff's employment and cut off her access to Bank privileges, which constituted a change in employment status under § 3.2 of the Plan, *id.*

The Committee also found Plaintiff ineligible for benefits under Plan § 3.2 because she had not reached retirement age or become disabled while employed with the Bank. AR 15. On the issue of disability, the Committee found no evidence in the record suggesting that Plaintiff was not able to perform her work because of a health condition either at the time of her suspension in March 2010 or through her resignation in May 2010. AR 15. The Committee also found no evidence showing Plaintiff was not able to engage in any substantial gainful activity at the time of her separation. *Id.* The Committee observed that "Metaxas continuously came to work and performed her duties leading up to her resignation." *Id.* The Committee concluded that Plaintiff's separation was not based on a disability within the meaning of the SERP, but instead stemmed

11

1    from the federal investigation and indictment for defrauding Gateway.  *Id.*

2         The denial decision advised Plaintiff of her right to appeal the decision, to request

3    additional documents, and to submit evidence.  AR 16.

4    G.    Plaintiff's Appeal and the Appeal Committee's Denial

5         Plaintiff appealed the denial of her claim for SERP benefits on August 15, 2016.  AR 3.

6    She contended she was entitled to disability benefits due to "disabling symptoms resulting from

7    CIPN [chemotherapy-induced peripheral neuropathy]."  AR 4.  She argued she "was rendered

8    unable to work due to CIPN and her other symptoms as of March 23, 2010."  AR 5.  Plaintiff

9    submitted a letter by Dr. Steven Fugaro, a practitioner in internal medicine and primary care

10   physician, who reviewed Plaintiff's medical records and opined that Plaintiff's neuropathy made it

11   "unlikely she would be able to engage in any substantial, gainful activity" as of March 2010.  AR

12   155-59.

13        The Board appointed a Committee ("Appeal Committee") comprised of Directors Colin

14   Madden, Dale McKinney, and Vinod Thukral to consider the appeal.  AR 335.  The Committee

15   conducted a hearing, which included argument from Plaintiff's counsel.  AR 254, 256.  On May

16   22, 2017, the Committee denied Plaintiff's appeal in a sixteen-page written decision.  *See* Docket

17   No. 41-4 ("App. Dec.").

18        1.    Denial of Termination Benefits

19        First, the Committee found that Plaintiff was ineligible for *any* SERP benefits because she

20   was terminated for cause pursuant to Plan § 3.4 before Plaintiff tendered her resignation in May

21   2020.  *Id.* at 7-9.  The Committee pointed to Plaintiff's suspension without pay on March 23, 2010

22   suspected fraudulent and criminal conduct, and the OTS Report of Examination indicating that the

23   Board of Directors "unanimously voted to terminate Ms. Metaxas's employment" on April 29,

24   2010.  *Id.* at 11.  The Committee explained that Plaintiff did not dispute the authenticity of the

25   Board's minutes documenting her suspension on March 23, 2010, nor the OTS's report

26   documenting that Plaintiff was terminated by the Board on April 29, 2010.  *Id.*  The Committee

27   discounted the weight of evidence showing that Plaintiff continued to receive paychecks after

28   March 23, 2010 and the processing of Plaintiff's employee paperwork suggesting that she was still

United States District Court
Northern District of California

12

an employee up until her resignation in May 2010, explaining that such inconsistencies "may be attributed to error stemming from management instability and inadequate management resources as described by the OTS, or from willful disregard of Gateway employees who previously served under [Plaintiff]." *Id.* The Committee further rejected Plaintiff's argument that she was not terminated on April 29, 2010 because she did not receive notice of her termination, concluding that, "Mrs. Metaxas's termination is best determined from the entirety of the circumstances, and [does not] simple hinge on receipt of written notice." *Id.* at 11. It explained:

> The weight of the evidence show that Ms. Metaxas had been suspended, her physical and electronic access to the Bank had been revoked, and she was subsequently fired by unanimous decision of the Board on April 29, 2010 as reported by the OTS. Moreover, Ms. Metaxas's admitted breach of her covenant to perform her duties in "conformance with the highest standards of diligence, competence, skill, judgment, and efficiency in the Thrift industry" (Ex. A-9, CLMREC 00176) obviated any duty on the part of Gateway to provide her with formal written notice.

*Id.*

### 2. Denial of Disability Benefits

Second, the Committee determined, in the alternative, that Plaintiff was not entitled to disability benefits because she did not become disabled while employed by Gateway Bank. The Committee summarized Plaintiff's medical records, documenting her appointments and physician notes dating from September 2008 to June 2010. *Id.* at 4-7. The Committee observed that Plaintiff claimed disability as of the "very same date" as the Board suspended her employment based on her criminal conduct, noting that if true it "would be an astounding coincidence." *Id.* at 11. It also noted that Metaxas failed to produce any medical records for the six-month period prior to her March 2010 suspension. Specifically, she produced a medical report from September 2009, which did not indicate she had any symptoms of neuropathy at that time. *Id.*

The next medical report is dated April 6, 2010, two weeks *after* the Board suspended Plaintiff's employment. App. Dec. at 11. In that visit, Metaxas reported weakness, syncope, right groin pain, nausea, vomiting, and diarrhea. *Id.* As the Committee found, those are "symptoms that could be attributed to the stress caused by the OTS's investigation into her fraud and suspension from employment," not from neuropathy. *Id.* at 12-13.

United States District Court
Northern District of California

The Committee found that the various symptoms reported by Plaintiff in the subsequent medical records—such as abdominal pain and upset stomach, dizziness, syncopal episodes, and diarrhea—are indicative of stress, not neuropathy, and their appearance coincided with the OTS's investigation into Metaxas's illegal activities. *Id.* at 13. The medical records showed that other symptoms reported by Metaxas, such as carpal tunnel, back pain, and migraines, had improved or were stable. *Id.* The Committee observed that at no time does it appear that Plaintiff informed her healthcare providers that she had already been suspended from work, was under federal investigation for fraud, and thereafter had been terminated from employment. *Id.*

The Committee determined that Plaintiff's medical records did not support a finding that any impairment rendered her unable to work as of March 23, 2010 or through her purported resignation on May 26, 2010. *Id.* The Committee also weighed the expert reports submitted by Plaintiff and Gateway. *Id.* at 13-15. Plaintiff's expert opined that Plaintiff suffered from "severe peripheral neuropathy as of March 2010" due to her 2008 chemotherapy rendering her unable to work. *Id.* at 14. Dr. Ari David Baron, Gateway's expert, an oncologist with experience treating ovarian cancer, opined that Metaxas's medical records (which post-dated her purported resignation) support a diagnosis of chronic pain syndrome, unrelated to her chemotherapy, but that this condition did not render Plaintiff unable to engage in any substantial gainful activity. *Id.* at 14. The Committee found Dr. Baron's expert report more credible in light of his relevant experience in oncology, and given Plaintiff's expert's failure to provide any basis for tethering the disability date to March 23, 2010, especially in light of the absence of any medical records in the six months prior to that date. *Id.*

The Committee also decided to give little weight to the Social Security Administration's finding that Plaintiff was disabled as of March 23, 2010, noting that the medical records did not support a finding of disability at that time, and noting that the Committee was not bound by the SSA's definition of disability. *Id.* at 15-16. Specifically, the Committee determined that the medical records did not support of finding of disability under subsection (i) of the definition of disability under the SERP, which requires evidence of an impairment preventing Plaintiff from performing *any* gainful activity. *Id.* Again, the Committee observed that there is no evidence that

14

the SSA was aware of Plaintiff's suspension from work on March 23, 2010, and there is no

independent analysis in the SSA's decision explaining why the disability date was set to March

23. *Id.*

The Committee also found that Plaintiff was not receiving any income replacement

benefits under a Gateway benefit plan *at the time* of her employment separation. *Id.* at 16.

Plaintiff did not apply for disability benefits under any Gateway sponsored plan until months after

her separation from employment. *Id.* Therefore, she did not satisfy subsection (ii) of the Plan's

Disability definition, which requires that the Participant be "*receiving* income replacement

benefits" for at least three months under an employer-sponsored plan at the time of her separation.

*Id.*

H.   Extra-Record Evidence of Conflicts of Interest

Plaintiff submits extra-record evidence which it seeks to have the Court consider solely for

the purpose of assessing the Claim Committee and Appeals Committee's respective conflicts of

interests when determining the extent of the deference those decisions are afforded. *See* Docket

No. 86 ("Opp. to Mot. to Strike") at 4.[2]

Plaintiff submits Meeting Minutes from the Board of Directors Meeting on April 29, 2010.

*See* Docket No. 78 ("Feinberg Decl."), Exh. A ("April 29 Meeting Minutes"). Those minutes do

not expressly state that Plaintiff was terminated at that meeting. The minutes do state that a report

was made to "the Board on the status of discussions about Mr. Jeffrey Cheung in the position of

President/CEO whom was recommended to the Bank by OTS." *Id.* at 3. "The Board discussed

Mr. Cheung's qualifications and ratified the decision to offer Mr. Cheung the position of

President/CEO pending OTS approval." *Id.*; *see also id.* at 4 ("Mr. Chairman is very pleased with

all the work management is doing and the advances made with respect to the OTS guidance that

---

[2] "Although, for the most part, judicial review of benefits determinations is 'limited to the administrative record'—that is, the record upon which the plan administrator relied in making its benefits decision—the evaluation of a conflict of interest is not so limited." *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 930 (9th Cir. 2012) (citing *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009)). "Evidence outside the administrative record is 'properly considered' in determining the extent to which a conflict of interest affected an administrator's decision." *Id.* Accordingly, the Court permits introduction of this extra-record evidence for this limited purpose, and **DENIES** Defendants' motion to strike the evidentiary submissions. *See* Docket No. 83.

United States District Court
Northern District of California

1    Bank has received and that it is a very positive move for the Bank to offer Mr. Cheun the position

2    of President/CEO.").

3         Plaintiff also submits Meeting Minutes from the Board of Directors Meeting on May 27,

4    2010.  *Id.*, Exh. B ("May 27 Meeting Minutes").  The minutes reflect that "the Bank has received

5    Poppi Metaxas['s] resignation from the Board and Directors and of employment CEO and

6    President of the Bank on May 26, 2010."  *Id.* at 1.  "After an appropriate motion. . . it was

7    unanimously RESOLVED that the Board of Directors, having received the resignation of Poppi

8    Metaxas, accept it as submitted."  *Id.*  The May 27 Minutes also reflect that OTS approved the hire

9    of Jeff Cheung, and the Board unanimously resolved to appoint Jeff Cheung as the CEO and

10   President of the Bank.  *Id.* at 1-2.

11        The parties also jointly stipulated to facts regarding the share-holdings of various members

12   of the Claim Committee and Appeal Committee.  *See* Docket No. 79.  Significantly, as of

13   February 2016, James Keefe owned 24.91% of Gateway's common stock and 77.34% of

14   Gateway's preferred stock.  *Id.* ¶ 1.  As of May 22, 2017, Colin Madden, Dale McKinney and

15   Vinod Thukral, members of the Appeal Committee, each owned less than 1% of Gateway's

16   common stock and less than 4% of Gateway's preferred stock.  *Id*. ¶¶ 2-4.

17        Finally, Plaintiff Metaxas enters a declaration attaching various court filings, meeting

18   reports, financial reports, and audits of Gateway's finances, and her own analysis, calculations,

19   and conclusions regarding those reports.  *See* Docket No. 80 ("Metaxas Decl.").  The main point

20   Plaintiff makes in her declaration analyzing these underlying documents is that Plaintiff's SERP

21   plan was a deferred compensation plan, which, until a final a decision regarding Plaintiff's

22   qualification for the benefits was made, was a liability to the Bank.  Plaintiff purports to show that

23   Gateway was under pressure by OTS to reduce its liabilities and to increase its capital, and by

24   denying Plaintiff's claim for SERP benefits, Gateway acted in its own interests by increasing its

25   capital by $1.2 million.  *Id.* ¶ 7.

26   I.   Procedural Background

27        Plaintiff filed her Complaint on February 17, 2020, challenging the administrative denial

28   of her SERP benefits and asserting two causes of action under the Employee Retirement Income

United States District Court
Northern District of California

16

1   Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*: (1) a claim for benefits under ERISA Section

2   502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); and (2) a claim for equitable relief under ERISA Section

3   502(a)(3), 29 U.S.C. § 1132(a)(3).

4         With regards to Plaintiff's motion to supplement the record, the Court issued a ruling that

5   Plan at issue here confers discretionary authority to the Committee to construe the terms of the

6   plan and determine eligibility for benefits, and, thus, the Court reviews Plaintiff's appeal from

7   denial of benefits for abuse of discretion.  *See* Docket No. 58 at 3.  Accordingly, the Court

8   concluded that the proceedings would generally be limited to the administrative record, save and

9   except evidence pertaining to any conflict of interest which may affect the level of deference

10   accorded under abuse of discretion review.  *Id.* at 7.  Plaintiff thereafter moved to supplement the

11   administrative record with approximately 215 pages of additional information.  Docket No. 60-1.

12   The Court denied Plaintiff's motion.  Docket No. 70.

13         Now pending are the parties' respective cross-motions for summary judgment.  *See* Def.

14   MSJ; Pl. MSJ.

15           **II.**      **STANDARD OF REVIEW**

16         As the Court previously determined, because the Plan grants discretionary authority to

17   Gateway Bank's SERP Plan Administrator, the Court reviews the Administrator's benefits

18   decision for an abuse of that discretion.  *See* Docket No. 58; *Stephan v. Unum Life Ins. Co. of Am.*,

19   697 F.3d 917, 928 (9th Cir. 2012).  "Under this deferential standard, a plan administrator's

20   decision 'will not be disturbed if reasonable.'"  *Stephan*, 697 F.3d at 928 (citation omitted).  This

21   reasonableness standard requires deference to the administrator's benefits decision unless it is "(1)

22   illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in

23   the record."  *Id.* (citation omitted).

24         The test for abuse of discretion in a factual determination is whether the Court is "left with

25   a definite and firm conviction that a mistake has been committed," and the Court may not merely

26   substitute its view for that of the fact finder.  *Salomaa v. Honda Long Term Disability Plan*, 642

27   F.3d 666, 676 (9th Cir. 2011) (citation omitted).  Additionally, the Ninth Circuit does not permit

28   an ERISA plaintiff "to be 'sandbagged' by a rationale the plan administrator adduces only after

*United States District Court*
*Northern District of California*

the suit has commenced.  *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1104 (9th Cir. 2003) (citing *Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir.1998)).  Instead, in the ERISA context, the Ninth Circuit adheres to "the general rule that 'an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself,' not a subsequent rationale articulated by counsel." *Id.* (citation omitted).

Moreover, as discussed below, the extent of the deference which the Court affords to the Plan Administrator is tempered by the degree to which evidence evinces a likelihood that a conflict of interest affected the Administrator's decision-making.

## III.   <u>LEGAL STANDARD</u>

Traditional summary judgment principles have limited application in ERISA cases governed by the abuse of discretion standard.  *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009).  "Where," as here, "the abuse of discretion standard applies in an ERISA benefits denial case, a motion for summary judgment is," in most respects, "merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Id.* (internal quotation marks omitted).

Consideration of a conflict of interest is, however, an exception to this feature of ERISA cases as "the traditional rules of summary judgment" do apply. *Id.*  As to issues regarding the nature and impact of a conflict of interest, summary judgment may only be granted if after "viewing the evidence in the light most favorable to the non-moving party, there are [no] genuine issues of material fact." *Id.* (internal quotation marks omitted).

## IV.   <u>DISCUSSION</u>

A.   <u>Conflict of Interest</u>

Under ERISA, Gateway has a duty to process claims "solely in the interests of the [plan's] participants and beneficiaries." *Stephan*, 697 F.3d at 928 (citation omitted).  But because Gateway "both decides who gets benefits and pays for them. . . it [also] has a direct financial incentive to deny claims." *Id.* (citation omitted).  Gateway's dual role as plan administrator, authorized to determine the amount of benefits owed, and insurer, responsible for paying such benefits, creates a structural conflict of interest. *Id.* (citation omitted).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

"While not altering the standard of review itself, the existence of a conflict of interest is a factor to be considered in determining whether a plan administrator has abused its discretion." *Id.* The weight of this factor depends upon the likelihood that the conflict impacted the administrator's decision-making. *Id. See also Harlick v. Blue Shield of Cal.,* 686 F.3d 699, 707 (9th Cir. 2012) (noting that abuse-of-discretion review "is tempered by skepticism when the plan administrator has a conflict of interest in deciding whether to grant or deny benefits"). Where, for example, an insurer has "taken active steps to reduce potential bias and to promote accuracy," the conflict may be given minimal weight in reviewing the insurer's benefits decisions. *Id.* (citation omitted). In contrast, where "circumstances suggest a higher likelihood that [the conflict] affected the benefits decision," the conflict "should prove more important (perhaps of great importance)." *Id.* (citation omitted).

In *Harlick*, the Ninth Circuit applied "some skepticism" because "the record before [it] does not indicate whether [the insurance company] has a history of bias in claims administration or whether it has taken any steps to promote accurate decision-making." 686 F.3d at 707-08. In the instant case, the record before the Court does not indicate, nor does Plaintiff assert, a history of biased claims administration. Plaintiff presents evidence suggesting that at least one member (James Keefe) of the six total Committee members had a significant financial stake in the health of the Bank. Docket No. 79 ¶ 1. Furthermore, Plaintiff presents evidence suggesting that the Bank was under pressure from its federal regulator, OTS, to reduce its liabilities and increase its capital, and that, in denying Plaintiff's claim for SERP benefits, Gateway allegedly reduced its liabilities and increased its capital by $1.2 million. Metaxas Decl. ¶ 7. These submissions reveal, at most, a degree of self-interest in this particular adjudication. Additionally, the record reflects, at most, only limited steps taken by the Bank to promote accurate decision-making (*e.g.*, providing multiple opportunities for Plaintiff to request evidence and to supplement the record). Accordingly, like in *Harlick*, the Court also applies "some skepticism" in the case at bar. *See also Cromwell v. Kaiser Found. Health Plan*, No. 18-CV-06187-EMC, 2019 WL 4601527, at *5 (N.D. Cal. Sept. 23, 2019) (applying "some skepticism" to abuse of discretion review where no evidence of a history of biased decision-making).

B.      Termination Benefits

Plaintiff challenges the reasonableness of the Committee's denial of her claim for termination benefits under the SERP, arguing that the Committee abused its discretion in two ways: (1) the Initial Claim Committee lacked authority to change Ms. Metaxas's employment status to render her ineligible for termination benefits pursuant to Plan § 3.2, Pl. MSJ at 14-15; and (2) the Appeal Committee erred in determining Plaintiff was "terminated for cause," rather, she voluntarily resigned from her position, Pl. MSJ at 23-27.  Taking into account the extra-record evidence as to conflicts of interest and viewing the Committees' decisions with "some skepticism," the Court agrees with both of Plaintiff's arguments.

1.      Change in Employment Status

The Initial Claim Committee abused its discretion by overstepping the bounds of its authority and declaring that Plaintiff experienced a "change in employment status" which rendered her ineligible for termination benefits.  The Plan excludes a participant from receiving termination benefits under the SERP pursuant to a decision by the *Board* that the employee experienced a "Change in Employment Status:"

> If the *Board* determines that a Participant's employment performance is no longer at a level which deserves reward through participation in this Plan, but does not terminate the Participant's employment with Employer, participation herein and eligibility to receive benefits hereunder shall be limited. . . and shall only be payable if the Participant attains Retirement with Employer or becomes disabled while employed by Employer.

Plan § 3.2 (emphasis added).  There is, however, no evidence in the record that the *Board* ever made such a determination that Plaintiff's "employment performance is no longer at a level which deserves reward through participation in this Plan."  *Id.*  Instead, the Initial Claim Committee *asserted* that the Board's decision to suspend Plaintiff without pay and revoke her access privileges to the Bank constituted such a conclusion by the *Board*.  AR 15.  But the Initial Claim Committee's own written decision, through its absence of citation to any evidence of a Board decision or finding to this effect, confirms that the *Committee* made this determination on its own in 2016, six years after the fact:

The Board concluded that Metaxas's employment preference at

> Gateway was not at a level that deserves reward through the SERP. Specifically, Metaxas pled guilty to conspiracy to commit bank fraud against Gateway bank and caused immeasurable damage to the financial condition and reputation of Gateway.  As a result of Metaxas's actions, Gateway was required to respond to criminal subpoenas, an investigation by a federal agency and defend itself from any criminal liability.  Such actions do not deserve award through a SERP.

AR 15.  Indeed, while the Committee's reasoning suggests that the Board may have good reason to make a "change in employment status" finding against Plaintiff, the written decision does not indicate any evidence in the record that the Board *actually* made such a determination.

Defendants attempt to defend the Initial Claim Committee's conclusion that Plaintiff suffered a "change of employment" determination by arguing that that the "Plan delegates to the Committee the sole discretionary authority to interpret the SERP" and "[i]n the exercise of such discretion, the Committee reasonable found that the Board's vote to suspend Plaintiff's employment on March 23, 2010 and revoke all Bank privileges satisfied the Plan's requirement for a Board determination that Plaintiff's employment performance no longer deserved reward through the Plan."  Docket No. 84 ("Def. Opp.") at 21.

But even recognizing that the Committee had discretion to interpret the SERP provisions, such discretionary authority is not endless; the Committee is bound by the scope of the discretion afforded to it by the relevant SERP provision.  *See Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1104 (9th Cir. 2003) ("The instrument in this case does vest discretion, but the same instrument and the regulation that governed it set time boundaries within which that discretion must be exercised. . . Decisions made outside the boundaries of conferred discretion are not exercises of discretion, the substance of the decisions notwithstanding.").  Here, while the Committee may have discretion generally to find whether "the *Board* determines that a Participant's employment performance is no longer at a level which deserves reward through participation in this Plan," Plan § 3.2 (emphasis added), the Committee's finding is not based on any evidence:  the Committee failed to cite *any action by the Board* so indicating.  The Board's suspension of Ms. Metaxas from her job duties in 2010 was pending further investigation.  The Board made no final determination at that point and did not address whether her performance was "no longer at a level which deserves reward through participation in

this Plan," under § 3.2.

Defendants' briefing suggests that the Initial Claim Committee reasonably relied on the *Board's* decision to suspend Plaintiff without pay as evidence of the Board's implied determination of Plaintiff's "change in employment status." Def. Opp. at 21. But this is a new argument that is presented for the first time in this litigation.[3]  No such rationale appears in the decision of the Initial Claim Committee.  *Cf.* AR 15.  Indeed, the entirety of the reasoning provided by the Initial Claim Committee on this issue is quoted above.  No part of that reasoning references or is otherwise tethered to any decision, determination or action by the *Board*.[4]

Moreover, at the hearing, Defendants' counsel asserted that the Court should *infer* the Board made a determination that Plaintiff's employment status had changed, contending that evidence in the record shows that the Board suspended Plaintiff with an implicit plan to terminate her because OTS had made a demand of the Board that Plaintiff be terminated when they notified the Bank of her alleged misconduct.  However, this is yet another post hoc rationale that appears nowhere in the Initial Claim Committee's denial.  Moreover, none of the record citations which Defendants' counsel provided to the Court at the hearing provide evidence in support of the proposition that OTS demanded Gateway terminate Plaintiff at the time that it informed Gateway of her alleged misconduct.  *See* AR 227 (2016 memo from Initial Claim Committee member to Board); AR 353 (March 25, 2010 letter from Board to OTS stating that Board voted to "suspend Ms. Metaxas, without pay, effective immediately, *pending the conclusion of an independent internal investigation"*) (emphasis added); AR 376 (March 25, 2010 Board Meeting Minutes noting only that the Board discussed with OTS day-to-day management of the Bank during Plaintiff's suspension).

Thus, because the Court considers only the rationales given by the Initial Claim Committee and not new arguments raised by Defendants' counsel now, the Court finds the Initial Claim

_____

[3] Accordingly, the Court takes no position on the merits of this rationale, nor on a related rationale that the Board could have made a retroactive "change in employment status" determination under § 3.2 after Plaintiff later pleaded guilty to and thus was convicted of the charged crimes

[4] The Appeal Committee abandoned the "change in employment status" rationale as a basis to deny Plaintiff's claim for termination benefits.  *See* App. Dec.

United States District Court
Northern District of California

Committee's interpretation of SERP § 3.2 and conclusion that Plaintiff was ineligible for termination benefits because she experienced a change in employment status exceeded the scope of its discretionary authority and was not supported by the record, and, therefore, constituted an abuse of discretion.

   2. Termination for Cause

  The Appeal Committee abused its discretion in determining that Plaintiff was "terminated for cause," and was, therefore, ineligible for any SERP benefits.  Several errors in the Appeal Committee's process and reasoning combine to yield the Court's conclusion.

  First, the Appeal Committee articulated the rationale denying Plaintiff's claim for termination benefits because she was "terminated for cause" for the first time when reviewing Plaintiff's administrative *appeal*.  In so doing, the Appeal Committee failed to adhere to ERISA's implementing regulations ensuring Plaintiff a full and fair review.  *See* 29 C.F.R. § 2560.503-1(g)(i)-(iv).  Indeed, here, the Initial Claim Committee expressly and definitively stated, "Gateway did **not terminate** Metaxas, **she resigned** on May 26, 2010."  AR 15 (emphases added).  Accordingly, the Initial Claim Committee did *not* deny Plaintiff's claim for termination benefits on the basis that she was "terminated for cause" by Gateway.  Nonetheless, the Appeal Committee fully reversed the decision of the Initial Claim Committee and denied Plaintiff's claim for termination benefits *solely* on the basis that she was terminated for cause by Gateway.  *See* App. Dec. at 9 ("The Appeals Committee. . . finds that Ms. Metaxas is not entitled to receive termination benefits because she was fired for cause pursuant to Section 3.4 of the SERP prior to her alleged resignation.").  Indeed, the Appeals Committee abandoned the *only* rationale on which the Initial Claim Committee relied to deny Plaintiff's claim for termination benefits – that Plaintiff experienced a "change in employment status."

  An administrator must provide a plan participant with adequate notice of the reasons for denial, 29 U.S.C. § 1133(1), and must provide a "full and fair review" of the participant's claim, *id.* § 1133(2); *see also* 29 C.F.R. § 2560.503–1(g)(1), (h)(2).  "When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates

ERISA's procedures." *Abatie v. Alta Health & Life Ins. Co*., 458 F.3d 955, 974 (9th Cir. 2006). "[S]ection 1133 requires an administrator to provide review of the specific ground for an adverse benefits decision." *Id.* (citation omitted). "By requiring that an administrator notify a claimant of the reasons for the administrator's decisions, the statute suggests that the specific reasons provided must be reviewed at the administrative level." *Id.* "Moreover, a review of the reasons provided by the administrator allows for a full and fair review of the denial decision, also required under ERISA." *Id.* "Accordingly, an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA." *Id.* "This procedural violation must be weighed by the district court in deciding whether [the Administrator] abused its discretion." *Id.*

Here, the Appeal Committee did not just "tack[] on a new reason for denying benefits in a final decision," *id.*, it completely reversed the finding of the Initial Claim Committee (that Plaintiff was not terminated by Gateway, rather, she resigned), abandoned the *only* reason articulated by the Initial Claim Committee for denying Plaintiff's termination benefits (that Plaintiff experienced a "change in employment status"), and relied on this new reason (that Plaintiff was terminated for cause) as the *sole basis* for its denial of Plaintiff's claim for termination benefits. Here, then, the Appeal Committee's substantial procedural violations undermining Plaintiff's right to a full and fair review of her claim, "insulating the rationale form review," and "contravene[ing] the purpose of ERISA," weigh heavily against Defendants. *See Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) (ERISA's procedural protections call for "a meaningful dialogue between ERISA plan administrators and their beneficiaries. . . There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters.").

Second, the Appeal Committee's reasoning for reversing the Initial Claim Committee's determination that Plaintiff was not terminated, but, rather, that Plaintiff resigned, "lacks support in inferences that may be drawn from the facts in the record." *Stephan*, 697 F.3d at 928. To support its finding that Plaintiff was terminated for cause, the Appeal Committee relies on the OTS Report of Examination, AR 367, in which the OTS states, "At the board meeting held on April 29, 2010, the directors unanimously voted to terminate Ms. Metaxas' employment." *Id.*;

App. Dec. at 11.  Interestingly, the Appeal Committee elected to rely on this statement which appears in a document prepared by a third-party, OTS, rather than review the underlying document to which it refers – the minutes from Gateway's own April 29, 2010 Board Meeting, to which the company undoubtedly had access.  Defendant faults Plaintiff for failing to present the minutes of that meeting to the Appeal Committee in her submissions.  This argument rings hollow in light of the fact that Plaintiff lacked notice that the issue of whether she was "terminated" was a matter in dispute.  More importantly, Gateway obviously has access to its Board minutes, yet failed to make them part of the record.  As discussed, the Initial Claim Committee expressly stated in its written decision that "Gateway did not terminate Ms. Metaxas," AR 15, a finding the Appeal Committee fails to adequately address.

In any event, the Court has the April 29, 2010 Board Meeting minutes to review, as part of its extra-record review of evidence of Defendants' conflicts of interest.  Those minutes do *not* reflect that Ms. Metaxas's termination was raised, discussed or voted on during that meeting.  *See* April 29 Meeting Minutes.  At most, they indicate that the Board was inclined to go forward with hiring a new CEO.  *Id.* at 3.  But the prospective hire of a new CEO is clearly different than a unanimous vote terminating Plaintiff for cause.  Moreover, the Court also reviewed the May 27, 2010 Board Meeting Minutes which state, "After an appropriate motion. . . it was unanimously RESOLVED that the Board of Directors, having received the *resignation* of Poppi Metaxas, accept it as submitted."  *Id.* at 1 (emphasis added).  These meeting minutes tend to confirm Plaintiff's position and the view of the Initial Claim Committee that Plaintiff *resigned* from Gateway rather than being terminated.  At the very least, the May 27 Board Meeting Minutes raise a question which warrants explanation: if the Board had unanimously voted to terminate Plaintiff a month earlier, why did they unanimously agree to accept Plaintiff's letter of resignation?  These documents were both generated by the company, appear to be clearly relevant to the Committee's determination that Plaintiff was terminated, and they strongly contradict, or at least cast doubt on, the Appeal Committee's reliance on the OTS Report regarding a "termination vote" at the April 29 Board Meeting.  Thus, these submissions confirm the skepticism with which the Court's reviews the Appeal Committee's finding that Plaintiff was terminated for cause.

United States District Court
Northern District of California

1    Indeed, even without a lens of skepticism, the Appeal Committee's cursory reasoning and

2    hand-waving to dismiss pertinent record evidence evinces an abuse of discretion.  The Appeal

3    Committee acknowledged record evidence that Plaintiff's personnel record indicated that she

4    resigned effective May 26, 2010 and that she continued to be paid after she was suspended, AR

5    172, but summarily rejected the import of these facts by asserting that they could be "attributed to

6    error stemming from management instability and inadequate management resources as described

7    by the OTS, or from willful disregard of Gateway employees who previously served under her."

8    App. Dec. at 11.  But the Appeal Committee cited no evidence for its proposition that Gateway

9    employees were "willful[ly] disregard[ing]" a decision of such magnitude as the Board's

10   termination of the company's longtime CEO.  Similarly, nor does the Appeal Committee explain

11   how the OTS's structural analysis of the company's management resources would explain why

12   Plaintiff's personnel file erroneously indicated that she resigned, when, in fact, she had been

13   terminated nearly one month earlier.  Likewise, the Appeal Committee summarily concluded that

14   it had no obligation to every provide Plaintiff with any notice of her termination for cause.  App.

15   Dec. at 11.  But, to support this claim, the Appeal Committee cited Plaintiff's employment

16   contract, which *expressly* stated the opposite:

> Early Termination by Employer for Cause:  This Agreement and
> Employee's employment may be terminated for cause by the Board
> of Directors of Gateway Bank *upon written notice* to Employee and
> Employee shall not be entitled to receive compensation or other
> benefits for any period after termination for cause.  Employee
> understand and agrees that her/his satisfactory performance of this
> Agreement require conformance with the highest standards of
> diligence, competence, skill, judgment and efficiency in the Thrift
> industry.  Failure to conform to such standards is cause for
> termination of this Agreement by the Board.

23   AR 176 ¶ 11(b) (emphasis added).  The Appeal Committee referred to a clipped fragment of the

24   provision to justify its determination that Plaintiff's conduct warranted termination for cause, but

25   completely ignored the language requiring that a termination for cause be made "upon written

26   notice to Employee."[5]

27   _____

28   [5] Moreover, at the hearing, Plaintiff's counsel argued that Plaintiff's employment contract
     contained a provision that automatically converts an OTS-prompted suspension into a termination

26

United States District Court
Northern District of California

1    And beyond the Appeal Committee's selective review of the record, the Committee also

2  failed to consider or address evidence that supported Plaintiff's position that she resigned.  Most

3  notably, Plaintiff submitted evidence of a transcript of an October 22, 2013 Gateway Bank

4  Business Meeting between Tim Green, Gateway's CFO, Edward McGrath, Gateway's COO and

5  CLO, and Jeff Cheung, Gateway's President and CEO.  AR 259-261.  The transcript reflects Mr.

6  Green informing his associates:

> But that SERP, if we ever end up in litigation, Poppi's going to sue
> over the SERP.  And here's where Larry Wang [Chairman of
> Gateway's Board in 2010 at the time of Plaintiff's separation from
> the company] did something that is not smart.  Larry Wang and the
> board allowed her to resign and didn't terminate her.  It says
> specifically in the SERP document that termination for cause will
> deny you access to the policy.  They allowed her to resign.

11  AR 261.  The Appeal Committee, however, does not reference, let alone address this evidence.

12    In sum, the Appeal Committee's justifications for why there is no written record of a

13  decision as momentous as the termination of the company's CEO of 12 years while internal and

14  federal investigations were pending against her, defy logic and plausibility, and also finds no

15  support in the record.  *Stephan*, 697 F.3d at 928.  This conclusion is strengthened when viewing

16  the Appeal Committee's decision with the appropriate skepticism in light of the conflict-of-

17  interest evidence, and when considering the Appeal Committee's failure to adhere to ERISA's

18  procedural requirements by reversing the express finding of the Initial Claim Committee that

19  Plaintiff resigned, and articulating, as the sole basis and for the first time on appeal, that Plaintiff

20  was not eligible for termination benefits because she was terminated for cause.  The record

21  provides ample support for the proposition that Gateway's Board *could* have terminated Plaintiff

22  for cause, but the Appeal Committee abused its discretion in its determination from the record that

23  _____

24  for cause, which counsel asserted the Appeal Claim Committee relied upon to support its
conclusion that Plaintiff was terminated with cause.  Counsel is wrong on both grounds.  Counsel

25  cited the employment contract at § 11(e)(v), but this provision says nothing about an automatic
conversion of a suspension into a termination for cause.  *See* AR 178.  This provision states that,

26  "A termination of Employee's employment pursuant to this Section 11.e. shall be deemed a
termination for cause pursuant to Section 11.b. of this agreement."  AR 178.  The plain language

27  of the provision which addresses what constitutes "cause" requires an independent termination
decision to be made; there is no indication that any "automatic" termination that is triggered.

28  Even if the provision stated what counsel represented it did (it does not), the Appeal Committee
does not cite this provision, nor even this page, in its denial decision.  *Cf.* App. Dec. at 10-11.

United States District Court
Northern District of California

1  the Board *actually did* terminate Plaintiff for cause before she resigned.  Thus, the Appeal

2  Committee abused its discretion in denying Plaintiff's claim for termination benefits.

3         3.      Conclusion re Termination Benefits

4         Accordingly, the Court concludes that Defendants abused their discretion in denying

5  Plaintiff's claim for termination benefits.  As explained, the Committee abused its discretion in

6  interpreting and applying Plan §§ 3.2 and 3.4, and in concluding that Plaintiff experienced a

7  change in employment status or was terminated with cause.  Additionally, the Committee erred

8  procedurally by issuing its "termination for cause" rationale for the first time on appeal, denying

9  Plaintiff a full and fair hearing.  Where the Plan administrator has abused its discretion in

10  interpreting a provision of the plan or erred procedurally, the appropriate remedy is to remand to

11  the administrator for reconsideration.  *See Saffle v. Sierra Pac. Power Co. Bargaining Unit Long*

12  *Term Disability Income Plan*, 85 F.3d 455, 460-61 (9th Cir. 1996) ("We now make it explicit, that

13  remand for reevaluation of the merits of a claim is the correct course to follow when an ERISA

14  plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong

15  standard to a benefits determination."); *Hoffman v. Screen Actors Guild-Producers Pension Plan*,

16  571 F. App'x 588, 590–91 (9th Cir. 2014) ("Here, the Plan's denial of a full and fair review of

17  Hoffman's claim prevented full development of the administrative record. . . Thus, the only way

18  that the district court can assess the 'effect of th[e] failure' here and 'recreate what the

19  administrative record would have been had the procedure been correct' is to remand to the Plan");

20  *Henry v. Home Ins. Co.*, 907 F. Supp. 1392, 1398–99 (C.D. Cal. 1995) ("Home's rejection of

21  Henry's claim was an abuse of discretion.  It is not the court's function *ab initio* to apply the

22  correct standard to Henry's claim.  That function, under the Plan, is reserved to the Plan

23  administrator.  Accordingly, this matter must be remanded to the Plan administrator for a re-

24  determination of Henry's claim, in a manner consistent with this opinion."); *King v. Hartford Life*

25  *& Acc. Ins. Co.*, 414 F.3d 994, 1005 (8th Cir. 2005) ("We think the posture of this case is

26  comparable to those in which the administrator of an ERISA-regulated plan denies a claim for

27  benefits based on an unreasonable interpretation of terms in the plan. . . Under these

28  circumstances, we believe the proper remedy is to return the case to the administrator for

1   reevaluation of the claim").

2       Accordingly, the Court **GRANTS** Plaintiff's motion for summary judgment, **DENIES**

3   Defendants' motion for summary judgment as to Plaintiff's claim for termination benefits, and

4   **REMANDS** to Defendants to reconsider Plaintiff's claim for termination benefits in a manner

5   consistent with this opinion.

6   C.      Disability Benefits

7       Plaintiff challenges the reasonableness of the Committee's denial of her claim for

8   disability benefits under the SERP, arguing that the Committee abused its discretion in three ways:

9   (1) the Committee misconstrued the Plan's definition of "disability;" (2) the Committee

10  improperly weighed the medical evidence, including unjustifiably discounting the SSA's disability

11  determination as of March 23, 2010; and (3) the Committee denied her a full and fair hearing by

12  departing from ERISA's procedural regulations requiring the Committee to inform her at the time

13  it initially denied her claim what specific evidence she needed to submit on appeal to perfect her

14  claim.  Plaintiff's arguments are unpersuasive.

15          1.      Definition of Disability

16      Recall that the Plan defines a "Disability" as

17          (i)     a medically determinable physical or mental impairment
                    which can be expected to result in death or can be expected
18                  to last for a continuous period of not less than twelve (12)
                    months, as a result of which the Participant is unable to
19                  engage in any substantial gainful activity, or

20          (ii)    an above-described impairment from which the Participant is
                    receiving income replacement benefits for at least three (3)
21                  months under an accident and health plan covering the
                    employees of Employer.
22

23  Plan § 2.9.  Plaintiff challenges the Appeal Committee's interpretation of § 2.9(ii), arguing that the

24  provision "contains no timing requirement for the receipt of other 'income replacement benefits,'"

25  yet the Appeal Committee impermissibly "invented a temporal requirement in section 2.9 of the

26  Plan which does not exist" by erroneously citing to "Section 3.2 of the Plan for the proposition

27  that benefits are payable only if an employee becomes disabled while employed by the Bank."  Pl.

28  MSJ at 22.  Plaintiff's observation is correct, in part – but the missing portion of Plaintiff's

29

1  argument renders it, ultimately, unpersuasive.

2      The Appeal Committee did make reference to and incorporate a portion of Section 3.2,

3  which defines "Change in Employment Status," when initially construing the definition of

4  disability under § 2.9(ii):

> Disability benefits are payable under SERP Section 3.2 only if an
> employee "becomes disabled *while* Employed by Employer." (Ex.
> A-2, CLMREC 00025) (italics added). Section 2.9(ii) defines
> "Disability" as an impairment for which a participant *"is receiving*
> income replacement benefits for a period of not less than three (3)
> months under an accident and health plan covering employees of
> Employer." *(Id.,* CLMREC 00024) (italics added). Thus, a
> participant must show that he or she "is receiving income
> replacement benefits" *while* an employee of Gateway Bank to be
> deemed disabled under Section 2.9(ii).  The Appeals Committee
> interprets this section to cover situations where, for example, an
> employee is on extended sick leave (but has not resigned or been
> terminated) and is receiving income replacement benefits. In such a
> situation, there is a high probability that such participant will not be
> able to return to work.

App. Dec. at 16 (emphasis in the original).  Plaintiff is correct that the Appeal Committee's

reference and incorporation of Section 3.2 was unwarranted, as the Appeal Committee did *not*

determine that Plaintiff experienced a "Change in Employment Status" under § 3.2.  In fact, the

Appeal Committee abandoned the Initial Claim Committee's reliance on § 3.2 altogether.

Therefore, § 3.2 did not apply to the Appeal Committee's analysis and its language should not

have controlled the Committee's interpretation of § 2.9(ii).

      However, the Committee's misplaced reference to § 3.2 was of no consequence to its

interpretation of § 2.9(ii), because the Appeal Committee also provided independent analysis

*solely* based on the text of § 2.9(ii) and reached the same conclusion:

> At the hearing, Ms. Metaxas's counsel argued that disability benefits
> would be "illusory" if the Appeals Committee "insisted upon a
> literal interpretation" of Section 2.9(ii).  The Appeals Committee
> disagrees.  Gateway's interpretation not only supports the above-
> described policy considerations behind Section 2.9(ii), but follows
> its common-sense meaning "in an ordinary and popular sense as
> would a person of average intelligence and experience." (Ex. A at p.
> 7).  On the other hand, under Ms. Metaxas 's interpretation a
> participant could be eligible for disability benefits any time *after* her
> employment with Gateway has terminated, without any apparent
> limitation.  To qualify for disability benefits under these
> circumstances, Section 2.9(ii) would need to use the future tense,
> *i.e.,* "is receiving *or* will receive income replacement benefits for a

30

period of not less than three (3) months .... "

*Id* (emphasis in the original). The Appeal Committee conducted a plain language interpretation solely of the text of § 2.9(ii) and concluded that the use of the present tense in the provision conditions qualification for disability benefits on a showing that the applicant was receiving income-replacement benefits from a health plan covering company employees while employed. This analysis provided an independent basis for the Committee's interpretation of § 2.9(ii). Plaintiff does not challenge this independent analysis. Such analysis is also consistent with § 2.9(ii) requirement that a participant receive at least three months of income replacement benefits under a "plan covering the employees of Employer," which implies that the participant is *employed* (a necessary predicate for the participant to be an *employee*). Thus, the Appeal Committee's interpretation and reasoning that the provision's use of the present tense implied that that the employee must be receiving the relevant benefits while employed, supported by a plausible policy consideration, is reasonable.

Moreover, when applying its construction of § 2.9(ii) to Plaintiff's claim, the Appeal Committee accurately determined from evidence in the record that Plaintiff did not begin receiving income replacement disability benefits from Gateway's health policy under UNUM until "late June 2010" which was *after* Plaintiff tendered her resignation on May 26, 2010. App. Dec. at 17. Even assuming receipt of SSA or California's state disability benefits qualified under § 2.9(ii), the record indicates and Plaintiff concedes that she received SSA and state disability benefits as of March 23 and 24, 2010. AR 207-214, 218. Plaintiff, therefore, received those benefits for fewer than three months prior to her resignation. Thus, the Appeal Committee's determination that Plaintiff did not qualify for disability benefits pursuant to § 2.9(ii) was reasonable.

2.    Weighing the Medical Evidence

Next, Plaintiff challenges the Committee's weighing of the medical evidence as an abuse of discretion. Plaintiff argues that the Committee improperly discounted medical evidence, including the SSA's finding of disability, which indicated that she satisfied the first prong of the SERP's definition of disability. Plan § 2.9(i) ("[A] medically determinable physical or mental

impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, as a result of which the Participant is unable to engage in any substantial gainful activity").  In support of this contention, Plaintiff focuses on the following evidence and arguments which she contends the Committee illogically overlooked or dismissed:

- The Plan's definition of disability under § 2.9(i) "comes from section 216(l) and 223(d) of the Social Security Act's definition of disability as applied to claims for Social Security Disability Insurance benefits," and, therefore, the SSA's determination that Plaintiff was disabled as of March 23, 2010 necessarily suffices under the Plan.  *See* Pl. MSJ at 16-17.

- The Appeal Committee improperly discounted the expert report of Plaintiff's expert, Dr. Fugaro, including the opinion that Plaintiff suffered from a combination of chronic issues that "caused significant impairment of her ability to work as of March 23, 2010."  Pl. MSJ at 17 (citing AR 159).  The Appeal Committee illogically elevated the opinion of its own expert, Dr. Baron, who improperly focused on the narrow question of whether Plaintiff's disability was the result of neuropathy – not on whether Plaintiffs conditions, as a whole, rendered her disabled.  *Id.*; *id.* at 20 ("Thus, while Dr. Baron's opinion as to whether Ms. Metaxas suffered from CPIN symptoms as a result of the chemo medication she was taking may be insightful on that specific issue, it sheds very little light on whether she was disabled under the terms of the Plan.").

- The Appeal Committee improperly determined that there were "no record[s] of any neuropathy, migraine, back pain or any other debilitating symptoms for the six-month period prior to her suspension," App. Dec. at 12, because although there were no contemporaneous medical records regarding those symptoms in the six-months prior to her suspension, the medical records that were dated after April 2010 indicated Plaintiff's self-reports of experiencing those symptoms in the six preceding months.  Pl. MSJ at 20.

Plaintiff's arguments, however, do not demonstrate that the Committee abused its discretion in weighing the medical evidence.

First, the Committee was not bound by the SSA implementing regulations when determining whether Plaintiff was disabled pursuant to Plan § 2.9(i).  Plaintiff provides no support for her assertion that the Plan incorporates the same standard as the Social Security Act for the purposes of determining whether an applicant is disabled.  In the absence of any language in the Plan tethering its definition of disability to the Social Security Act or its implementing regulations,

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the Committee retained its discretion to reasonably interpret the definition.  *See Black & Decker*

2   *Disability Plan v. Nord*, 538 U.S. 822, 833 (2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*,

3   489 U.S. 101, 115 (1989)) ("In determining entitlement to Social Security benefits, the adjudicator

4   measures the claimant's condition against a uniform set of federal criteria. 'The validity of a claim

5   to benefits under an ERISA plan,' on the other hand, 'is likely to turn,' in large part, 'on the

6   interpretation of terms in the plan at issue.'").  Accordingly, the Committee was not bound by the

7   SSA's disability determination, and the SSA's determination did not automatically entitle Plaintiff

8   to benefits under the Plan.

9          That said, in choosing to discount the SSA's determination of disability, the Committee

10   was still obligated to provide a reasonable rationale.  It did so.  The Appeal Committee explained

11   that the SSA gave "no explanation as to why th[e] date [of March 23, 2010] was chosen [as the

12   disability onset date], or whether the Attorney Advisor who made the decision was aware of Ms.

13   Metaxas's suspension from employment as of that date."  App. Dec. at 15.  "Further," the Appeal

14   Committee explained "that the same Attorney Advisor disregarded the findings of the State's own

15   medical consultative examiner.  The examiner opined that Ms. Metaxas: could stand and walk for

16   2-4 hours in an 8-hour workday and lift and carry 10 and 20 pounds. . . [Ms. Metaxas] could

17   perform light exertional level work, and she had normal neurological exam in January 2011 by the

18   treating physician.  The adjustment disorder identified by the consultative examiner was not sever

19   as that term was defined in the regulations." *Id.* at 15-16.  The Appeal Committee concluded that

20   the SSA's determination of disability was not entitled to great weight because of these holes in its

21   reasoning.

22          The Court, therefore, concludes that the Committee's analysis and discount of the SSA's

23   report was not illogical, implausible or lacked support in inferences drawn from the record.

24   Indeed, other information in the record as well as within the SSA's own report support the Appeal

25   Committee's discount of the SSA disability determination and support the Committee's

26   interpretation that Plaintiff was not disabled under § 2.9(i) of the SERP because she was not

27   precluded from "engag[ing] in any substantial gainful activity."  For example, the SSA found that

28   Plaintiff had "residual functional capacity to perform sedentary work," the SSA recommended

"continuing review" because "medical improvement is expected with appropriate treatment," and the SSA's disability determination was based, in part, on its finding that no jobs "exist in significant numbers in the national economy that [Plaintiff] can perform" – a narrow standard for assessing whether Plaintiff can engage in *any* gainful activity which was not binding on the Committee.  *See* AR 207-14.

Second, Plaintiff's argument that the Committee improperly elevated Dr. Baron's expert report (which diagnosed Ms. Metaxas with chronic pain syndrome unrelated to her chemotherapy and which did not render her disabled), based on its narrow assessment of the disabling impact of neuropathy, over Dr. Fugaro's report misrepresents the substance of Dr. Fugaro's report and the nature of the comparison that the Committee was called to make between the reports.  Dr. Fugaro's analysis focused on the impact that neuropathy had on Plaintiff.  Indeed, Dr. Fugaro emphasized his opinion that, "the medical records provide indisputable evidence that Ms. Metaxas was suffering from severe peripheral neuropathy as of March 2010."  AR 158.  He reiterated, "The medical records show that Ms. Metaxas had significant and severe peripheral neuropathy as of March 2010. . . This would make it very difficult to work on a computer."  *Id.*  And, again, later, he wrote, "In my opinion, the severe peripheral neuropathy that Ms. Metaxas had in March of 2010 clearly met the definition of disability as defined earlier in this report.  The impairment of her hands as well as her gait, combined with the pain of neuropathy, made it unlikely she would be able to engage in any substantial, gainful activity."  *Id.* at 159.  Although Dr. Fugaro then added, "A further complication is that Ms. Metaxas had additional medical problems," Dr. Fugaro's summary reference to those additional issues ("chronic migraines, her cervical and lumbar and spinal stenosis with arm and leg pain, and her fibromyalgia were all documented in the medical records") does not change the fact that main thrust of Dr. Fugaro's opinion was about his view that Plaintiff was disabled as a result of neuropathy.  *Id.*; *see also id.* ("In conclusion, my opinion is that Ms. Metaxas clearly met the definition of disability as noted above, as of March 23, 2010, primarily because of her toxic peripheral neuropathy combined with her migraine headaches, spinal stenosis, and fibromyalgia.").

In light of this express and repeated focus of Dr. Fugaro's report on Plaintiff's neuropathy,

United States District Court
Northern District of California

the Court does not find illogical the Committee's decision to assess the credibility and weight to give the opinion by comparing it to Dr. Baron's report addressing the same topic.  The Appeal Committee reasonably determined that it would give Dr. Baron's report and analysis regarding chemotherapy induced peripheral neuropathy more weight than Dr. Fugaro's because Dr. Baron is an oncologist who "treated hundreds of women with ovarian cancer and over a thousand patients with [the relevant] chemotherapy protocol," whereas Dr. Fugaro practices "general internal medicine and as a primary care physician" and "does not state whether he has ever treated any women with ovarian cancer, whether he has any experience diagnosing or treating patients with CIPN, or whether he has any experience with chemotherapy."  App. Dec. at 14.  Indeed, as Plaintiff concedes, given Dr. Baron's extensive background in oncology, his opinion about the impact of neuropathy qualifies as "insightful." Pl. MSJ at 20.  The Committee, then, did not abuse its discretion on giving greater weight to Dr. Baron's insights on this issue than Dr. Fugaro's, and, accordingly, finding the thrust of Dr. Fugaro's opinion – which focused on this very issue – to be entitled to little weight.

Moreover, to the extent Plaintiff contends that the Committee failed to properly weigh Dr. Fugaro's analysis regarding non-neuropathy symptoms Plaintiff experienced, this argument is incorrect.  As an initial matter, Dr. Fugaro did not analyze Plaintiff's other symptoms – he only summarily referenced the fact that they were reported in other underlying medical records (all of which the Committee acknowledged, summarized, and considered in its decision).  *See* AR 159. After referencing those other conditions, Dr. Fugaro's analysis consisted of nothing more than an unreasoned and conclusory assertion: "These were chronic issues.  I have no doubt that in combination with her peripheral neuropathy, they created further significant impairment of her ability work as of March 23, 2010."  *Id.*  But despite Dr. Fugaro's deficient analysis of these other symptoms, the Appeal Committee still provided a comparison by looking to Dr. Baron's analysis of those issues, quoting five paragraphs of Dr. Baron's assessment of those issues.  *See* App. Dec. 15.  That Plaintiff disagrees with the Appeal Committee's analysis on the merits does not indicate that the Appeal Committee's reasoning was illogical, implausible or that it abused its discretion in analyzing and weighing the expert reports of Dr. Fugaro and Dr. Baron.

United States District Court
Northern District of California

1   Finally, Plaintiff's argument that the Appeal Committee abused its discretion by over-

2   relying on the fact that there were no contemporaneous medical records of any medical problems

3   experienced by Plaintiff in the six months before she was suspended on March 23, 2010 is not

4   persuasive.  Plaintiff does not dispute the fact that there are no medical records regarding any

5   disabling symptoms Plaintiff claimed in the period between September 18, 2009 and April 6, 2010

6   – two weeks *after* she was suspended from Gateway Bank.  App. Dec. at 12; *see also id.* ("Thus,

7   there is no record of any neuropathy, migraine, back pain, or any other debilitating symptom" in

8   that period of time).  Moreover, Plaintiff does not dispute nor is there any evidence calling into

9   question the Committee's finding that Plaintiff "continuously came to work until March 23, 2010,

10  the date that the Board of Directors suspended her and revoked her physical and electronic access

11  to Gateway Bank."  App. Dec. at 12.  Further, Plaintiff provides no answer to the Appeal

12  Committee's observation that, despite these facts, it would be an "astounding coincidence" that

13  her disability began "on the very same date" that she was suspended without pay.  *Id.*  Indeed,

14  Plaintiff points to nothing in the evidentiary record to provide a basis for her claim that her

15  *disability* began on that date.  And, Plaintiff also offer no response or evidence to the Appeal

16  Committee's observation that "as of May 26, 2010 – the date of her purported evidence – there is

17  no evidence that Ms. Metaxas had been certified by a health care provider or an insurance

18  company that she had a disability that left her no longer able to work."  *Id.*

19  Rather than substantively respond to these points made by the Appeal Committee, Plaintiff

20  argues that the Committee abused its discretion because the Committee should have overlooked

21  these holes and unanswered question in the evidentiary record, and, instead, should have deferred

22  to the medical records that were created *after* Plaintiff's suspension from work, in which Plaintiff

23  self-reported that the experienced debilitating symptoms in the months prior to her suspension.

24  The Court is unpersuaded.  The Appeal Committee's analysis that there is no evidence that

25  Plaintiff suffered a debilitating disability in the six months before her suspension is supported by

26  the record, and the implications which the Committee observed are reasonable.  Moreover, the

27  Appeal Committee did not end its analysis there.  The Committee reviewed Plaintiff's medical

28  records between September 8, 2008 and June 6, 2010, App. Dec. at 4-8, to determine whether she

36

1    was disabled within the meaning of the Plan before she resigned on May 26, 2010.  The

2    Committee analyzed those records and took note of the medical findings and Plaintiff's self-

3    reports included in those records.  *See* App. Dec. at 12-13.  The Committee reasonably observed

4    that while those records indicated Plaintiff's self-reports that she had been unable to work for

5    weeks or months (based on the date of the appointment), none of the records indicated that

6    Plaintiff ever disclosed to her medical providers that she had been suspended from her

7    employment as of March 23, 2010.  *Id.*

8         Thus, when evaluating the medical evidence, even apply some skepticism to its analysis,

9    the Committee reasonably included the evidence of Plaintiff's lack of disclosure to her medical

10   providers of her suspension and the pending internal and federal criminal investigation into her

11   conduct in its analysis.  Moreover, the Committee reasonably weighed contemporaneous medical

12   reports against Plaintiff's post-facto self-reports to reveal inconsistencies in Plaintiff's self-

13   reported symptoms.  *See, e.g.,* App. Dec. at 13 ("Ms. Metaxas claims for the first time that she has

14   experienced unsteadiness and has fallen ever since her chemotherapy for over a year, but none of

15   the medical records she provided corroborates this.  In fact, they show the opposite.  The record

16   from October 9, 2008 – during her chemotherapy – specifically states 'no tripping reported'. . .

17   There is no mention of syncope in any of her medical records until April 6, 2010").  Thus, the

18   Committee reasonably weighed the medical evidence in analyzing whether Plaintiff's alleged

19   disability rendered her unable to engage in any substantial gainful activity for a period of 12

20   months, as required under Plan § 2.9(i).

21        Taken together, the Court concludes that none of Plaintiff's arguments demonstrate that the

22   Committee abused its discretion in weighing the medical evidence and determining that Plaintiff

23   did not qualify for disability benefits pursuant to Plan § 2.9(i).

24        3.    Full and Fair Hearing

25        Plaintiff argues that she not provided with a full and fair hearing on her claim for disability

26   benefits because the Initial Claim Committee did not provide her with a denial decision that

27   articulated "a description of any information necessary for the claimant to perfect the claim and an

28   explanation of why such material or information is necessary," as required by the Plan and

United States District Court
Northern District of California

37

1    ERISA's implementing regulations. *See* Plan § 8.1; 29 C.F.R. § 2560.503-1(g). The Court

2    disagrees.

3              Importantly, it is undisputed that Plaintiff did not submit any medical evidence in support

4    of her initial claim. *See* AR 14. Instead, Plaintiff "wrote an e-mail to Gateway requesting a

5    calculation of her benefits under the SERP and that Gateway start paying her benefits on her

6    retirement date when she turned sixty." *Id.* The record does not indicate that Plaintiff ever

7    advanced an argument in her initial claim that she was entitled to disability benefits. Nonetheless,

8    the Initial Claim Committee referred to her resignation letter in which she stated she resigned due

9    to disability, and explained that Plaintiff did not qualify for disability benefits because she had not

10   presented any evidence "to indicate that [she] was unable to engage in any substantial gainful

11   activity," there was "no evidence that [Plaintiff's] work performance was suffering because of any

12   disability when she resigned," and because "[Plaintiff] continuously came to work and performed

13   her duties leading up to her resignation." AR 15.

14             Thus, despite the fact that Plaintiff neither articulated a claim for disability benefits in the

15   first instance, nor presented *any* evidence of medical disability, the Initial Claim Committee

16   provided reasoning about what evidence was missing and what information would need to be

17   explained in order for Plaintiff to succeed on a claim for a disability benefits. Moreover,

18   Plaintiff's subsequent appeal and the voluminous information she submitted in support show that

19   she understood from the denial decision the additional information she should submit for

20   consideration on appeal. AR 3-249. Therefore, the Court rejects Plaintiff's procedural argument.[6]

21             4.      <u>Conclusion re Disability Benefits</u>

22             Accordingly, the Court concludes that Defendants acted reasonably in denying Plaintiff's

23   claim for termination benefits. Thus, the Court **GRANTS** Defendants' motion for summary

24   judgment, and **DENIES** Plaintiff's motion for summary as to the denial of Plaintiff's claim for

25

26   ────────────────

27   [6] In any event, the remedy for any such procedural violations would be to permit Plaintiff to file a
     lawsuit without having to exhaust administrative remedies. *See* 29 C.F.R. § 2560.503-1(l). Thus,
     even if there were a procedural violation, it would not impact the reasonableness of the
28   Committee's decision. *See Viad Corp. Supplemental Pension Plan v. Nasi*, 586 F. App'x 451, 452
     (9th Cir. 2014).

United States District Court
Northern District of California

1    disability benefits.

2    D.    <u>Equitable Relief</u>

3          In Plaintiff's complaint, her second cause of action seeks equitable relief under 29 U.S.C. §

4    1132(a)(3), and specifically alleges that, "In their capacity as ERISA fiduciaries, defendants owed

5    plaintiff certain fiduciary duties," which they allegedly violated.  Docket No. 1 ("Compl.") ¶¶ 21-

6    22.  Plaintiff's claim fails as a matter of law.

7          There is no dispute between the parties that the SERP is a "top-hat plan."  Such a plan is

8    "unfunded and maintained by an employer primarily for the purpose of providing deferred

9    compensation for a select group of management or highly compensated employees," and is exempt

10   from ERISA's fiduciary duty obligations.  *See* 29 U.S.C. § 1101(a)(1); *Duggan v. Hobbs*, 99 F.3d

11   307, 310 (9th Cir. 1996) ("ERISA exempts top-hat plans from the fiduciary, funding, participation

12   and vesting requirements applicable to other employee benefit plans.") (citing 29 U.S.C. §

13   1101(a)(1)); *Koeplin v. Klotz*, 265 F. Supp. 3d 1039, 1044 (N.D. Cal. 2017) ("ERISA explicitly

14   states that top hat plans are not subject to the ERISA's fiduciary requirements.  Further, it is well

15   established in the caselaw that there is no cause of action for breach of fiduciary duty involving a

16   top hat plan.").  Accordingly, Plaintiff's claim, which is based solely on alleged violations of

17   Defendants "in their capacity as ERISA fiduciaries," Compl. ¶ 21, has no application here where

18   ERISA's fiduciary duties do not attach to the SERP.  Plaintiff's claim fails.

19         Plaintiff attempts to sidestep this obstacle by arguing that Plaintiff's claim is actually based

20   on an alleged breach of contractual duty of good faith and fair dealing, rather than on an ERISA-

21   mandated fiduciary duty.  Pl. MSJ at 34.  This argument directly contradicts the claim articulated

22   on the complaint which expressly limits the claim to Defendants violation of their fiduciary duties

23   "in their capacity as ERISA fiduciaries."  The complaint does not allege any facts that would

24   afford Defendants with fair notice of Plaintiff's current theory of liability.  *See Pickern v. Pier 1*

25   *Imps. (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (holding that the district court did not err

26   in finding that plaintiff failed to provide defendant with adequate notice of new theories raised

27   during summary judgment where plaintiff's complaint alleged different facts).  Moreover, Plaintiff

28   request for leave to amend her claim is untimely and Plaintiff has not shown cause to be granted

United States District Court
Northern District of California

leave at this juncture.  The parties stipulated to a deadline to amend the pleadings which has long expired.  The Court declines Plaintiff's request for leave to amend, and **GRANTS** summary judgment to Defendants on Plaintiff's request for equitable relief.

**V.**     **CONCLUSION**

For the foregoing reasons, the Court:

- **GRANTS** Plaintiff's motion for summary judgment, and **DENIES** Defendants' motion for summary judgment as to the denial of Plaintiff's claim for termination benefits;

- **GRANTS** Defendants' motion for summary judgment, and **DENIES** Plaintiff's motion for summary as to the denial of Plaintiff's claim for disability benefits;

- **DENIES** Defendants' motion to strike extra-record evidence; and

- **REMANDS** this case to Defendants for reconsideration of Plaintiff's eligibility for termination benefits, consistent with this decision.

This order disposes of Docket Nos. 74, 77, and 83.

The Clerk of the Court is directed to enter judgment and close this case.

**IT IS SO ORDERED**.

Dated: August 26, 2022

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

40